## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN THE MATTER OF | Bankruptcy No.: 14-01948 |
| RAMALLO BROS. PRINTING, INC. | Chapter: 11 |
| Debtor | |

## MOTION FOR ENTRY OF ORDER PROHIBITING THE USE OF ISLAND HOLDINGS' CASH COLLATERAL AND FOR ADEQUATE PROTECTION

**TO THE HONORABLE COURT:**

**COMES NOW** LSREF2 Island Holdings, Ltd., Inc. ("Island Holdings"), as secured creditor and successor in interest of Firstbank Puerto Rico[1] ("Firstbank"), by and through its undersigned counsel, and respectfully submits this Motion for Entry of Order Prohibiting the Use of Cash Collateral, and for Adequate Protection (the "Motion").

### Preliminary Statement

For the reasons stated below, Island Holdings requests that this Honorable Court prohibit Debtor's use of its cash collateral ("Cash Collateral"). As part of a series of credit agreements described in detail below, Ramallo Bros. Printing, Inc. ("Ramallo" or the "Debtor") entered into a Security Agreement in which they pledged, assigned, set over and transferred as collateral to secure all of their obligations with Firstbank various bank accounts, inventory, equipment, documents and instruments, deposit accounts, books and records, contracts, among others. The Debtor has not complied with the terms of the Security Agreement and Island Holdings has not consented to the use of its collateral. Island Holdings should not be forced to bear the risk of erosion of its Cash Collateral, the burden of the continued diminution in the

---

[1]  Pursuant to that certain Loan Portfolio and Real Estate Owned Purchase Agreement entered into as of March 28, 2013 between Firstbank and Island Holdings.

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 2 of 14

value of its collateral generally, without Debtor providing adequate protection.

**Background**

**A.   The Ramallo Credit Agreement**

1.      On March 14, 2014, Ramallo filed a voluntary petition for the Bankruptcy Court,

District of Puerto Rico. Docket No. 1.

2.      On December 15, 2010, Firstbank and Ramallo entered into a Revolving Credit

and Term Loans Agreement, granting Ramallo certain credit facilities in the aggregate principal

amount of twelve million seven hundred seventeen thousand eight hundred fifty two dollars

($12,717,852.00), authenticated under affidavit number 4,197 of Notary Public Jose J. Ledesma

and identified by Firstbank as Loan Num. 115082-00000005-000, Loan Num. 115082-00090009-

001, and Loan Num. 115082-00000007-000 (as amended from time to time, the "Ramallo Credit

Agreement"). A copy of the Ramallo Credit Agreement is attached hereto as **Exhibit 1**.

3.      The Ramallo Credit Agreement is evidenced by, among others, (i) a Term Note A

dated December 15, 2010 in the principal amount of five million six hundred fifty seven

thousand eight hundred fifty two dollars ($5,657,852.00), bearing interest as therein stated,

authenticated under affidavit number 4,202 of Notary Public Jose J. Ledesma; (ii) a Term Note B

dated December 15, 2010 in the principal amount of one million nine hundred thousand dollars

($1,900,000.00), bearing interest as therein stated, authenticated under affidavit number 4,203 of

Notary Public Jose J. Ledesma; and (iii) a Revolving Loans Note dated December 15, 2010 in the

principal amount of five million one hundred sixty thousand dollars ($5,160,000.00), bearing

interest as therein stated, authenticated under affidavit number 4,204 of Notary Public Jose J.

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 3 of 14

Ledesma (collectively, the "Ramallo Promissory Notes"). A copy of each of the Ramallo

Promissory Notes is attached hereto as **Exhibits 2, 3 and 4**.

4.     The principal purpose of the funds advanced under the Ramallo Credit

Agreement was the refinancing of Ramallo's debt with Firstbank certain transaction costs of the

sale of certain real estate property of Ramallo and working capital for Ramallo's operations.

B. **The Ramallo Collateral**

5.     Ramallo's obligations under the Ramallo Credit Agreement are secured by,

among other things, the following mortgage (hereinafter, the "Mortgage"):

> Mortgage note executed by Ramallo on May 1, 2002, payable to the order of
> bearer, for the principal sum of seven hundred thousand dollars ($700,000.00)
> authenticated under affidavit number 7,032 of Notary Public Leopoldo J. Cabassa
> Saurí (hereinafter, "Mortgage Note"). Mortgage Note is guaranteed by a
> mortgage constituted through Deed Number 2 of May 1, 2002 of Notary Public
> Leopoldo J. Cabassa Sauri, recorded at page 169 of volume 434, property number
> 9,028 of Cidra, Registry of the Property, Second Section of Caguas (hereinafter
> "Mortgage").  **Exhibits 5 and 6.**

6.     On December 15, 2010, Firstbank and Ramallo executed a Mortgage Note Pledge

and Security Agreement, authenticated under affidavit number 4,200 of Notary Public José J.

Ledesma, pursuant to which Ramallo pledged, as collateral to secure all of the obligations under,

among others, the Ramallo Credit Agreement, the Mortgage Note (hereinafter, the "Mortgage

Note Pledge Agreement").  A copy of the Mortgage Note Pledge Agreement is attached hereto

as **Exhibit 7**.

7.     The Mortgage Note serves as collateral for all of the obligations of, among

others, Ramallo pursuant to, among others, the Ramallo Credit Agreement.

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 4 of 14

8.      Mortgage that guarantees Mortgage Note, pledged in favor of Firstbank, as

subsequently endorsed in favor of LSREF2, encumbers the following real property, described in

the Spanish language as follows:

> URBANA: Parcel of land lot number three (3) located at Cidra Industrial
> Subdivision, Cidra, Puerto Rico. It bounds by the North, with land owned by
> Puerto Rico Urban Renewal and Housing Corporation; by the South, with street of
> the same industrial subdivision, by the East, with lot number four (4) of the same
> industrial subdivision and by the West, with lot number two (2) of the same
> industrial subdivision. It has a surface area of two thousand nine hundred  ten
> point four hundred fifty eight square meters (2,910.458 s.m.), equivalent to zero
> point seven thousand four hundred five "cuerdas" (0.7405 cdas.). It is affected by
> a right-of-way for storm sewer lines which affect a strip of land three (3) meters
> wide along its northern and western boundaries.

> The real property described above is recorded at page 60 of volume 227 of Cidra,
> property number 9,028, Registry of the Property of Puerto Rico, Second Section
> of Caguas (hereinafter, the "Ramallo Real Estate").

9.      On December 15, 2010, Firstbank and Ramallo executed a Security Agreement

(hereinafter, the "Ramallo Security Agreement"), authenticated under affidavit number 4,199 of

Notary Public Jose J. Ledesma, whereby Ramallo pledged and granted to Firstbank, as collateral

to secure all of the obligations under, among others, the Ramallo Credit Agreement, a

continuing first priority lien upon the following:

> (a) Accounts. All of Debtor's present and future rights to payments for Inventory
> sold or leased or for services rendered, whether or not represented by
> instruments or chattel paper, and whether or not earned by performance; all of
> Debtor's now owned or hereafter acquired accounts, contract rights, chattel
> paper, instruments, documents and proceeds, including, without limitation, all
> insurance proceeds; proceeds of any letter of credit on which Debtor is
> beneficiary; and all forms of obligations whatsoever owing to Debtor, together
> with all instruments and documents of title representing any of the foregoing, all
> rights in any Inventory, and all rights, security and guaranties with respect to each
> of the foregoing, including, without limitation, any right of stoppage in transit.

> (b) Inventory. All of Debtor's now owned and hereafter acquired inventory,

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 5 of 14

including, without limitation, all goods, merchandise and other personal property furnished under any contract of service or intended for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description that are or might be used, consumed or sold in Debtor's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods, merchandise and other personal property, all returned or repossessed goods now, or at any time or times hereafter, in the possession or under the control of Debtor or the Secured Party, and all documents of title or documents representing the same.

(c) <u>Equipment</u>. All equipment of Debtor, now owned or hereafter acquired, including, without limitation, all machinery, tools, dies, blueprints, catalogues, computer hardware and software, furniture, furnishing, and fixtures.

(d) <u>Documents and Instruments</u>. All documents and instruments of Debtor, now owned or hereafter acquired.

(e) <u>General Intangibles, etc</u>. All now existing or hereafter acquired general intangibles of every nature, all permits (to the extent that they may be assigned), regulatory approvals (to the extent that they may be assigned), copyrights, patents, trademarks, service marks, trade names, mask works, good will, licenses (to the extent that they may be assigned), and all other intellectual property owned by Debtor or used in Debtor's business.

(f) <u>Deposit Accounts</u>. All deposit accounts, now existing or hereafter arising, maintained in Debtor's name with the Secured Party and any and all funds at any time held therein.

(g) <u>Books and Records</u>. All now existing and hereafter acquired books and records relating to the foregoing Security Collateral and all equipment containing such books and records (including, without limitation, computer data and storage media).

(h) <u>Contracts</u>. Any and all agreements entered into by Debtor with Persons in connection with the management, development and operation of Borrower's business, as such may be amended, modified or substituted.

(i) <u>Proceeds</u>. All Proceeds of the foregoing Security Collateral. For purposes of this Agreement (all of the foregoing, collectively, the "<u>Ramallo Personal Property</u>"). A copy of the Ramallo Security Agreement is attached hereto as **Exhibit 8**.

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 6 of 14

10.     On December 15, 2010, Firstbank and Ramallo subscribed a Pledge and Assignment of Depository Accounts, authenticated under affidavit number 4,198 of Notary Public Jose J. Ledesma (hereinafter, the "Ramallo Account Pledge Agreement"), whereby Ramallo pledged, assigned, set over and transferred as collateral to secure all of the obligations under, among others, the Ramallo Credit Agreement, certain bank accounts held by Ramallo with Firstbank identified under account numbers **-***5866; **-***4953; **-***0672; and **-***0727 (hereinafter, the "Ramallo Accounts"). A copy of the Ramallo Account Pledge Agreement is attached as **Exhibit 9**.

11.     On December 22, 2010, Island Holdings filed a Financing Statement in the Department of State of the Commonwealth of Puerto Rico, pursuant to section 9-301 of the Puerto Rico Commercial Transactions Act. 19 L.P.R.A. § 2251, in connection with the Ramallo Security Agreement and the Ramallo Account Pledge Agreement in order to perfect the collateral security described above. The filing number of said financing statement is 2010007007. See **Exhibit 10**.

12.     The Ramallo Promissory Notes, the Mortgage, the Mortgage Note, the Mortgage Note Pledge Agreement, the Ramallo Security Agreement, and the Ramallo Account Pledge Agreement are collectively referred to as the "Ramallo Collateral Documents"; the Ramallo Collateral Documents and the Ramallo Credit Agreement, collectively, the "Ramallo Loan Documents"; the Ramallo Real Estate, the Ramallo Personal Property, the Ramallo Accounts, and the Ramallo Lease are collectively referred to as the "Ramallo Collateral".

13.     Debtor defaulted under the Loan Documents. Hence, on May 17, 2013, Island Holdings commenced a civil action for breach of contract, collection of monies, and foreclosure

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 7 of 14

of collateral and guarantees in the case captioned under LSREF2 Island Holdings, Ltd. Inc. vs.

Ramallo Bros. Printing, Inc., et als. Civil Case No. EAC 2013-0163 (402), due to Ramallo's default

on the payment due under the Ramallo Loan Documents, as well as the breach of other material

and substantial obligations.

14.     On March 14, 2014, (the "Petition Date"), Ramallo filed a voluntary petition under

Chapter 11 of the Bankruptcy Code.

## Relief Requested and Basis Therein

15.     As set forth above, Island Holdings has a first priority lien in Ramallo's

accounts receivables for inventory sold or services rendered, inventory, equipment, contracts,

deposit accounts and all funds held at any time therein, general intangibles and all proceeds of

the foregoing assets.

16.     As of this date, the Debtor has not requested or obtained an order authorizing

the use of any Cash Collateral.

17.     As of this date, the Debtor has not requested or obtained Island Holdings'

consent to use any of the Cash Collateral.

18.     As of this date, the Debtor has failed to provide a budget and/or provided any

financial disclosure to Island Holdings.

19.     Notwithstanding the clear provisions of the section 363 of the Code, the

Debtor has using the Cash Collateral without any authorization of Island Holdings after the

Petition Date.

20.     Accordingly, Island Holdings is forced to file this Motion.

21.     For the reasons stated below, Island Holdings requests that the Court prohibit

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 8 of 14

any and all use of the Cash Collateral, and direct the Debtor to deliver the Cash Collateral to

Island Holdings.

## I.   **The Court Should Prohibit Any Further Use of Cash Collateral**

### A.   **The extent of Island Holdings' Cash Collateral**

22.   The Cash Collateral constitutes "cash collateral" as defined in 11 U.S.C. §

363(a) of the Bankruptcy Code, which defines as follows:

> [C]ash, negotiable instruments, documents of title, securities, deposit
> accounts, or other cash equivalents whenever acquired in which the estate and
> an entity other than the estate have an interest and includes the proceeds,
> products, offspring, rents, or profits of property and the fees, charges,
> accounts or other payments for the use or occupancy of rooms and other
> public facilities in hotels, motels , or other lodging properties subject to a
> security interest as provided in section 552(b) of this title, whether existing
> before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

23.   As noted above, Island Holdings has a first priority lien in Ramallo's accounts

receivables for inventory sold or services rendered, inventory, equipment, contracts, deposit

accounts and all funds held at any time therein, general intangibles and all proceeds of the

foregoing assets.  The post-petition effect of Island Holdings security interest is governed by

Section 552(b)(1) of the Bankruptcy Code, which states in pertinent part:

> **(b)(1)** Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of
> this title, if the debtor and an entity entered into a security agreement before the
> commencement of the case and if the security interest created by such security
> agreement extends to property of the debtor acquired before the
> commencement of the case and to proceeds, products, offspring, or profits of
> such property, then such security interest extends to such proceeds, products,
> offspring, or profits acquired by the estate after the commencement of the case
> to the extent provided by such security agreement and by applicable
> nonbankruptcy law, except to any extent that the court, after notice and a
> hearing and based on the equities of the case, orders otherwise.

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 9 of 14

11 U.S.C. § 562(b)(1).

24.     According to Collier, section 505 provides that a pre-petition interest extends to post-petition proceeds if the security agreement provides such an extent. 5-552 Collier on Bankruptcy P 552.02 (2014). The Ramallo Security Agreement expressly provides that the proceeds extend to the "now existing" or "owed" to the "hereinafter acquired" or "arising".

25.     Island Holdings complied with all requirements of Puerto Rico law relating to perfection of its security interests. As a result, Island Holdings clearly has a post-petition security interest in the Cash Collateral, as it is encumbered in favor of Island Holdings.

26.     Based on the foregoing, the monies attributed to accounts receivable in Debtor's Bank accounts constitute part of Island Holdings' Cash Collateral in accordance with section 552 of the Bankruptcy Code.

27.     Accordingly, Island Holdings possesses a valid lien over the Cash Collateral for which the Debtor has not obtained prior Court approval for its use, has not obtained Island Holdings' consent for its continued use, nor has provided adequate protection to Island Holdings pursuant to section 361 and 363 of the Bankruptcy Code, 11 USC §§361 and 363.

**B.      The Court Should Prohibit the Use of Any Cash Collateral**

28.     Pursuant to section 363(c)(2) of the Code, Ramallo may not use the Cash Collateral stated in the Ramallo Security Agreement absent Island Holdings' consent or an order authorizing the same. 11 U.S.C. § 363(c)(2). See also In re Cross Baking Co., Inc., 818 F.2d 1027, 1031 (1st Cir. 1987).  Ramallo has used the cash collateral, in contravention to section § 363(c)(4) of the Bankruptcy Code, which states that unless the court has authorized the use of the cash

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 10 of 14

collateral or all creditors with an interest have consented, the debtor must "segregate and

account for any cash collateral in his possession, custody, or control." 11 U.S.C. § 363(c)(4);

Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc., 823 F.2d 362, 367 (9th Cir. 1987).

See also Robert E. Ginsberg, Robert D. Martin & Susan V. Kelley, Ginsberg and Martin on

Bankruptcy § 5.05 (2014).

29.     The Bankruptcy Court, in virtue of its equitable powers, may grant the creditor

relief from the debtor's unauthorized use of the cash collateral. See In re J.L. Graphics, Inc., 62

B.R. 750, 754 (Bankr. D.N.H. 1986).

30.     Ramallo has been making the deposits from accounts receivables in Bank

accounts which are not those pledged to Island Holdings under the Ramallo Pledge Agreement,

in clear and decisive violation of the Ramallo Pledge Agreement. Furthermore, Ramallo keeps

using and disposing of the proceeds without providing a single payment to Island Holdings,

such actions in complete detriment of Island Holdings's security interest.

31.     It is evident that the Cash Collateral will diminish, producing substantial

detriment to Island Holdings secured position, and no adequate protection has been offered

to offset the diminution in said value.  Under this set of factors, the Court should not require

Island Holdings to essentially "finance" the Debtor's continuing uncertainty, by allowing the

use of Island Holdings Cash Collateral while Island Holdings security position continues to

diminish.

32.     Island Holdings therefore requests that the Debtor be ordered immediately to

cease any use of Cash Collateral and to turn over all future Cash Collateral, without prejudice

to future agreements with Island Holdings for reasonable use of Cash Collateral under Island

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 11 of 14

Holdings' control.

### **Island Holdings is Entitled to Adequate Protection of its Cash Collateral.**

33.     A party with an interest in Cash Collateral is entitled to adequate protection of that interest pursuant to Section 361 and 363 (e) of the Bankruptcy Code.

34.     As described above, Island Holdings requests that the Court prohibit any use of the Cash Collateral, and in addition, to such prohibition, that the Court grant Island Holdings adequate protection as required by 11 USC § 361 by:

> (a)      requiring an accounting of all Cash Collateral received by or for the benefit of Ramallo since the Petition Date;

> (b)      requiring that any Cash Collateral of Island Holdings that is in the possession, custody or control of the Ramallo (as such term is defined in 11 U.S.C. § 101) be turned over to Island Holdings, whether now existing or hereafter created;

> (c)      prohibiting the Debtor from using any Cash Collateral of Island Holdings unless otherwise ordered by this Court;

> (d)      permitting Island Holdings immediate access to the books and records of the Debtor, including all electronic records on any company computers, to make electronic copies, photocopies or abstracts of the business records of the Debtor.

35.     Section 363(e) states that "the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).     Section 361 provides examples of adequate protection including: (1) periodic cash payments; (2) additional or replacement liens; and (3) such other relief as will provide the "indubitable equivalent" of the interest.  11 U.S.C. § 361.  See also In re Stein, 19 B.R. 458 (Bankr. ED. Pa. 1982) (a court's authority to grant use of cash collateral

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 12 of 14

carries with it a concomitant responsibility to insure that the value of the creditor's security is not impaired and the court may do this by using the non-exclusive terms set forth in 11 U.S.C. § 361).

36.    As described above, Island Holdings already has a post-petition security interest in the Debtor's post-petition accounts, inventory, equipment, contracts, general intangibles, deposit accounts, among others pursuant to the Ramallo Security Agreement and 11 U.S.C. §552(b)(1).

37.    In view of the above, Island Holdings submits that the continued use of cash collateral will serve to increase the deficiency that Island Holdings will bear.  It is, therefore, self-evident that Island Holdings is not adequately protected from the continued diminution in the value of its collateral.

## Conclusion

The Debtor has no right to use the Cash Collateral and all such Cash Collateral should be forthwith turned over to Island Holdings. As previously stated the Cash Collateral is property in which Island Holdings has a security interest. The circumstances described above, underscore Island Holdings' need for an immediate order prohibiting Debtor's use of any cash collateral until and if the Ramallo obtains Island Holdings' consent after submitting a budget for the use of the cash collateral. Based on the aforementioned, it is clear that Ramallo has disregarded the terms of the Security Agreement and has used the cash collateral without Island Holdings' consent or this Honorable Court's authorization. The use of the cash collateral is causing an impairment on the value of Island Holdings' security interests and on the estate.

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 13 of 14

**WHEREFORE,** Island Holdings requests that the Court prohibit any use of the Cash Collateral and, in addition to such prohibition, that the Court grant Island Holdings adequate protection as required by 11 U.S.C. § 361 by:

   a.   Directing Debtor to deliver to Island Holdings the Cash Collateral that is in the possession, custody or control of the Debtor (or any of Debtor's insiders as such term is defined in 11 U.S.C. § 101 insofar as such Cash Collateral is derived from the use of Debtor' equipment and/or assets encumbered by Island Holdings), whether now existing or hereafter created, within the later of: (i) five days; or (ii) five days of receipt;

   b.   Directing Debtor to account for all Cash Collateral received by or for the benefit of the Debtor since the Petition Date, without prejudice to Debtor's compliance with other reporting obligations under the Bankruptcy Code and Rules.

   c.   Ordering Debtor to provide Island Holdings immediate access to the equipment collateral in order for the same to be inspected and appraised by a third party which shall be engaged and named by Island Holdings, in its sole discretion, in a future date.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 20 day of March 2014.

**FERRAIUOLI LLC**
221 Plaza, 5th Floor
221 Ponce de León Ave.
San Juan, Puerto Rico 00917
Telephone: (787) 766-7000
Fax: (787) 766-7001

*/s/ Sonia E. Colón*
SONIA E. COLÓN
(USDC No. 213809)
scolon@ferraiuoli.com

In re: Bankruptcy Case No. 14-01948
Motion for Entry of Order
Page 14 of 14

## NOTICE

Within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the clerk's office of the United States Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the court, the interest of justice requires otherwise.

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to CM/ECF participants.

*/s/ Sonia E. Colón*

**Exhibit 1**

*11 508 2*
*12/15/10*

# REVOLVING CREDIT

# AND

# TERM LOANS AGREEMENT

This Revolving Credit and Terms Loan Agreement, entered into in the City of San Juan, Commonwealth of Puerto Rico, this 15th day of December, 2010.

**FIRSTBANK PUERTO RICO** (hereinafter the "**Lender**"), a banking corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its Senior Vice President, **MR. LUIS ORENGO**, who is of legal age, married, executive and resident of Trujillo Alto, Puerto Rico; and

**RAMALLO BROS. PRINTING, INC.** (hereinafter the "**Borrower**"), a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its President, Alberto Ramallo Yllanes, of legal age, single, executive and resident of San Juan, Puerto Rico.

## WITNESSETH

**WHEREAS**, Borrower has applied to Lender for (i) a term loan in the sum of **FIVE MILLION SIX HUNDRED FIFTY SEVEN THOUSAND EIGHT HUNDRED FIFTY TWO DOLLARS ($5,657,852.00)** to refinance certain indebtedness of Borrower with the Lender, and satisfying the costs, fees and expenses to be incurred with respect to the financing facilities contemplated hereby, (ii) a term loan in the sum of **ONE MILLION NINE HUNDRED THOUSAND DOLLARS ($1,900,000.00)** to cover certain closing costs described in **Exhibit G** hereto related to the sale of the Property (as such term is defined hereinafter) to the Municipality of San Juan, and (iii) loans in a revolving line of credit of up to **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)**, at any one time outstanding necessary for working capital of the Borrower.

**WHEREAS**, Lender has agreed to Borrower's aforesaid requests and the parties desire to execute this Agreement to set forth the terms and conditions in the premises.

**NOW, THEREFORE**, in consideration of the premises, and of the mutual and separate agreements, pledges, covenants and warranties of the parties hereto, and for other good and valuable consideration, it is agreed, covenanted, and warranted by the parties hereto as follows:

- 2 -

## ARTICLE 1
### INCORPORATION OF RECITALS

1.1    **Incorporation of Recitals**.  The foregoing preambles and all other recitals set forth are made a part of this Agreement.

## ARTICLE 2
### DEFINITIONS

2.1    **Defined Terms**.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

**"Affiliate"** means with respect to any Person (1) each Person that, directly or indirectly owns or controls, or is controlled by, or is under the common control with such Person or an affiliate of such Person; (2) each Person that, directly or indirectly whether beneficially, or as trustee, guardian or other fiduciary capacity, owns or holds ten percent (10%) or more of the Stock having ordinary voting power in the election of directors of such Person; or (3) each of such Person's officers, directors, joint venturers and partners.  The term "control of a Person" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

**"Agreement"** means this Revolving Credit and Term Loans Agreement, together with Exhibits and Schedules hereto, as amended, supplemented, replaced, or otherwise or modified from time to time.

**"Ancillary Agreements"** shall mean, if any, any supplemental agreement, understanding, instrument, document or other writing executed or delivered by the Borrower, and/or any other Person as a condition to funding under this Agreement or otherwise in connection herewith, and all amendments, modifications or supplements, exhibits and schedules to any of the foregoing.

**"Assignment Agreement(s)"** refers to that(those) agreement(s), if any, forming part of the Collateral whereunder and/or whereby Borrower and/or Guarantor collaterally assigns to Lender its(their) contractual rights to and under the contract(s) identified in the Assignment Agreement(s), as security for the Loans and the CP Loans.

**"Base Interest Rate"** shall mean the fixed annual rate of interest equal to **3.25%**.

**"Bankruptcy Code"** shall mean the United States Bankruptcy Code, as amended from time to time.

- 3 -

"**Board**" shall mean the Board of Governors of the Federal Reserve System and any successor thereto or to the functions thereof.

"**Board of Directors**" shall mean the Board of Directors of any corporation or a duly constituted committee thereof having power and authority over matters to which the action proposed to be taken or authorized relates.

"**Borrower**" means **RAMALLO BROS. PRINTING, INC.**

"**Borrowing Base Certificate**" means a report prepared by Borrower or on its behalf setting forth the consolidated dollar value of Eligible Accounts Receivable, Eligible Inventory and Eligible Work-in-Process and the available amounts under the Revolving Loans Commitment based on the Borrowing Base Formula.

"**Borrowing Base Formula**" shall have the meaning given to such term in Section 4.4 (f) hereof.

"**Business Day**" shall mean any day on which commercial banks in the Commonwealth are open for businesses.  Business Days do not include Saturdays, Sundays, or legal holidays on which bank in the city of San Juan are authorized or required by law or executive order to close.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person during any measuring period for any fixed assets or improvements or for replacements, substitutions or additions thereto, that have a useful life of more than one year and that are required to be capitalized under GAAP.

"**Caribbean Printing**" means Caribbean Printing Group, Inc. a Puerto Rico corporation.

"**Change of Control**" means any change in the ownership of the Borrower such that Angel Ramallo Diaz no longer has the power to vote at least fifty-one percent (51%) of the voting Stock of the Borrower and such person and ceases to have the operational control of the Borrower.

"**Charge(s)**" shall mean all Federal, State (including the Commonwealth), county, city, municipal, local, foreign or other governmental (including, without limitation, PBGC) taxes at the time due and payable, levies, assessments, charges, Liens, claims or encumbrances upon or relating to (i) the Collateral, (ii) the Obligations, (iii) the Borrower's employees, payroll, income or gross receipts, (iv) the Borrower's ownership or use of any of its assets, or (v) any other aspect of the Borrower's business.

"**Collateral**" means all of the assets and property (tangible and intangible, corporeal and incorporeal) of Borrower and/or of any Person subject to or intended to be subject to the lien or security interest created by any Loan Document and described in **Exhibit C** hereof, as security for the Loans and the CP Loans.

"**Commercial Transactions Act**" shall mean the Commercial Transactions Act of the Commonwealth of Puerto Rico, as created by Act No. 208 of August 17, 1995, as amended, and in effect from time to time in the Commonwealth.



- 4 -

"**Commitment Termination Date**" shall have the meaning assigned to such term in <u>Section 4.4(a)</u>.

"**Commonwealth**" shall mean the Commonwealth of Puerto Rico and its political subdivisions, municipalities, agencies or instrumentalities.

"**CP Credit Agreement**" shall mean that certain Credit Agreement among Lender, Borrower and Caribbean Printing dated the date of this Agreement.

"**CP Loans**", collectively or singly, as the context may require, means the revolving and non-revolving credit facilities made to Caribbean Printing pursuant to the CP Loan Agreement.

"**Debt Service Coverage Ratio**" shall mean EBITDAR of the Borrower divided by the aggregate of Borrower's debt service obligations under this Agreement, including financial leases.

"**EBITDAR**" shall mean for any period being measured, a Person's net income before deducting interest, taxes, depreciation, amortization expenses, real property rent in connection with the Property and excluding non-cash, non-recurring and non-operating revenues, expenses, gains or losses during that period.



"**Eligible Accounts Receivable**" shall mean, at any date of determination thereof, all of the bona fide, non disputed, and if disputed, that portion non disputed, Receivables of Borrower arising during the ordinary course of business from parties inside the Commonwealth and net of any volume and sales discounts and any Reserves required by GAAP or as may be required by the Lender's auditors, from time to time, but excluding: (i) accounts which have been outstanding over 90 calendar days or more, after their respective corresponding invoice dates; (ii) accounts owed by an account debtor whose account with Borrower reflects that 50% or more of its accounts fall under the category established in (i) above (except for credit quality clients requested by Borrower and approved in writing by Lender in its sole discretion); (iii) employee and Affiliate accounts; (iv) accounts of account debtors with poor credit history; (v) accounts from the government (Commonwealth or Federal) or any of their agencies unless the same are duly assigned to the Lender, as required by applicable law, (vi) accounts whose account debtor has filed a petition or which a petition against has been filed under bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, or liquidation law or statute of any jurisdiction, and (vii) such other accounts which do not have proper documentation and/or which the Lender may reasonably deem to be unacceptable collateral.

"**Eligible Assignee**" means (a) any bank; (b) a commercial bank organized under the laws of the Commonwealth, the United States, or any state thereof, and having total assets in excess of $250,000,000.00; and (c) any other bank or similar financial institution approved by the Lender.

"**Eligible Inventory**" shall mean the lower of the cost (determined using FIFO) or market value of all inventory of goods and merchandise purchased by Borrower held for sale in the ordinary course of business and located at any one of Borrower's outlets and warehouses (including in-transit Inventory purchased with letters of credit issued by the Lender), less, without duplication (i) any slow moving or obsolete items of inventory; (ii) inventory held in

- 5 -

consignment; (iii) in-transit inventory; and (iv) Reserves required by GAAP or established, at the request and at the sole option of the Lender for items not acceptable to the Lender's auditors.  For purposes of this paragraph, "slow moving or obsolete items of inventory" shall  be items of inventory that have been in stock for a period of time of one (1) year or more and/or any item that the Lender, in its reasonable discretion, deems to be slow moving or obsolete.

"**Eligible Work-in-Process**" shall mean that part of Inventory that has already been subject to the production process and that has not been completed but that Borrower has already incurred in a capital investment and that is not yet considered to be a final product, but must still be accounted for because funds have been invested toward its production in accordance to GAAP, without duplication of what is considered Eligible Inventory.

"**Default**" shall mean any event which, with the giving of notice or the lapse of time, or both, would, unless cured or waived, become an Event of Default.

"**Default Interest Rate**" shall mean two hundred (200) basis points above the Base Interest Rate applicable to each Loan.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder, and published interpretations thereof.

"**Event of Default**" means any of the events specified in **Article 8**.

"**Fiscal Quarter**" shall mean the three months period which ends on the last days of the months of **June, September, December and March** of each year.

"**Fiscal Year**" shall mean the fiscal year of Borrower, which ends on **June 30.**

"**GAAP**" means generally accepted accounting principles in effect from time to time in the United States of America.

"**Governmental Authority**" shall mean the United States, the Commonwealth and the municipality in which the Borrower's operations or charter are located and any political subdivision of any thereof, and any agency, department, commission, board, bureau, court or other instrumentality of any of them.

"**Guarantor(s)**" means each Person required to deliver a Guaranty hereunder and identified in **Exhibit D.**

"**Guaranty**" means the guarantee of the Obligations of the Borrower hereunder, to be made, executed, and delivered by each of the Guarantors mentioned in **Exhibit D** attached hereto and made part hereof.

"**Indebtedness**" shall mean all of the Borrower's obligations and liabilities to any Person, including, without limitation, all debts, claims and indebtedness, contingent, fixed or otherwise, heretofore, now or from time to time hereafter owing, due and payable, however



- 6 -

evidenced, created, incurred, acquired or owing, and however arising, whether under written or oral agreement, by operation of law, or otherwise.  Unless otherwise specified, Indebtedness includes, without limiting the generality of the foregoing definition, (a) the Obligations, (b) obligations and liabilities of any Person secured by a lien, claim, encumbrance, or security interest upon property owned by Borrower even though such Borrower has not assumed or become liable for the payment thereof; (c) obligations or liabilities created or arising under any lease of real or personal property, or conditional sales contract or other title retention agreement with respect to property used or acquired by Borrower even though the rights and remedies of the lessor, seller or the Lender thereunder are limited to repossession of such property; and (d) all Charges.

"**Inventory**" means and includes all of the Borrower's now owned and hereafter acquired inventory, including, without limitation, all goods, merchandise and other personal property furnished under any contract of service or intended for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used, consumed or sold in the Borrower's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods, merchandise and other personal property, all returned or repossessed goods now, or at any time or times hereafter, in the possession or under the control of Borrower, and all documents of title or documents representing the same.

"**Lease**" shall mean the lease agreement entered into with the Municipality of San Juan with respect to the Property.

"**Lender**" means **FIRSTBANK PUERTO RICO**, its successors, transferees and Eligible Assignee.



"**Lien**" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, factor's lien, trust receipt, warehouse receipt, conditional sale (or other title retention agreement), installment sale, deposit arrangement, lien, claim, security interest, easement or encumbrance, guaranty or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any finance lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Commercial Transactions Act or comparable law of any jurisdiction).

"**Loan Documents**" means collectively this Agreement, the Notes, the Security Agreements, the Assignment Agreements, and any and all agreements and documentation whereby or whereunder the lien on the Collateral is constituted and delivered to Lender pursuant to the Agreement.

"**Loan(s)**" collectively and/or singly, as the context may require, means the Term Loan A, the Term Loan B and/or the Revolving Loans.

"**LOC Margin Account**" shall have the meaning assigned to such term in Section 4.5(b) hereof.

"**Material Adverse Effect**" shall mean material adverse effect on (i) the business, assets, operations, prospects or financial or other condition of the Borrower, (ii) the ability of the Borrower to pay the Obligations in accordance with the terms hereof or thereof, or (iii) the Collateral or Lender's Liens on the Collateral or the priority of the Lender's Liens.

"**Multiemployer Plan**" means a Plan described in Section 4001(a)(3) of ERISA.

"**Note(s)**" means the Revolving Loans Note, the Term Note A, the Term Note B, or any of them, as the context may require, and any renewals, modifications, replacements, substitutions or extensions thereof made, executed, and delivered by Borrower pursuant to this Agreement.

"**Obligation(s)**" shall mean all present and future indebtedness, obligations and liabilities, and all renewals and extensions thereof, or any part thereof, now or hereafter owed to Lender by the Borrower, arising from, by virtue of, or pursuant to the Loan Document, or any other obligation of Borrower to the Lenders, including, without limitation, as co-borrower of the obligations of Caribbean Printing under the CP Credit Agreement, together with all interest accruing thereon and reasonable costs, expenses and attorneys' fees incurred in the enforcement or collection thereof, whether such indebtedness, obligations and liabilities are direct, indirect, fixed, liquidated, unliquidated, joint, several or joint and several or were, prior to acquisition thereof by Lender, owed to some other Person, arising from, by virtue of or pursuant to the Loan Document.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government (whether Federal, state (including the Commonwealth), county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof) or other legally recognized entity.

"**Plan**" means any pension plan which is covered by Title IV of ERISA and in respect of which the Borrower is an "employer" as defined in Section 3(5) of ERISA.

"**Prohibited Transaction**" means any transaction set forth in Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

"**Property**" means the real estate and/or the real estate rights in and to the real estate, specifically described in the **Exhibit F**, together with all present and future buildings and improvements thereon, and all appurtenant easements, other appurtenances, and all fixtures and

- 8 -

equipment required for the operation thereof, wherein Borrower shall continue to operate until the full payment of the Obligations thereof pursuant to Section 7.14 hereof.

"**Receivables**" shall mean and include all of the Borrower's present and future rights to payments for services rendered or goods sold, whether or not represented by instruments or chattel paper, and whether or not earned by performance; all of the Borrower's now owned or hereafter acquired accounts, contract rights, chattel paper, instruments, documents, and proceeds, including, without limitation, all insurance proceeds; proceeds of any letter of credit on which such Borrower is beneficiary; and all forms of obligations whatsoever owing to the Borrower, together with all instruments and documents of title representing any of the foregoing, all rights in any goods, merchandise or Inventory that any of the foregoing may represent, all rights in any returned or repossessed goods, merchandise or Inventory, and all rights, security and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit.

"**Reserves**" shall mean reserves for doubtful accounts, returns, allowances and the like, as may be established by the Borrower or as may be required pursuant to GAAP.

"**Restricted Reserve Account**" shall have the meaning assigned in Section 6.18.

"**Reportable Event**" means any of the events set forth in Section 4043 of ERISA.

"**Responsible Officer**" shall mean the Chairman of the Board of Directors, the Chief Financial Officer, the President, the Vice President, the Secretary, the Treasurer, the Assistant Secretary or the Assistant Treasurer.

"**Revolving Loans**" shall have the meaning assigned to such term in Section 4.4.

"**Revolving Loans Note**" shall have the meaning assigned to such term in Section 4.4.



"**Security Agreement(s)**" shall mean any agreement, instrument, document or other writing executed or delivered by the Borrower pursuant to the terms of this Agreement, whereby and/or whereunder a security interest under the Commercial Transactions Act, the Civil Code of Puerto Rico or any other law therein specified, is constituted in favor of and/or delivered to Lender, upon the rights and/or instruments and/or assets therein also specified, as security for the Loans and the CP Loans.

"**Solvent**" means, as to any Person, that (a) the fair value and present fair saleable value of such Person's assets is in excess of the total amount of such Person's stated liabilities; (b) the present fair saleable value of such Person's assets is in excess of the amount that will be required to pay such Person's probable liability on such Person's Indebtedness as such Indebtedness becomes absolute and mature; (c) such Person does not have unreasonably small capital to carry on the business in which such Person is engaged and all businesses in which such

CONFIDENTIAL - PRODUCED BY CPA FERRER & ASSOCIATES TO TUBE MANSON & AMTLERS 03/03/14 19

- 9 -

Person is about to engage; and (d) such Person has not incurred Indebtedness beyond such Person's ability to pay such Indebtedness as it matures.

"**Subsidiary**" (if any, whether now existing or coming to exist) shall mean, with respect to any Person, any corporation or entity of which an aggregate of more than fifty percent (50%) of the outstanding Stock or equity having ordinary voting power to elect majority of the Board of Directors (or Persons performing similar functions), of such corporation or entity (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly owned legally or beneficially by such Person, by one or more Subsidiaries of such Person, or by a general or limited partnership of which such Person or any of its Subsidiaries is a general partner.

"**Term Loan A**" shall have the meaning assigned to such term in Section 4.2.

"**Term Loan B**" shall have the meaning assigned to such term in Section 4.3.

"**Term Loans**" shall mean, collectively, the Term Loan A and the Term Loan B.

"**Term Note A**" shall have the meaning assigned to such term in Section 4.2.

"**Term Note B**" shall have the meaning assigned to such term in Section 4.3.

"**United States of America**" shall mean, when used in a geographical sense, all the States of the United States of America, the District of Columbia and the Commonwealth of Puerto Rico.

2.2    **Accounting Terms and Determination**.  As used in this Agreement and in any certificate, report or other document made or delivered pursuant hereto, unless the context otherwise requires, accounting terms not otherwise defined or only partly defined herein (to the extent not defined) shall be construed, calculations hereunder shall be made and financial data required hereunder shall be prepared, both as to classification of items and as to amounts, combined in accordance with the GAAP consistently applied and maintained.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and make the Loans, the Borrower makes the following representations and warranties to Lender, each and all of which shall be true and correct as of the date of execution and delivery of this Agreement and shall survive its execution and delivery:

- 10 -

3.1     **Existence; Compliance with Law**.

(a)     The Borrower (i) is duly organized, validly existing and in good standing as a corporation under the laws of the Commonwealth of Puerto Rico; (ii) has the power and authority and the legal right to own and operate its assets and property, to own, operate and encumber its assets and to conduct the businesses in which it is currently engaged; and (iii) is duly qualified and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its businesses require such qualification, except where the failure to be so qualified in another jurisdiction would not have a Material Adverse Effect.

(b)     The Borrower is in compliance, with all laws, rules and regulations applicable to it, except for those the failure to comply with which would not have a Material Adverse Effect.

3.2     **Power and Authority; Enforceability**.

(a)     The Borrower has full corporate power, authority and legal right to execute, deliver and perform each of the Loan Documents and to borrow hereunder.

(b)     The Borrower has taken all necessary actions to authorize the execution, delivery and performance by it of the Loan Documents and to authorize the Loans hereunder.

(c)     The Loan Documents have been duly executed and delivered on behalf of the Borrower and all parties thereto.

(d)     The Loan Documents constitute the legal, valid and binding obligation of the Borrower and all parties thereto, enforceable against the Borrower and all parties thereto in accordance with their respective terms, except as the enforceability thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, transfer, moratorium or similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether enforcement is sought by proceedings in equity or at law).

(e)     Except for the pertinent filings in the Registry of the Property and/or with the Commonwealth State Department, no consent of any other Person and no consent, license, approval or authorization of, or registration, declaration or filing with or notice to, any governmental authority, bureau or agency, is required in connection with the execution, delivery or performance or the validity or enforceability of the Loan Documents.

3.3     **No Legal Bar**.  The execution, delivery and performance by the Borrower, of each of the Loan Documents do not and will not violate any provision of any existing law, rule or regulation or any order, judgment, award or decree of any court, arbitrator or governmental authority, bureau or agency, or of the charter or By-laws of, or any security issued by the Borrower, of any mortgage, indenture, lease, contract or other agreement or undertaking to which the Borrower is a party or by which any of its properties or assets may be bound, and will not

- 11 -

result in the creation or imposition of any lien on any of its properties or assets pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement or undertaking other than in favor of Lender pursuant to the Loan Documents.

    3.4    **No Litigation**.   Except as disclosed in <u>Schedule 3.4</u> hereof, no uninsured litigation or other proceeding of or before any court, arbitrator or Governmental Authority is currently pending nor, to the knowledge of the Borrower, is any litigation or other proceeding threatened against the Borrower or against any of their properties, assets or revenues, and no investigation of or before any court, arbitrator or Governmental Authority is pending or threatened with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, which if it is adversely determined would have or cause a Material Adverse Effect.

    3.5    **No Default**. The Borrower is not in default in any material respect in the payment or performance of any of its obligations or in the performance of any mortgage, indenture, lease, contract or other agreement or undertaking to which it is a party or by which it or any of its properties or assets may be bound, and no Default or Event of Default has occurred and is continuing. The Borrower is not in default in any material respect under any order, award or decree of any court, arbitrator or Governmental Authority binding upon or affecting it or by which any of its properties or assets may be bound or affected, and no such order, award or decree would materially and adversely affect the ability of the Borrower to carry on its business as presently conducted or the ability of the Borrower to perform its obligations under this Agreement or any of the other Loan Documents to which it is a party.

    3.6    **No Burdensome Restrictions**. The Borrower is not a party to nor bound by any contract, agreement or instrument or subject to any charter or by-law restriction materially and adversely affecting the businesses, operations, properties, assets or financial or other condition of the Borrower.

    3.7    **Taxes**. The Borrower has filed all tax returns which are required to be filed, and has paid all taxes shown to be due and payable on such returns or on any assessments made against it or any of its property or assets and all other taxes, fees or other charges imposed on it or any of its property or assets by any Governmental Authority (other than those, the amount or validity of which, is currently being contested in good faith and by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower). The parties acknowledge that Lender has retained certain amounts to satisfy the tax obligations of Borrower as set forth in **Exhibit G** hereof.

    3.8    **Use of the Proceeds**. The Loans will be used promptly and exclusively as stated in the preamble of this Agreement.

    3.9    **Financial Statements**. The compiled financial statements of Borrower dated June 30, 2010 (the "Financial Statements") are complete and correct in all material respects and fairly present the financial condition of Borrower as at such date all in accordance with GAAP consistently applied. To Borrower's knowledge, there are no liabilities of Borrower fixed or

contingent, which are material but are not reflected in the Financial Statements or in the notes thereto.  No financial information, exhibit, or report furnished by the Borrower to Lender in connection with the negotiation of this Agreement contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statement contained therein not materially misleading.  Provided, however, that Lender has granted Borrower an extension to submit the audited financial statements (individual and combined) of Borrower and Caribbean Printing, as at June 30th, 2010, and Borrower's and Caribbean Printing's in-house financial statements as at September 30, 2010.

3.10    **No Material Adverse Effect**.  Since the date of the Financial Statements referred to in Section 3.9, above, there has occurred no event having a Material Adverse Effect.

3.11    **Inventory and Receivables**.

(a)    Borrower agrees, represents and warrants that each Receivable will be owned by the Borrower, free and clear of any Liens, claims or encumbrances other than those in favor of the Lender, and will cover a bona fide sale of goods usually dealt in by the Borrower or the rendition by the Borrower of services to customers in the ordinary course of business, and will be for a liquidated amount maturing as stated in the schedules thereof and in the invoice or contract covering said sale, and the Lender's Lien therein will not be subject to any other Lien or to any offset, deduction, counterclaim or other similar condition.

(b)    Borrower agrees, represents and warrants that all Inventory is and will be owned by the Borrower free of all Liens, claims or encumbrances other than those in favor of the Lender, and shall be kept by the Borrower at its places of business consistent with past practice for the purpose of sale in the ordinary course of its business, and that the Borrower shall not remove the Inventory therefrom, except for the purpose of (i) sale in the ordinary course of its business consistent with industry standards and (ii) disposal or return to supplier.  Except for (i) sales of Inventory made in the ordinary course of its business, and (ii) disposal or return to supplier obsolete or unmerchantable Inventory, the Borrower shall not sell, encumber or dispose of or permit the sale, encumbrance or disposal of Inventory.

3.12    **Full Disclosure**.  Neither the Financial Statements referred to in Section 3.9, nor any of the Loan Documents or any certificate or written statement furnished by the Borrower to Lender in connection with the Loan Documents contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein and herein not misleading as of the date hereof.  There is no fact known to the Borrower which the Borrower has not disclosed to Lender in writing prior to the date of this Agreement, with respect to the transactions contemplated by the Loan Documents, which would have a Material Adverse Effect.

3.13    **Labor Matters**.  There are no strikes or, to Borrower's knowledge, there are no other labor disputes or grievances against the Borrower pending or threatened which would have a Material Adverse Effect.  To Borrower's knowledge, hours worked by and payment made to Borrower's employees have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters, which would have a Material Adverse Effect.  There

- 13 -

are no unfair labor practice charges, representation petitions, or grievances pending or in process or, to the knowledge of threatened by or on behalf of any employee or group of employees of the Borrower which could have a Material Adverse Effect.  As of the date hereof, there are no written complaints received by the Borrower or, to the knowledge of the Borrower, threatened, or with respect to unresolved complaints, on file, with any federal state, Commonwealth or local court or government agency alleging employment discrimination, wrongful discharge, or other unlawful employment practice by the Borrower.  All payments due from the Borrower on account of employee health and welfare insurance which would have a Material Adverse Effect if not paid have been paid.

3.14    **Ownership of Property; Liens**.  The Borrower has good and marketable title to all its properties and assets and the properties, assets, income and profits of the Borrower are free from Liens other than as disclosed in the Financial Statements of Borrower, except as otherwise disclosed to the Lender.

3.15    **Acts of God**.  As of the date hereof, neither the business nor the properties of the Borrower are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy, or other casualty (whether or not covered by insurance) materially and adversely affecting such business or properties or the operation of the Borrower.

3.16    **Operation of Business**.  The Borrower possesses all material licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, to conduct its business substantially as now conducted and as presently proposed to be conducted the failure of which would not have a Material Adverse Effect, and Borrower, to its knowledge, is not in violation of any valid rights of others with respect to any of the foregoing which could have a Material Adverse Effect.

3.17    **Options, Warrants, Rights**.  Borrower has no outstanding rights, options, warrants or agreements, and has not granted rights of first refusal, pursuant to which it may be required to issue or sell any stock or other equity participation in Borrower.

3.18    **Of the Property**.



(a)    Title to Property.  The Borrower has, and at all times during the term of this Agreement will have good, marketable and recordable leasehold interest to the Property subject to no liens, charges, or encumbrances other than as stated in the title insurance policy in the ALTA form referred to in Article Five (5) hereof.

(b)    Possession of Property.  That Borrower is and will be at all times in complete and exclusive possession of the same.

3.19    **Absence of Certain Agreements**.  The Borrower has not entered into any agreement for (i) the merger or consolidation of any of the Borrower into any other Person (other than the consolidation between the entities comprising the Borrower) nor (ii) the sale or other

- 14 -

disposition of a material portion of any of its assets except in the ordinary course of business nor (iii) the acquisition of any other Person or business.

3.20   **Ownership**.  As of the date hereof, the persons mentioned in **Exhibit E** attached hereto and made party hereof, hold and/or control, directly or indirectly, the unrestricted right to vote 100% of the voting capital stock of the Borrower.

3.21   **Other Ventures; Borrower's Business**.  The Borrower is not engaged in any joint venture or partnership with any other Person.

3.22   **Brokers**.  No broker or finder acting on behalf of the Borrower brought about the obtaining, making or closing of the Loan and the Borrower has no obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

3.23   **ERISA**.  Except as disclosed to Lender in Schedule 3.23 hereof, the Borrower is in compliance in all material respects with all applicable provisions of ERISA.  Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan; no notice of intent to terminate a Plan has been filed, nor has any Plan been terminated; no circumstances exist which constitute grounds entitling the PBGC to institute proceedings to terminate, or appoint a trustee to the Borrower has completely or partially withdrawn from a Multiemployer Plan; the Borrower has met their minimum funding requirements under ERISA with respect to all of their Plans, and the present value of all vested benefits under each Plan exceeds the fair market value of all Plan assets allocable to such benefits, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA; and the Borrower has not incurred any liability to the PBGC under ERISA.

3.24   **Environment**.  Except for: (i) the listing of certain Borrower's property in the Environmental Protection Agency CERCLIS list, as set forth in the study titled "Phase I Environmental Site Assessment Ramallo Bros. Printing, Inc., Ramallo International Center PR-1 Road, Km 25.5, Quebrada Arenas Ward San Juan, Puerto Rico" of October 20, 2010 prepared for Lender by Caribe Environmental Services Inc. (the "Phase I Report"), which situation is further described in Borrower's full disclosure document of December 14, 2010 prepared by its environmental consultant, engineer Rafael Toro; (ii) Puerto Rico's Environmental Quality Board administrative order in the matter of: IN RE: Ramallo Bros. Printing Inc., Case Number: OA-10-TE-103 REF: OAL-10-115; and (iii) Southwire et.al., vs. Ramallo Bros. Printing, Inc., et.al., Case No. 031100 (GAG) (CVR) in the United States District Court for the District of Puerto Rico, Borrower has in all material aspects duly complied with, and its business, operations, assets, equipment, property, leaseholds or other facilities are in material compliance with, the provisions of all applicable federal, state and local environmental, health and safety laws, codes and ordinances, and all applicable rules and regulations promulgated thereunder, except where the failure to comply would not have a Material Adverse Effect.

Except as provided in the Phase I Report, Borrower has been issued and will use its best efforts to maintain all required federal, state and local permits, licenses, certificates and approvals relating to (i) air emissions, (ii) discharges to surface or groundwater, (iii) noise

- 15 -

emissions, (iv) solid or liquid waste disposal, (v) the use, generation, storage, transportation or disposal of toxic or hazardous substances or wastes (intended hereby and hereafter to include any and all such materials listed in any federal, state or local law, code or ordinance and all rules and regulations promulgated thereunder, as hazardous or potentially hazardous), or (vi) other environmental, health or safety matters necessary to conduct its business in compliance with environmental laws and regulations.

Except as stated in this Section 3.24, Borrower has received no notice of, and knows of nor suspects facts which might constitute any material violations of any federal, state or local environmental, health or safety laws, codes or ordinances and any rules or regulations promulgated thereunder with respect to its business, operations, assets, equipment, property, leaseholds or other facilities which would cause a Material Adverse Effect.

Except as provided in the Phase I Report, and in that certain study titled "Limited Phase II Assessment Activities Report Ramallo Bros. Printing, Inc. Ramallo International Center PR-1 Road, KM. 25.5, Quebrada Arenas Ward San Juan, Puerto Rico" of November 2010 prepared by Caribe Environmental Services Inc., for Lender (the "Phase II Report"), as of the date of this Agreement, there has been no material uncorrected, emission, spill, release or discharge into or upon (i) the air, (ii) soils or any improvements located thereon, (iii) surface water or groundwater, or (iv) the sewer, septic system or waste treatment, storage or disposal system servicing Borrower's real estate property and/or leasehold property. To Borrower's knowledge, none of Borrower's businesses are located or whereupon it operates, contain any toxic or hazardous substances or wastes at or from such premises, which would require a remedial action under any environmental law, rule, regulation or ordinance.

Except as stated in this Section 3.24, as of the date of this Agreement, there has been no complaint, order, directive, claim, citation or notice by any Governmental Authority or any person or entity with respect to material uncorrected (i) air emissions, (ii) spills, releases or discharges to soils or improvements located thereon, surface water, groundwater or the sewer, septic system or waste treatment, storage or disposal systems servicing the premises, (iii) noise emissions, (iv) solid or liquid waste disposal, (v) the use, generation, storage, transportation or disposal of toxic or hazardous substances or waste or (vi) other environmental, health or safety matters materially affecting the Borrower or its business, operations, assets, equipment, property or leaseholds.

Except as stated in this Section 3.24, Borrower has no material indebtedness, obligation or liability, absolute or contingent, matured or not matured, with respect to storage, treatment, clean-up or disposal of any solid wastes, hazardous wastes or other toxic or hazardous substances (including, without limitation, any such indebtedness, obligation or liability with respect to any current regulation, law or statute regarding such storage, treatment, clean-up or disposal).

3.25   **Margin Regulations**. The Borrower does not own any "margin security", as such term is defined in the Regulations of the Board and the proceeds of the Loan will be used only for the purpose contemplated hereunder. The proceeds of the Loan will not be used, directly or indirectly, for the purpose of purchasing or carrying any such margin security, for the purpose of

- 16 -

reducing or retiring any indebtedness which are originally incurred to purchase or carry any margin security or for any other purpose which might cause the Loan under this Agreement to be considered a "purpose credit" within the meaning of Regulations of the Board. The Borrower will not take or permit any agent acting on its behalf to take any action which might cause this Agreement or any document or instrument delivered pursuant hereto to violate any regulation of the Board.

3.26 **Investment Company Act, etc.** None of the Borrowers is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor, as of the Closing Date, a company "controlled" (within the meaning of such Act) by such an "investment company". The Borrower is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act or to any Federal, state, or Commonwealth statute or regulation limiting its ability to incur indebtedness for money borrowed.

3.27 **Solvency**. The Borrower is, and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents will be, Solvent. Borrower has not (a) entered into the transaction contemplated by this Agreement or executed the Notes, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) failed to receive reasonably equivalent value in exchange for its obligations under such Loan Documents. The Borrower does not intend to, and Borrower does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond such Borrower's ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by such Borrower and the amounts to be payable on or in respect of the obligations of such Borrower, including Borrower's right to contribution from Caribbean Printing in the event that the Borrower makes any payment on account of its guaranty of the CP Loans). No petition in bankruptcy has been filed against any Borrower or any of such Borrower's constituent Persons, and no Borrower nor any of such Borrower's constituent Persons has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. The Borrower nor any of such Borrower's constituent Persons are contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of any Borrower's assets or properties, and no Borrower has any knowledge of any Person contemplating the filing of any petition against such Borrower or any of such Borrower's constituent Persons.

3.28 **Full Disclosure**. Neither the Financial Statements referred to in <u>Section 3.9</u>, nor any of the Loan Documents, or any certificate or written statement furnished by the Borrower to Lender in connection with the Loan Documents and/or the Lease contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein and herein not misleading as of the date hereof. There is no fact known to the Borrower which the Borrower has not disclosed to Lender in writing prior to the date of this Agreement, with respect to the transactions contemplated by the Loan Documents and/or the Lease, which would have a Material Adverse Effect.

- 17 -

## ARTICLE 4
## AMOUNT AND TERMS OF LOANS

4.1    **General Conditions to the Loans**.

(a)    Method and Time of Payment.  All payments of principal of, or interest on the Loans shall be made by the Borrower to Lender at its offices located at 1519 Ponce de León Avenue, Santurce, Puerto Rico, or at such other address as Lender may from time to time designate to the Borrower in writing, in Dollars and in immediately available funds not later than 2:00 P.M. (Commonwealth time), on the date on which such payment shall become due, and funds received after that hour shall be deemed to have been received by Lender on the next succeeding Business Day.  Lender is hereby authorized and empowered to charge the Borrower's accounts with Lender to collect payments of principal and interest due hereunder.

(b)    Payment on Non-Business Days.  Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fee, as the case may be; provided, however, if such extension would cause payment of interest on or principal of the Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(c)    Capital Adequacy; Change in Law.  If due to the adoption of any law on capital adequacy, or any change therein or in the interpretation or application thereof, or compliance by the Lender or its parent company with any request, directive or guideline on capital adequacy (whether or not having the force of law) from any Governmental Authority or international body (including, without limitation, the Bank for International Settlements) and as a consequence of the Lender's obligations hereunder, there shall be a reduction in the rate of return on the Lender's capital to a level below that which the Lender could have achieved but for such adoption, change or compliance (taking into consideration the Lender's policies with respect to capital adequacy), then, from time to time, upon the Lender's written demand, the Borrower shall pay to the Lender, within ten (10) days of receipt of the Lender's demand and statement, such additional amounts as will compensate the Lender for such reduction, to the extent such amounts are not already reflected in the calculation of the interest rate(s) applicable to the Loans.  The Lender shall submit to the Borrower a written statement setting forth the basis for determining such amounts, which statement shall be conclusive for all purposes in the absence of demonstrable error.

(d)    Intentionally Omitted.

(e)    Increased Costs.  If during the term of this Agreement there occurs any change in law or regulation or in the interpretation thereof by a court of law or any Governmental Authority charged with the administration thereof that shall:  (a) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds by any commercial bank in

- 18 -

the Commonwealth (the "Commonwealth Banks"); (b) impose on the Commonwealth Banks any other condition that will have an effect on this Agreement; (c) subject the Commonwealth Banks to any tax of any kind whatsoever (federal, local or municipal), levy, impost, duty, charge, fee, deduction, or withholding on or from payments due a borrower (including the Borrower hereunder); or (d) change the basis of taxation of payments due from a borrower (other than changes to any taxes presently imposed upon the Lender), and the result of the foregoing is to increase the cost or expense to the Lender of this Agreement (or reduce the amount of principal or interest received by the Lender) then, upon demand by the Lender, the Borrower shall immediately pay the Lender additional amounts which shall compensate the Lender for such increase costs (or reduction in the receipt of principal or interest); provided the Lender give written notice thereof to Borrower, which notice shall set forth the basis of the calculation of such increased costs, and which calculation shall, in the absence of manifest error, be deemed conclusive and binding upon the Borrower.  Lender shall give notice of the Borrower setting forth the calculation of such increased costs.

(f)     Payments; Taxes.    All payments to be made hereunder and under the Notes and any other documents by Borrower shall be made without setoff, counterclaim or other defense.  All such payments shall be made free and clear of and without deduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, Charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (other than taxes levies, imposts, duties, charges, fees, deductions or withholdings imposed on Lender or its income) (collectively, "Taxes").  If any Taxes are imposed and required to be withheld from any amount payable by Borrower hereunder or under Notes, Borrower shall be obligated to:  (i) pay such additional amount so that the Lender will receive a net amount (after giving effect to the payment of such additional amount and to the deduction of all Taxes) equal to the amount due hereunder; (ii) pay such Taxes to the appropriate taxing authority for the account of the Lender; and (iii) as promptly as possible thereafter, sending Lender a certified copy of any original official receipt showing payment thereof, together with such additional documentary evidence as Lender may from time to time reasonably require.  If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall be obligated to indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of such failure.  The obligations of Borrower under this Section shall survive the repayment of the Loans.  Within thirty (30) days after paying any amount to Lender from which it is required by law to make any deduction or withholding; and within thirty (30) days after it is required by law to remit such deduction or withholding to any relevant taxing or other authority, Borrower shall deliver to Lender evidence satisfactory to Lender of such deduction, withholding or payment (as the case may be).

(g)     Default Interest Rate.    All Obligations of Borrower to Lender during the existence of an Event of Default, shall bear interest for each day that such Default continues at a per annum rate equal to Default Interest Rate.

(h)     Late Charge Fee.    Borrower shall pay Lender a late charge fee equal to five percent (5%) of any monthly installment of principal and/or interest not received by Lender

- 19 -

within fifteen (15) days of its due date. This fee shall be in addition to the application of the Default Interest Rate.

(i)     Loan Funding Cost Recovery.  The Loans shall accrue and Borrower shall pay to the Lender at maturity date, or at any date the loan is prepaid, a cumulative payment amount equal to 1.75% per annum, calculated over the average daily outstanding balance of the Loans, as compensation to the Lender for the concessions provided in the restructured credit facilities. This fee is not applicable to any prepayments made by the Borrower.

4.2     **Of the Term Loan A**.

(a)     **The Term Loan A**.  Subject to the terms and conditions hereof, and relying on the representations, covenants, and warranties of the Borrower contained herein, Lender agrees to lend to the Borrower, on the date of execution of this Agreement, the lump sum of **FIVE MILLION SIX HUNDRED FIFTY SEVEN THOUSAND EIGHT HUNDRED FIFTY TWO DOLLARS ($5,657,852.00)** (hereafter the **"Term Loan A"**).

(b)     **The Note**.  The Term Loan A is evidenced by the Term Note A, a copy of which is attached hereto as **Exhibit "A-1"**.

(c)     **Interest Rate**.  The Term Loan A shall bear interest at a rate equal to the Base Interest Rate.  Interest on the Term Loan A shall be computed on the basis of a year of three hundred sixty (360) days and for the number of actual days elapsed, and shall be payable on the first day of each month hereafter.

(d)     **Payment of Principal**.  The Term Loan A shall be repaid in twenty-four (24) consecutive monthly installments of principal plus interest thereon.  The first twenty-three (23) installments of principal shall be in the amount of **$11,787.19**, plus interest thereon payable on the first day of each month commencing on January 1, 2011 until the last and twenty-fourth (24th) installment for the then outstanding balance of the principal of the Term Loan A and accrued interest thereon shall be due and payable, together with any other amounts outstanding under the Loan Documents.

4.3     **Of the Term Loan B**.

(a)     **The Term Loan B**.  Subject to the terms and conditions hereof, and relying on the representations, covenants, and warranties of the Borrower contained herein, Lender agrees to lend to the Borrower, on the date of execution of this Agreement, the lump sum of **ONE MILLION NINE HUNDRED THOUSAND DOLLARS ($1,900,000.00)** (hereafter the **"Term Loan B"**).

(b)     **The Note**.  The Term Loan is evidenced by the Term Note B, a copy of which is attached hereto as **Exhibit "A-2"**.

- 20 -

(c) **Interest Rate**. The Term Loan B shall bear interest at a rate equal to the Base Interest Rate. Interest on the Term Loan shall be computed on the basis of a year of three hundred sixty (360) days and for the number of actual days elapsed, and shall be payable on the first day of each month hereafter.

(d) **Payment of Principal**. The Term Loan B shall be repaid in twenty four (24) consecutive monthly installments of principal plus interest thereon. The first twenty three (23) installments of principal shall be in the amounts set forth in the Term Note B, plus interest thereon payable on the first day of each month commencing on January 1, 2011 until the last and twenty fourth (24th) installment for the then outstanding balance of the principal of the Term Loan B and accrued interest thereon shall be due and payable, together with any other amounts outstanding under the Loan Documents.

4.4 **Of the Revolving Loans**.

(a) Subject to the terms and conditions hereof, and relying on the representations, covenants, and warranties of Borrower contained herein, Lender agrees to make loans to Borrower and to advance to Borrower monies so lent in a revolving line of credit (the "Revolving Loans") from time to time, in the amounts and for the terms requested by Borrower, provided however, that the aggregate of Revolving Loans outstanding shall not exceed in the aggregate of **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)** at any one time (the "Revolving Loans Commitment") and subject to the provisions of Section 4.4 (f) hereof. Borrower may borrow, repay and re-borrow at one time or from time to time from the date hereof to but excluding **December 1, 2011** (the "Commitment Termination Date"), on which date all Revolving Loans then outstanding will become due and payable. The Commitment Termination Date may be extended by Lender at its sole discretion upon a request from Borrower prior to the Commitment Termination Date.

(b) **Interest**. Revolving Loans shall bear interest during the respective Interest Period at rate equal to the Base Interest Rate. Such interest shall be computed only on outstanding balances of each Revolving Loan on the basis of a year of 360 days and for the number of actual days elapsed, and shall be payable monthly on the last day of each month.

(c) **Notice of Borrowing**. Whenever Borrower desires to make a Revolving Loan hereunder, it shall give Lender at least one (1) Business Day prior written notice before 10:00 A.M. (Commonwealth time) of such intention. Each notice ("Notice of Borrowing") shall be irrevocable and specify the aggregate principal amount of the Revolving Loan to be made. With each Notice of Borrowing, Borrower shall deliver to Lender a Borrowing Base Certificate, duly executed by an authorized officer or officers of Borrower, together with all information, attachments and documents necessary to support the information contained in the Borrowing Base Certificate. Each Notice of Borrowing shall be irrevocable and specify the aggregate principal amount of the Revolving Loan to be made, the use of the proceeds of each such Revolving Loan and shall include all supporting evidence and invoices relating to the costs and expenses incurred and to be satisfied with such proceeds.

- 21 -

(d) **Revolving Loan Note**. All Revolving Loans made by Lender under this Agreement shall be evidenced by a single promissory note in the form attached hereto as **Exhibit B** (the "Revolving Loan Note") duly completed in the principal amount of **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)**, dated the date of this Agreement, executed on behalf of Borrower by a duly authorized officer or officers thereof, and payable to Lender and maturing as to principal on demand, but demand of the same shall not be made until the Commitment Termination Date, or upon the occurrence of an Event of Default hereunder, whichever event or date first occurs. The Lender is hereby authorized by Borrower to endorse on the schedule attached to the Revolving Loans Note the amount of each Revolving Loan and of each payment of principal received by Lender on account of the Revolving Loans, which endorsement shall, in the absence of manifest error, be conclusive as to the outstanding balance of the Revolving Loans made by Lender; provided, however, that the failure to make such notation with respect to any Revolving Loan or payment shall not limit or otherwise affect the obligations of Borrower under this Agreement or the Revolving Loans Note.

(e) **Disbursements of Revolving Loans**. Upon receipt of the Notice of Borrowing and provided the Borrower is in compliance with all conditions required under this Agreement or under any of the other Loan Documents and if no Event of Default or Default deemed in Lender's reasonable opinion to be material has occurred and is continuing, no later than 2:00 P.M. (Commonwealth time) on the second Business Day following Lender's receipt of the Notice of Borrowing, Lender will make available to the Borrower, in dollars, at the Borrower's main operating account with Lender, the amount of such Revolving Loan.

(f) **Borrowing Base Formula**. The Lender's obligation to make Revolving Loans to Borrower shall be further conditioned to Borrower's compliance with the Borrowing Base Formula. At no time shall the aggregate of all outstanding advances under the Credit Facility shall exceed the lower of (the "Borrowing Base Formula"): (i) the Commitment Amount, or (ii) the sum of 85% of Eligible Accounts Receivable, plus 50% of Eligible Work-in-Process, plus 50% of Eligible Inventory. In addition to the Borrowing Base Certificate to be submitted by Borrower upon each borrowing request as per subsection (e) above, Borrower shall submit to Lender a monthly Borrowing Base Certificate no later than twenty (20) days after the end of each month. In the event that the Borrower fails to comply with this section, the obligation of Lender to make advances of Revolving Loans or letters of credit in accordance with Section 4.5 hereinbelow shall be suspended until Borrower makes repayments to the Revolving Loans facility in such amounts necessary to cover such over-advance.

4.5 **Letters of Credit**. (a) Notwithstanding anything herein to the contrary, the amount available under the Revolving Loans for documentary or standby letters of credit and 90 days sight drafts and acceptances (collectively "letters of credit") shall not exceed in the aggregate $5,160,000.00 at any one time (the "LOC Sub-limit"). Borrower may request from Lender the issuance of letters of credit for the account of Borrower, provided that: (i) no Default or Event of Default exists and is continuing, (ii) immediately after the issuance of the letter of credit, the sum of the Revolving Loans outstanding and the other letters of credit issued by Lender pursuant to this paragraph do not exceed the Revolving Loans Commitment as such is conditioned pursuant to the terms set forth in Section 4.4(f), (iii) immediately after the issuance

- 22 -

of the letter of credit, aggregate of the letters of credit outstanding do not exceed the LOC Sub-limit, and (iv) the letters of credit shall be used to facilitate the purchase of inventory by Borrower. All letters of credit shall expire on the Commitment Termination Date or on an earlier date in accordance with its terms. The issuance of the letters of credit shall be made on at least five Business Day prior notice by Borrower to Lender specifying amount, name and address of the beneficiary, date of issuance and when it shall expire and such other information as may be necessary to issue such letter of credit, all in accordance with the terms and limitations set forth in this Agreement. The letters of credit issued hereunder shall be subject to the laws of the Commonwealth of Puerto Rico and by the Uniform Customs and Practices for Documentary Credits in matters not provided for under local law. The Borrower shall reimburse Lender all payments, costs and disbursements made in connection with the issuance of the letters of credit, plus interest at the Base Interest Rate, plus charges customarily charged by the Lender in connection with the issuance of letters of credit.

(b)     All letters of credit and acceptances issued in accordance with this <u>Section 4.5</u> shall be issued against equivalent amounts advanced from the Revolving Loans facility and deposited on the date of issuance of such instruments in a separate margin account pledged to and under the sole control of Lender (the "**LOC Margin Account**"). Upon presentation, the letters of credit and/or acceptances shall be settled with a direct debit against the LOC Margin Account.

(c)     Notwithstanding the suspension provision set forth in the last sentence of <u>Section 4.4 (f)</u>, the Lender may, but shall not be obligated to, issue letters of credit and/or acceptances to allow for seasonability peaks in new contract orders from clients with a good credit history in the sole determination of the Lender provided that: (i) no Default shall have occurred and be continuing, (ii) the funds to be deposited in the LOC Margin Account as required in (b) above to issue such letters of credit and/or acceptances shall be transferred from the Restricted Reserve Account.

4.6     <u>**Intentionally Omitted**</u>.

4.7     <u>**Prepayment and Prepayment Premiums**</u>. Provided that Borrower notify Lender with ten (10) days prior written notice and an Event of Default hereunder has not occurred and is not continuing, Borrower may prepay the Loans, in whole or in part, with interest accrued to such date of prepayment on the amount prepaid but subject to the breakage expenses and funding losses incurred by the Lender as set forth in <u>Section 4.1</u>. All prepayments to the principal of the Loans effectuated with funds other than internally generated funds of Borrower shall be subject to a prepayment premium equal to two percent (2%) if the prepayment is made on or before the first anniversary of the execution of this Agreement and one percent (1%) if the prepayment is made on after the first anniversary of this Agreement and on or before the second anniversary of the execution of this Agreement. All prepayments shall be applied first to interest and fees incurred but not paid under the Loans and secondly to outstanding principal installments of the Loans in the inverse order of their maturity.

- 23 -

4.8     **Use of Proceeds**.  The proceeds of the Loans hereunder shall be used by Borrower for the purposes stated in the preamble of this Agreement and in accordance with the Uses of Funds described in **Exhibit G** hereto and for no other purpose.  Borrower covenants and agrees that no part of the proceeds of the Revolving Loans hereunder will be used, directly or indirectly, to purchase or carry any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or any successor regulation thereto.

ARTICLE 5
CONDITIONS PRECEDENT

5.1     **Condition Precedent to the Term Loan and initial Revolving Loan**.  The obligation of Lender to make the Term Loans and/or the initial Revolving Loan to Borrower is subject to the condition precedent that Lender shall have received on or before the day of such Term Loans or Revolving Loan each of the following, in form and substance satisfactory to Lender and its counsel:

(1)     **Notes**.  The Term Note A, Term Note B and the Revolving Loans Note duly executed by the Borrower;

(2)     **The Collateral**.  The execution and delivery of the Loan Documents and the Collateral;

(3)     **Evidence of all corporate action by the Borrower**.  Certified (as of the date of this Agreement) copies of all corporate action taken by the Borrower, authorizing the execution, delivery, and performance of the Loan Documents to which it is a party and each other document to be delivered pursuant to this Agreement;

(4)     **Corporate Charter**.  Copies of the articles of incorporation and by-laws of the Borrower;

(5)     **Good Standing Certificate**.  A certificate of good standing of the Borrower issued by the Department of State of the Commonwealth;

(6)     **Officer's certificate**.  A certificate signed by a Responsible Officer of Borrower and such other officers as may be required by Lender, dated the date of this Agreement or thereafter, certifying that all representations and warranties herein are true, accurate, and complete; that all conditions precedent to the making of the Term Loan and the initial Revolving Loan have been satisfied; that no Event of Default, and no event, which with notice or the running of time or both, would constitute such an Event of Default, exists or is threatened;

(7)     **Financial Statements**.  Delivery of the Guarantor's and Borrower's financial statements in form and substance acceptable to Lender;

(8)     **Insurance**.  Certificates of insurance as required under Section 6.5 hereof;

- 24 -

(9)   **Sale Documents**.  Copies of the sale agreement, the deed of sale and all related documents in connection with the sale of the Property to the Municipality of San Juan;

(10)   **Lease**.  Executed copies of the deed of lease for the property in form and substance acceptable to Lender;

(11)   **Property Taxes**.  Evidence of payment of any and all property taxes upon the Property;

(12)   **Accounts Receivable and Inventory Report**.  An Accounts Receivable aging and an Inventory report, including valuation methodologies, in form and substance acceptable to the Lender;

(13)   **Machinery and Equipment**.  A complete and detailed list of all machinery and equipment of Borrower described by brand, model, serial number, year of manufacture, together with an appraisal estimating the market and replacement value for each plus any other pertinent specification in form and substance acceptable to the Lender.  The parties hereby agree that this information shall be provided after the date hereof in the form of an appraisal being undertaken for the benefit of the Lender;

(14)   **Budget**.  Operating cash budget with full break-down of revenue inflows and expense outflows (month-by-month projection for the current Fiscal Year and the next 12 month period) prepared by the Borrower's Certified Public Accountant;

(15)   **Business Certifications**.  Copies of the municipal license issued by the Commonwealth municipalities in which Borrower operates,  the "Certificación de Comerciante" issued by the Puerto Rico Treasury Department, together with current payment certification on real property and personal property taxes, special additional tax over real property (Law Act No. 7) and payroll taxes showing no debts. If there is a payment plan on taxes due, Borrower must submit a certification from CRIM, Puerto Rico Department of the Treasury, the US Internal Revenue Service confirming that Borrower is in compliance and current in the required payment plan and the terms thereof;

(16)   **Financial Statements**.  Borrower's and corporate Guarantor's financial statements for fiscal years 2008 and 2009, and Borrower's audited financial statements as of June 30, 2010 and interim financial statements prepared by management, acceptable to the Lender;

(17)   **Opinion of Counsel**.  An acceptable opinion by Borrower's counsel as to such matters as the Lender and its counsel may reasonably request;

(18)   **Interest and Fees Outstanding**   Interests and late charges in arrears owing by Borrower to the Lender, and any others amounts in arrears under the restructured

- 25 -

facilities, shall be paid in full from the sale proceeds at the closing date of the transaction with the Municipality of San Juan; and

(19)   **Additional Documentation**.   Such other approvals or documents as Lender may reasonably request, including, but not limited to, insurance policies and evidence of payment thereof, management agreements, lease agreements, consulting agreements, non-competition agreements, and a list of personal property owned by Borrower.

5.2   **Condition Precedent to all Revolving Loans**.  The obligation of Lender to make Revolving Loans (including the initial Revolving Loan) is subject to the further conditions precedent that on the date of such Loan (i) the representations and warranties contained in this Agreement shall be true and correct on and as of the date of the Revolving Loans hereunder with the same effect as though such representations and warranties had been made on and as of such date; (ii) on such date, no Event of Default specified in this Agreement, and no condition, event or act that with the filing of notice or the lapse of time, or both, would constitute such an Event of Default, shall have occurred and be continuing, or shall exist; (iii) Borrower shall have provided Lender with all Loan Documents.

## ARTICLE 6
## AFFIRMATIVE COVENANTS

So long the Obligations shall remain outstanding:

6.1   **Corporate Existence**.  Borrower will do all things necessary to preserve and keep in full force and effect Borrower's existence, rights, and material franchises.

6.2   **Maintenance of Records**.  Borrower will keep adequate records and books of account for Borrower, in which full and correct entries in all material respects will be made in accordance with GAAP consistently applied, reflecting all financial transactions of Borrower.

6.3   **Maintain Properties in Good Repair**.   Borrower will keep, preserve and maintain all of Borrower's properties in good working order, condition, and repair, ordinary wear and tear excepted, so that the business carried on in connection therewith may be properly and efficiently conducted at all time.

6.4   **Conduct of Business**.   Borrower will continue to engage in an efficient and economical manner, a business of the same general type as conducted by Borrower on the date of this Agreement.

6.5   **Insurance**.   Borrower will maintain insurance coverage with responsible insurance companies of its assets and properties against such risks as are customarily maintained by corporations and/or companies engaged in the same or a similar business and operating like properties, including, but not limited to, flood, fire, business interruption extended coverage and windstorms and earthquake insurance, in such amounts, and with such insurance carriers,



- 26 -

generally maintained by other companies engaged in similar business, and file with Lender, immediately following the request of Lender therefor, a detailed list of all insurance then in effect, stating the name of each insurance company, the expiration dates of each policy and the property and risks covered thereby.  On the date of this Agreement, upon renewal/substitution of each policy and at any other time so requested by Lender, Borrower shall submit to Lender (i) evidence of payment of premiums of any and all such insurance; (ii) evidence that Lender is named "loss payee" thereunder; (iii) a copy of the applicable insurance policy certified to be a true and exact copy of the original thereof; and (iv) evidence that such policies contain an endorsement stating that the Lender shall be provided with a thirty (30) day prior written notice in the event that the policy is to be cancelled, amended or not renewed.  In addition to the above, Borrower shall provide Lender with the following in connection with the insurance coverage to be provided by the landlord under the Lease (which insurance coverage shall include Borrower as "loss payee" or "loss payee" for the following: boiler and machinery coverage): (i) evidence of payment of premiums of any and all such insurance; (ii) evidence that Borrower is named "loss payee" thereunder; (iii) a copy of the applicable insurance policy certified to be a true and exact copy of the original thereof; and (iv) evidence that such policies contain an endorsement stating that the Borrower shall be provided with a thirty (30) day prior written notice in the event that the policy is to be cancelled, amended or not renewed, which notice shall be delivered to Lender within 5 days after receipt.

6.6     **Taxes**.  Borrower will duly and punctually pay and discharge all taxes of any nature or description, assessments, and all other charges levied or leviable against it, its properties, assets and its income prior to or on the date on which such taxes, assessments, or other charges become delinquent, or on which penalties attach or interest accrues, unless and only to the extent that, such taxes, assessments or charges shall be contested in good faith by appropriate proceedings expeditiously prosecuted and after adequate reserves for the amount thereof, interest and penalties accruing thereon are set aside.  Upon the payment thereof and/or at the written request of Lender, Borrower shall submit to Lender satisfactory evidence of such payment of taxes.

6.7     **Statutory Compliance**.  Borrower will comply with all applicable statutes, regulations, judgments, decrees, resolutions and orders of, and all applicable restrictions imposed by, any and all governmental entities and/or authorities, federal, Commonwealth or municipal, judicial or administrative, applicable to the conduct of its businesses and activities, the ownership of its properties, its licenses, permits, franchises and/or its tax exemption grants, and with the terms of the same, unless it is contesting by appropriate proceedings the validity and/or enforceability of the same with respect to itself; provided, however, that Borrower has informed the Lender about its statutory non-compliance as disclosed in Schedule 3.23 hereof and has committed to cure such non-compliance within the term stipulated under such schedule.

6.8     **Contractual Compliance**.  Borrower will pay and discharge in all material respects, all of its indebtedness, trade bills, and obligations promptly and in accordance with their terms and/or the normal and customary trade terms unless it is contesting the same by appropriate proceedings.  Borrower will comply with the terms and conditions of any indentures, agreements,

- 27 -

contracts or other instruments to which it is a party or which may affect its assets or properties, except when any such lack of compliance will not have a Material Adverse Effect.

6.9     **Full Compliance**.  Borrower will comply with each and all of the material terms of any indenture, credit or loan agreement, mortgage or other instrument to which Borrower may be bound or by which the property of Borrower may be affected, except where any such lack of compliance will not have a Material Adverse Effect.

6.10     **Right of Inspection**.  Upon prior written request, from time to time, Borrower will permit Lender or any agent or representative thereof to examine during normal administrative business hours and make copies of and abstracts from the records and books of account of, and visit the properties of the Borrower and to discuss the affairs, finances, and accounts of the Borrower with any of their respective officers and directors and the Borrower's independent accountants.

6.11     **Reporting Requirements**.  Furnish to Lender:

(A)     **Annual Audited Financial Statements**.  Borrower will deliver to Lender, as soon as available and in any event within one hundred fifty (150) days after the end of each Fiscal Year of the Borrower and corporate Guarantor (i) balance sheets of the Borrower and corporate Guarantor as of the end of such Fiscal Year; (ii) statements of income and retained earnings of the Borrower and corporate Guarantor for such Fiscal Year, and (iii) statements of cash flows of the Borrower and corporate Guarantor for such Fiscal Year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior Fiscal Year and all prepared in accordance with GAAP consistently applied by an unqualified opinion thereon acceptable to Lender issued by independent certified accountants selected by the Borrower and reasonably acceptable to Lender.  Borrower shall also deliver to Lender, as soon as available and in any event within one hundred fifty (150) days after the end of each calendar year personal Guarantors' statements of financial condition prepared by a Certified Public Accountant in form and substance acceptable to the Lender;

(B)     **Monthly Operating Reports; Borrowing Base Certificate**.  As soon as available and in any event within twenty (20) days after the end of each month, deliver a Monthly Operating Report consisting of a Balance Sheet, an Income Statement, Statement of Cash Flow (except that the cash flow report shall be prepared in a quarterly basis, to be delivered within twenty (20) days after the end of each Fiscal Quarter) and operational statistics, all in reasonable detail and prepared in accordance with GAAP consistently applied prepared by Borrower's management and acceptable to the Lender.  As soon as available and in any event within twenty (20) days after the end of each month Borrower shall also deliver a Borrowing Base Certificate and an Accounts Receivable aging and an Inventory report;

(C)     **Management Letters**.  Promptly upon receipt thereof, copies of any reports submitted to the Borrower by independent certified public accountants in connection with examination of the financial statements of the Borrower made by such accountants;

- 28 -

(D)     **Certificate of No Default**.  Within thirty (30) days after the end of each Fiscal Year of the Borrower, a certificate of the President of the Borrower (a) certifying that to the best of his knowledge no Default or Event of Default has occurred and is continuing, or if a Default or Event or Default has occurred and is continuing, a statement as to the nature thereof and the action which is proposed to be taken with respect thereto;

(E)     **Notice of Litigation**.  Promptly after the commencement thereof, notice of all actions, suits and proceedings before any court or governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, in which a claim affecting the Borrower is made which, if determined adversely to the Borrower, could have a Material Adverse Effect;

(F)     **Notice of Defaults and Events of Default**.  As soon as possible and in any event within five (5) Business Days after having knowledge of the occurrence of each Default or Event of Default, a written notice setting forth the details of such Default or Event of Default and the action which is proposed to be taken by the Borrower with respect thereto;

(G)     **ERISA Reports**.  As soon as possible and in any event within thirty (30) days after the Borrower knows or has reason to know that any circumstances exist that constitute grounds entitling the PBGC to institute proceedings to terminate a Plan subject to ERISA with respect to the Borrower and promptly but in any event within two (2) Business Days of receipt by the Borrower of notice that the PBGC intends to terminate a Plan or appoint a trustee to administer the same, and promptly but in any event within five (5) Business Days of the receipt of notice concerning the imposition of withdrawal liability with respect to the Borrower, the Borrower will deliver to Lender a certificate of the chief financial officer of the Borrower setting forth all relevant details and the action which the Borrower proposes to take with respect thereto provided, however, that Borrower has informed the Lender about its statutory non-compliance as disclosed in Schedule 3.23 hereof and has committed to cure such non-compliance within the term stipulated under such schedule, but shall keep Lender appraised on it efforts to remediate its non-compliance and of any adverse determination adjudicated against Borrower by the corresponding Governmental Authority;

(H)     **General Information**.    Such other information, including environmental information respecting the condition or operations, financial or otherwise, of the Borrower or the Guarantor as Lender may from time to time reasonably request;

(I)     **Annual Updated Operating Cash Budget**.  Prior to the end of each Fiscal Year, the Borrower shall submit to the Lender an Annual Updated Operating Cash Budget with a full break-down of revenue inflows and expense outflows (month by month projections) for the next Fiscal Year.

6.12    **Environment**.  Borrower will continue to be and remain, and cause each Affiliate and/or Subsidiary to be and remain, in compliance with the provisions of all material federal, Commonwealth and municipal environmental, health and safety laws, codes and ordinances, and all rules and regulations issued thereunder; notify Lender promptly of any notice of a hazardous or regulated substance discharge or environmental complaint received from any Governmental

- 29 -

Agency or any other party; notify Lender promptly of any notice of a hazardous discharge from or affecting Borrower's premises; promptly contain and remove the same, in compliance with all applicable laws; promptly pay any fine or penalty assessed in connection therewith, except if any such fine or penalty is contested and adequate reserves therefor have been set aside; permit the Lender, after suitable prior arrangements made with Borrower, to inspect the premises, to conduct tests thereon, and to inspect all books, correspondence and records pertaining thereto; and at Lender's request, after notice of a government agency or any complaint, at Borrower's expense, provide a report of a qualified environmental engineer, reasonably satisfactory in scope, form, and content to Lender, and such other and further assurances reasonably satisfactory to Lender that the condition has been corrected.

6.13    **Mandatory Prepayments**.

(A)    Immediately upon receipt of proceeds (net of taxes, broker's commissions and monetary liens) of any total or partial disposition of the assets of Borrower, Borrower shall prepay the Loans in an amount equal to all such proceeds, except for (i) sale of assets in the ordinary course of business, (ii) sale of assets that in the aggregate do not exceed $150,000 in any given Fiscal Year or (iii) sale of assets consented in writing by the Lender and which proceeds therefrom are pledged to the Lender and invested within three months in replacement assets used in the Borrower's business operation.

(B)    Borrower shall prepay the Loans in an amount of insurance proceeds in excess of $50,000.00 which are not, in the sole discretion of Lender, promptly used toward the repair or replacement of the damaged or lost property of Borrower.

(C)    Borrower shall prepay the Loans in full upon a substantial change in the management of the Borrower (either one) or a change in the ownership structure of the Borrower (either one).

(D)    If Borrower issues additional stock or issues other type of debt (other than capital leases consented in writing by Lender and/or capital contributions made by Borrower's shareholders to Borrower for purposes acceptable to Lender which consent shall not be unreasonably withheld or denied), Borrower shall immediately prepay or cause to be prepaid the Loans in an amount equal to such proceeds.

(E)    Such prepayments shall first be applied to any fees and interest due to Lender under the Loans, second to the installments to the principal on the Term Loans in inverse order of their maturity, and last to principal outstanding under the Revolving Loans.

(F)    Nothing in this section shall be construed to constitute a consent or waiver of Lender of any transaction contemplated by (A), (B), (C) or (D) above which is not permitted by other provisions in this Agreement.

6.14    **Intentionally Omitted**.

- 30 -

6.15   **Financial Covenant**. For purposes of this Section 6.15, the financial indicator required hereunder shall be calculated by Borrower for the 12-month period ending on each Fiscal Year and shall be delivered to Lender within 150 days after the end of the Fiscal Year.

(A)   Debt Service Coverage Ratio - Borrower and Caribbean Printing shall maintain at all times a combined Debt Service Coverage Ratio of not less than 1.10:1.0. For purposes of determining compliance with this covenant Lender shall base its calculation on the consolidated financial statements of the Borrower and Caribbean Printing.

(B)   Maximum Capital Expenditures – Borrower shall not make aggregate Capital Expenditures funded with cash flow from operations during any given Fiscal Year, which, exceed the aggregate sum of $500,000.00.

(C)   Stockholders Equity – Borrower shall maintain at all time a stockholders equity equal or greater than $15,000,000.

6.16   **Operational Account**. (a) The Borrower will maintain with Lender its main operating bank accounts. Lender's price structure and services rendered with respect to such accounts shall be comparative and competitive with price quotes and services provided by other financial institutions in the Commonwealth market. The cost for servicing such accounts shall be paid by Borrower through fees or compensating balances.

(b)   On the date of this Agreement he Borrower shall execute a Cash Management Agreement, acceptable to the Lender.

6.17   **Restricted Reserve Account**. (a) On or prior to the date of this Agreement, Borrower shall establish and maintain in favor of Lender an account with Lender designated "Ramallo Restricted Reserve Account" (the "Restricted Reserve Account") wherein Borrower shall deposit on said date an amount equal to $1,160,000.00 (the "Reserve Requirement"), which reserve shall be used to satisfy interest and principal payments and over advances pursuant to the terms of this Agreement in accordance with Section 6.18 (b) below. This account shall be pledged to Lender, shall be under the sole and exclusive dominion and control of Lender and Borrower shall not have any right to withdraw funds from this account.

(b)   If by two in the afternoon (2:00 p.m.), San Juan, Puerto Rico time on the Business Day next succeeding after the date in which any payment of principal or interest with respect to the Loans should have been made in accordance with the provisions of this Credit Agreement (following any applicable notice and cure periods), Borrower has not paid any such amount, Lender shall have the right to apply the funds deposited in the Restricted Reserve Account to the payment of any such amount due. Upon the application by Lender of funds deposited in the Restricted Reserve Account to the payment of any amount due hereunder as permitted under this Section 6.17, Borrower shall immediately (but in no event later than ninety (90) days), unless a longer period is consented in writing by the Lender, without notice or demand, deposit into the Restricted Reserve Account sufficient moneys so that the amount then on deposit in the Restricted Reserve Account equals the Reserve Requirement. Lender may transfer funds from the operational account to replenish the Restricted Reserve Account.

(c)   Borrower acknowledges and agrees that, notwithstanding the creation of the Restricted Reserve Account and the availability of funds therein, it shall remain as

Borrower's obligation to make full payment of all amounts due hereunder and under the other Loan Documents on their required due dates.

6.18   **LOC Margin Account**.  On or prior to the date of this Agreement, Borrower shall establish and maintain in favor of Lender an account with Lender designated "Ramallo LOC Margin Account" (the "LOC Margin Account") wherein Borrower hereby irrevocably instructs Lender to deposit such amounts equal to the advances for Revolving Loans in connection with the issuance of letters of credit and acceptances as set forth in Section 4.5.  This account shall be pledged to Lender, shall be under the sole and exclusive dominion and control of Lender and Borrower shall not have any right to withdraw funds from this account.

6.19   **Marginal Account**. (a) On or prior to the date of this Agreement, Borrower shall establish and maintain in favor of Lender an account with Lender designated "Ramallo Marginal Account" (the "Marginal Account") against which all payments of principal, interest, fees and expenses may be debited until the full and complete satisfaction of the Loans.  Borrower shall deposit in the Marginal Account all income from the operation of Borrower.  The cost for servicing such accounts shall be paid by Borrower through fees or compensating balances.

(b)   This account shall be pledged to Lender, shall be under the sole and exclusive dominion and control of Lender and Borrower shall not have any right to withdraw funds from this account.   Furthermore, such operational account shall constitute collateral security for Borrower's present or future obligations to the Lender under this Agreement and the other Loan Documents, and Borrower hereby grants to Lenders a present and continuing security interest in (a) said operational account, (b) all contract rights, claims and privileges of the Borrower in respect of the operational account, and (c) all cash, checks, money orders and other items of value of Borrower now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession of, under the control of, or in transit to, Lender or any agent, bailee or custodian thereof, and all proceeds of the foregoing.

(c)   The Marginal Account shall be swept on a daily basis after deducting the amounts necessary to pay principal, interest and fees under this Agreement, and any balance thereafter shall be transferred to the Operational Account.

(d)   Borrower acknowledges and agrees that, notwithstanding the creation of the Marginal Account and the availability of funds therein, it shall remain as Borrower's obligation to make full payment of all amounts due hereunder and under the other Loan Documents on their required due dates.

6.20   **Joint and Several Liability; Contribution**.  On any date that Caribbean Printing makes a payment pursuant to the terms of that certain corporate Guaranty from Caribbean Printing, of even date herewith (the "CP Guaranty"), given in connection with the Loans, Borrower hereby acknowledges and agrees that Caribbean Printing shall have a right of contribution against Borrower in the amount of each such payment made by Caribbean Printing pursuant to the CP Guaranty.   In consideration therefor, Caribbean Printing has agreed that on any date that Borrower makes a payment pursuant to the terms of that certain corporate guaranty from Borrower, of even date herewith (the "RB Guaranty"), given in connection with the CP Loans, Borrower shall have a right of contribution against Caribbean Printing, in the amount of each such payment pursuant to the RB Guaranty.  Notwithstanding the foregoing, Borrower hereby acknowledges that Borrower shall not take any action to enforce its rights of contribution against Caribbean Printing until all of the Obligations of Borrower hereunder and all of the

- 32 -

Obligations of Caribbean Printing, as defined in the CP Loan Agreement, have been paid in full, it being expressly recognized and agreed that Borrower's right of contribution against Caribbean Printing shall be expressly junior and subordinate to all of the Obligations of Borrower hereunder and all of the Obligations of Caribbean Printing, as defined in the CP Loan Agreement.

ARTICLE 7
NEGATIVE COVENANTS

So long as the Obligations shall remain outstanding, Borrower will not, without the previous written consent of Lender, which consent shall not be unreasonably withheld, delayed or denied:

7.1 **Liens, Etc.** Create, incur or permit to exist any lien, mortgage, pledge, assignment or other encumbrance on, or security interest in, any of Borrower's properties, assets, or receivables, now owned or hereafter acquired, securing the Obligations.

7.2 **Limitation of Indebtedness**. Incur, create, assume or permit to exist any Indebtedness except for (i) Indebtedness incurred under this Agreement; (ii) previously incurred Indebtedness but no renewals, extensions or refinancing thereof; (iii) current accounts payable or accrued, incurred by Borrower in the ordinary course of business which are not past due beyond their respective maturities; and (iv) capital lease obligations incurred to finance equipment in the ordinary course of business of the Borrower provided such are previously notified to the Lender.

7.3 **Reorganization, Merger and Acquisitions**. Wind up, liquidate or dissolve Borrower, reorganize, merge or consolidate with or into, or convey, sell, assign, transfer, lease, or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of Borrower's assets (whether now owned or hereafter acquired) to any Person, or acquire all or substantially all of the assets or the business of any Person

7.4 **Dividends**. Without the previous written authorization of the Lender, Borrower will not declare or pay any dividends; or purchase, redeem, retire, or otherwise acquire for value any of its Stock now or hereafter outstanding; or make any distribution of assets to its stockholders as such whether in cash, assets, or obligations of the Borrower; or allocate or otherwise set apart any sum for the payment of any dividend or distribution on, or for the purchase, redemption, or retirement of any shares of its Stock; or make any other distribution by reduction of capital or otherwise in respect of any shares of its capital stock; or permit any of its Subsidiaries to purchase or otherwise acquire for value any stock of the Borrower or another Subsidiary.

7.5 **Sales of Assets**. Sell, lease, assign, transfer, or otherwise dispose of, or permit Borrower to sell, lease, assign, transfer, or otherwise dispose of, a material portion of any of its now owned or hereafter acquired assets, except (i) inventory or other property sold or disposed of in the ordinary course of business; (ii) the sale or other disposition of assets no longer used or useful in the conduct of Borrower's business, and (iii) for fair market value to the extent that the Borrower company shall within one hundred and eighty (180) days of any such disposition apply

- 33 -

the net proceeds realized by the Borrower company as a result of such disposition to the acquisition by the Borrower company of assets that are similar to the assets so disposed.

7.6     **Salaries**.  Without the Lender's prior written consent, which consent shall not be unreasonably denied, permit the aggregate compensation (including salaries, bonuses, commissions and other forms of remuneration paid by Borrower to officers and directors of Borrower) to exceed an amount that is currently paid to such Persons and any increases shall be in amounts such that their compensation or remuneration is reasonable and proper in relation to the work performed and which is comparable to that paid by other companies engaged in similar lines of business within the Commonwealth.  Lender hereby acknowledges the following current salaries: Ángel Ramallo Díaz - $500,000.00, Aida Díaaz Millian - $200,000.00, Alberto Ramallo Yllanes - $250,000.00, and Ángel Ramallo Yllanes - $250,000.00.  Unless previously notified to the Lender in writing and provided that (i) no Event of Default shall have occurred and be continuing, and (ii) the Borrower's net income for the prior Fiscal Year is positive, no increase in any of the salaries mentioned in the prior sentence may be increased, by either direct or indirect compensation.

7.7     **Guaranties**.  Allow Borrower to assume, guarantee, endorse or otherwise be or become liable upon, guarantee, endorse or otherwise be or become liable upon, the obligations of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

7.8     **Loans**.  Allow Borrower to make or have outstanding at any time, any guarantee, loan or advance to, or otherwise extend credit to any Person, including, without limitation, any officer, director, employee or stockholder of Borrower.

7.9     **Conduct of Business**.  Make any material change in the nature of the business carried on by the Borrower as of the date of this Agreement, or make any material change in any Borrower's business objectives, purposes and present operations.

7.10     **Transactions with Affiliates**.  Enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service, with any Affiliate, except in the ordinary course of business and pursuant to the reasonable requirements of the Borrower's business and upon fair and reasonable terms no less favorable to the Borrower than would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate.

7.11     **Change in Management**.  Permit or cause any change in the management of Borrower that may cause a Change of Control.

7.12     **Change in Ownership**.  Permit or cause any change in the ownership of Borrower or the shareholders of Borrower.

7.13     **Certificate of Incorporation; By-Laws**.  Amend, or cause or permit to be amended, any provision of the Certificate of Incorporation or By-laws of Borrower, which could result in a Material Adverse Effect.



7.14   **Termination**.   The Borrower shall not, without the prior written notice to the Lender, terminate or permit the termination of the Lease; provided, however, the Borrower agrees to consult with the Lender promptly in the event the Borrower alleges a breach by the other party to the Lease.  The Borrower acknowledges that the Lender agreement to make the Loans hereunder has been based in substantial part on the ability of the Borrower to continue the relationship under the existing Lease, to operate Borrower's business and to achieve the performance results necessary to enable the Borrower to perform its obligations in connection with the Loan Documents.

ARTICLE 8
EVENTS OF DEFAULT

**[NOTICE TO LENDER'S OFFICER:  DEFAULT NOTICES MUST BE ISSUED TO BORROWER AND CARIBBEAN PRINTING]**

8.1   **Events of Default**.  If any of the following events shall occur:

(1)   The Borrower should fail to pay the principal of, or interest on the Notes;

(2)   Any representation or warranty made or deemed made by the Borrower in this Agreement or any of the Loan Documents or which is contained in any certificate, document, opinion, or financial or other statement furnished at any time under or in connection with any Loan Document shall prove to have been incorrect, incomplete, or misleading in any material respect on or as of the date made or deemed made and such incorrect, incomplete, or misleading statement or representation shall remain untrue or unremedied for a period of fifteen (15) days;

(3)   The Borrower shall fail to perform or observe any term, covenant, or agreement contained in **Articles 6** or **7** hereof on its part to be observed or performed and any such failure shall remain unremedied for a period of fifteen (15) days, except that such cure period shall not be applicable when Borrower's failure to comply with the covenants set forth in **Article 7** is not remediable in Lender's sole discretion;

(4)   The Borrower shall (a) fail to pay any material Indebtedness for borrowed money (other than the Notes) or any interest or premium thereon, when due after expiration of any applicable cure periods (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), or (b) fail to perform or observe any material term, covenant, or condition on its part to be performed or observed under any agreement or instrument relating to any such Indebtedness, when required to be performed or observed, if the effect of such failure to perform or observe is such Indebtedness' maturity has been accelerated, whether or not such failure to perform or observe shall be waived by the holder of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be pre-paid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof and any such failure shall remain unremedied for a period of thirty (30) days;

(5)     The Borrower (a) shall generally not pay, or shall be unable to pay, or shall admit in writing its inability to pay its debts as such debts become due; or (b) shall make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver, or trustee for it or a substantial part of its assets; or (c) shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or (d) shall have had any such petition or application filed or any such proceeding commenced against it in which an order for relief is entered or an adjudication or appointment is made, and which remains undismissed for a period of sixty (60) days or more; or (e) shall take any action indicating its consent to, approval of, or acquiescence in any such petition, application, proceeding, or order for relief or the appointment of a custodian, receiver, or trustee for all or any substantial part of its properties; or (f) shall suffer any such custodianship, receivership, or trusteeship to continue undischarged for a period of sixty (60) days or more;

(6)     One or more uninsured judgments, decrees, or orders for the payment of money in excess of **ONE HUNDRED THOUSAND DOLLARS ($100,000.00)** in the aggregate shall be rendered against Borrower, and such judgments, decrees, or orders shall continue unsatisfied and in effect for a period of forty five (45) consecutive days without being vacated, discharged, satisfied, or stayed or bonded pending appeal;

(7)     Assets of the Borrower in excess of **ONE HUNDRED THOUSAND DOLLARS ($100,000.00)** in the aggregate shall be attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of the Borrower for a period of sixty (60) days; or the Borrower shall have concealed, removed or permitted to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or made or suffered a transfer of any of its property or the incurring of an obligation which may be fraudulent under any bankruptcy, fraudulent conveyance or other similar law;

(8)     The Liens purported to be created by any of the Loan Documents for any reason, except to the extent permitted by the term thereof, cease to create a valid and perfected Lien on the property purported to be covered thereby;

(9)     Any of the following events shall occur or exist with respect to the Borrower under ERISA (except as otherwise disclosed in Schedule 3.23 hereof with respect to ERISA): any Reportable Event shall occur; complete or partial withdrawal from any Multiemployer Plan shall take place; any Prohibited Transaction shall occur; a notice of intent to terminate a Plan shall be filed, or a Plan shall be terminated; or circumstances shall exist which constitute grounds entitling the PBGC to institute proceedings to terminate a Plan, or the PBGC shall institute such proceedings.   The above to the contrary notwithstanding and the acknowledgment by Lender with respect to Borrower's continued non-compliance under ERISA, if (i) Borrower has not be able to resolve with its ERISA obligations within the periods stipulated in Schedule 3.23, (ii) if such non-compliance causes a Material Adverse Effect or if (iii) such non-compliance results in criminal indictments, any and all exculpatory provisions with respect

- 36 -

thereof contained in this Agreement shall cease to have any effect or benefit in favor to the Borrower;

(10)     The Lease shall be terminated or expired and no substitute comparable lease shall be executed within thirty (30) days of such termination or expiration;

(11)     Any one of the Guaranties shall at any time after its execution and delivery and for any reason cease to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested by the Guarantor or the Guarantor shall deny it has any further liability or obligation thereunder, or shall fail to perform its obligations under the Guaranty;

(12)     A default shall have occurred under any of the Loan Documents and the same shall have not been cured within the applicable cure period provided therefore;

(13)     An "Event of Default" under, and as defined in, the CP Credit Agreement shall have occurred; and

(14)     Any other event which would have a Material Adverse Effect shall have occurred and be continuing for a period of fifteen (15) days;

THEN, and in any such event, Lender may, after notice to the Borrower, (i) declare its obligations to make Revolving Loans to the Borrower to be forthwith terminated and (ii) declare the Term Notes and the Revolving Loans Note, all interest thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Term Notes and the Revolving Loans Note, all such interest, and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower.

Upon the occurrence and during the continuance of any Event of Default, Lender is hereby authorized at any time and from time to time, without notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Lender to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or the Notes or any other Loan Document, irrespective of whether or not Lender shall have made any demand under this Agreement or the Notes or such other Loan Document and although such obligations may be unmatured.  Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application.  The rights of Lender under this Section 8.01 are in addition to other rights and remedies (including, without limitation, other rights of set off) which Lender may have.

8.2     **Cross-default and Cross-collateral**.  Borrower agrees that this Agreement is also secured by the collateral securing the CP Credit Agreement and, furthermore, Borrower agrees that the occurrence of an "Event of Default" under the CP Credit Agreement (as such term is

- 37 -

defined therein) shall constitute Event of Default under this Agreement, giving Lenders the right to foreclose on the Collateral guaranteeing this Agreement and vice versa. Even further, Borrower agrees that the Collateral shall also guarantee the obligations under the CP Credit Agreement. Lender shall give notice to Borrower and Caribbean Printing before declaring an Event of Default.

ARTICLE 9
MISCELLANEOUS

9.1 **Indemnity**. The Borrower shall indemnify, release, protect and hold Lender harmless from and against any and all suits, litigation, actions, proceedings, judgments, claims, damages, losses, liabilities, costs, obligations, penalties, investigations and expenses (including, without limitation, reasonable attorney's fees, consultant's fees and disbursement), which may be instituted or asserted against or incurred by Lender: (i) as the result of any investigation related to, or its having entered into or sought enforcement of or payments under any of the Loan Documents and which in any case is not the result of an act or omission of Lender; (ii) as a result of Borrower's violations of environmental laws, regulations or permits, or (iii) with respect to any environmental matter, hazardous or toxic materials, wastes and/or substances affecting real estate or leasehold property of the Borrower whether or not the same originates or emanates from such real estate or leasehold property or any contiguous real estate, or the occurrence of a reportable event under any Federal, State, Commonwealth, or local environmental law or regulation, and with respect to any other matter affecting real estate or leasehold property within the jurisdiction of federal or local environmental regulatory agency.

9.2 **Complete Agreement; Sale of Interest; Modification of Agreement**. The Loan Documents constitute the complete agreement between the parties hereto with respect to the subject matter hereof and may not be modified, altered or amended except by an agreement in writing signed by the Borrower and Lender.

Borrower may not sell, assign or transfer any of the Loan Documents or any portion thereof, including, without limitation, its rights, title, interests, remedies and duties hereunder or thereunder.

No amendment or waiver of any provision of this Agreement, the Notes or any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

9.3 **Costs, Expenses and Taxes**. The Borrower agrees to pay on demand all reasonable costs and expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, filing, and administration of the Loan Documents, and of any amendment, modification, or supplement to the Loan Documents, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for Lender incurred in connection with

- 38 -

advising Lender as to its rights and responsibilities hereunder. The Borrower also agrees to pay all such reasonable costs and expenses, including court costs, incurred in connection with enforcement of the Loan Documents, or any amendment, modification, or supplement thereto, whether by negotiation, legal proceedings, or otherwise. In addition, the Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing, and recording of any of the Loan Documents and the other documents to be delivered under any such Loan Documents, and agrees to hold Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees. This provision shall survive termination of this Agreement.

9.4   **No Waiver by Lender**. Lender's failure, at any time or times, to require strict performance by the Borrower of any provisions of this Agreement and any of the other Loan Documents shall not waive, affect or diminish any right of the Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Lender of an Event of Default by the Borrower under the Loan Documents shall not suspend, waive or affect any other Event of Default by the Borrower under this Agreement and any of the other Loan Documents whether the same is prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of the Borrower contained in this Agreement or any of the other Loan Documents and no Event of Default by the Borrower under this Agreement and no defaults by the Borrower under any of the other Loan Documents shall be deemed to have been suspended or waived by the Lender, unless such suspension or waiver is by an instrument in writing signed by an officer of the Lender and directed to the Borrower specifying such suspension or waiver.



9.5   **Remedies**. Lender's rights and remedies under this Agreement shall be cumulative and non-exclusive of any other rights and remedies which Lender may have under any other agreement, including, without limitation, the Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

9.6   **Successors and Assigns**. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, Lender's approved successors of the Borrower, the Lender's and the Borrower's approved assigns, transferees and endorsees of the Lender and the Borrower. Nothing in this Agreement or the other Loan Documents, express or implied, shall give to any Person, other than the parties hereto and their approved successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Agreement.

9.7   **Conflict of Terms**. Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

9.8   **Authorized Signatories**. Until Lender shall be notified by the Borrower to the contrary, the signature upon any document or instrument delivered pursuant hereto of an authorized representative of the Borrower shall bind the Borrower and be deemed to be the act of

- 39 -

the Borrower affixed pursuant to and in accordance with resolutions duly adopted by the Borrowers' authorized representatives.

   9.9     **Notices**.  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties hereto by another, or whenever any of the parties hereto desires to give or serve upon another any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be delivered in person with receipt acknowledged, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

   (a)     If to Lender:

        FirstBank Puerto Rico
        PO Box 9146
        Santurce, Puerto Rico  00908-0146
        Attention:  Mr. Luis Orengo
        and/or Manager Commercial Credit Department
        Fax Number:  (787) 729-8223

   (b)     If to Borrower:

        Ramallo Bros. Printing, Inc.
        300 Ramallo Boulevard #1
        San Juan, Puerto Rico 00936-8225
        Attention: Mr. Alberto Ramallo Yllanes
        Fax Number:  (787) 620-8686

or at such other address as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Every notice, demand, request, consent, approval, declaration or other communication hereunder shall be deemed to have been duly given or served on the date on which personally delivered, with receipt acknowledged, or three (3) Business Days after the same shall have been deposited in the United States mail.  Failure or delay in delivering copies (other than by personal delivery) of any notice, demand, request, consent, approval, declaration or other communication to the persons designated above to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.  For the convenience of the parties who have listed a telecopier number above, any party giving notice pursuant to this Section to any of the aforesaid parties shall make reasonable efforts to transmit such communications by telecopier in addition to any of the specified methods for giving notice; provided, however, that any failure or delay by a party in making such transmission by telecopier shall not in any way result in any liability on the part of such party or adversely affect the effectiveness of notice given by such party in accordance with this Section.

- 40 -

9.10   **Captions**.  The headings, captions and arrangements used herein and in any of the Loan Documents are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of the Loan Documents, nor affect the meaning thereof.

9.11   **Exhibits and Schedules**.  All exhibits and schedules attached hereto shall be and are hereby incorporated herein, and made a part of this Agreement for all purposes.

9.12   **Governing Law and Venue**:

(a)     The Loan Documents are being executed and delivered by Borrower and Lender, and are intended to be performed, in the Commonwealth, and (except as specifically provided otherwise in any Loan Document or to the extent that the Laws of any other jurisdiction otherwise require) the Laws of the Commonwealth shall govern the rights and duties of the parties hereto and the validity, construction, enforcement, and interpretation of the Loan Documents.

(b)     Borrower hereby submits itself to the venue of the Court of First Instance of Puerto Rico, San Juan Part, or any other court Lender may elect in any litigation or dispute arising out of, connected with, related to or incidental to the relationship established between Borrower and Lender in connection with this Agreement, and whether arising in contract, tort, equity or otherwise.

9.13   **Severability**.  If any provision of any of the Loan Documents is held to be illegal, invalid or unenforceable under present or future laws effective during the term thereof, such provision shall be fully severable; the appropriate Loan Document shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; and the remaining provisions thereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance therefrom.

9.14   **Survival of Representations**.  All indemnities, representations and warranties herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of this Agreement and the making of the Loan hereunder and shall continue in full force and effect until the Obligations shall have been paid in full.

9.15   **Assignment and Participations**.  The Lender may assign, negotiate, pledge or otherwise hypothecate all or any portion of this Agreement, or grant participations herein, or in any of its rights or security hereunder an under the Loan Documents, including, without limitation, the instruments securing the Borrower's obligations  hereunder.  Subject to the provisions of Section 9.16 hereof in connection with any assignment or participation, the Lender may disclose to the proposed assignee or participant any information that the Borrower is required to deliver or to disclose to the Lender pursuant to this Agreement.

9.16   **Confidentiality**.  The Lender agrees (on behalf of itself and each of its Affiliates, directors, officers, employees and representatives) to keep confidential and to not furnish or



- 41 -

disclose to any Person any and all information and/or documentation supplied or to be supplied to it by the Borrower or otherwise obtained or to be obtained related to the Borrower; provided, however, that the Lender may furnish the aforesaid information and/or documentation (i) to the Lender's Affiliates, (ii) to the Lender's legal counsel, and (iii) as may be required by an order of any court or administrative agency or by any statute, rule, regulation, order, policy, directive or request of any Governmental Authority or agency.

**[SIGNATURE PAGE FOLLOWS]**

- 42 -

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**FIRSTBANK PUERTO RICO**                    **RAMALLO BROS. PRINTING, INC.**

By: _____              By: _____
        Luis Orengo                                  Alberto Ramallo Yllanes
        Senior Vice President                              President

Affidavit Number:  4197

Acknowledged and subscribed to before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed persons, of the personal circumstances and in the capacities and representations stated above, both personally known to me.

NOTARY PUBLIC

EXHIBIT "A-1"

**TERM NOTE A**

VALUE:          **$5,657,852.00**

DUE DATE:       **December 1, 2013**

     **FOR VALUE RECEIVED**, the undersigned, **RAMALLO BROS. PRINTING, INC.** (the "**Borrower**"), promises to pay to the order of **FIRSTBANK PUERTO RICO** (hereinafter called the "**Lender**"), in legal currency of the United States of America, at its office at Number 1519 Ponce de León Avenue, Stop 23, Santurce, Puerto Rico, or at such other place, or to such other party or parties as the holder of this Note may from time to time designate, the principal sum of **FIVE MILLION SIX HUNDRED FIFTY SEVEN THOUSAND EIGHT HUNDRED FIFTY TWO DOLLARS ($5,657,852.00)**, with interest thereon from the date hereof and until its full and complete payment at the annual rate provided in the Loan Agreement (as such term is defined hereafter).

     Interest shall be computed on the basis of a year of three hundred sixty (360) days and for the number of actual days elapsed.

     The Note shall be repaid in twenty four (24) consecutive monthly installments of principal plus interest thereon. The first twenty three (23) installments of principal shall be in the amount of **$11,787.19**, plus interest thereon payable on the first day of each month commencing on January 1, 2011 until the last and twenty fourth (24th) installment for the then outstanding balance of the principal of the Note and accrued interest thereon shall be due and payable, together with any other amounts then outstanding under the Loan Documents.

     Borrower may prepay the principal amount outstanding on this Note in whole or in part, subject to the provisions of Section 4.7 of the Loan Agreement.

     Borrower shall pay Lender a late charge fee equal to five percent (5%) of any monthly installment of principal and/or interest not received by Lender within fifteen (15) days of its due date.

     In the case recourse to the courts by the holder of this Note becomes necessary, including but not limited to, the filing of a proof of claim or other proceedings under the Bankruptcy Code in order to collect the whole or any portion of the principal and interest due on this Note, the undersigned agrees to pay a liquidated sum equal to **ten per cent (10%)** of the principal sum of this Note, to cover expenses of such proceedings, court costs, disbursements and attorney's fees which amount will immediately become due and payable upon the filing and commencement of such proceedings, as a fixed and liquidated amount, and without necessity for judicial assessments, determination or review.

This Note has been issued pursuant to the provisions of a Revolving Credit and Term Loans Agreement executed on this date, between Borrower and Lender (the "Loan Agreement"), and it is entitled and subject to the benefits and security provided for therein. Terms used herein which are defined in the Loan Agreement shall have their defined meanings when used herein.

The Loan Agreement, amongst other, contains provisions pertaining to acceleration of the maturity of this Note upon the happening of stated Events of Defaults.

Borrower hereby waives presentment for payment, demand, protest, notice of protest and notice of dishonor.

Executed at San Juan, Puerto Rico, this 15th day of December, 2010.

RAMALLO BROS. PRINTING, INC.

By: _____

Alberto Ramallo Yllanes
President

Affidavit Number: _____

Acknowledged and subscribed before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed person, in his stated capacity and representation, who is of legal age, single, executive and resident of San Juan, Puerto Rico, personally known to me.

_____
NOTARY PUBLIC

<b><u>EXHIBIT "A-2"</u></b>

<b><u>TERM NOTE B</u></b>

VALUE: **$1,900,000.00**

DUE DATE: **December 1, 2013**

    **FOR VALUE RECEIVED**, the undersigned, **RAMALLO BROS. PRINTING, INC.** (the "**Borrower**"), promises to pay to the order of **FIRSTBANK PUERTO RICO** (hereinafter called the "**Lender**"), in legal currency of the United States of America, at its office at Number 1519 Ponce de León Avenue, Stop 23, Santurce, Puerto Rico, or at such other place, or to such other party or parties as the holder of this Note may from time to time designate, the principal sum of **ONE MILLION NINE HUNDRED THOUSAND DOLLARS ($1,900,000.00)**, with interest thereon from the date hereof and until its full and complete payment at the annual rate provided in the Loan Agreement (as such term is defined hereafter).

    Interest shall be computed on the basis of a year of three hundred sixty (360) days and for the number of actual days elapsed.

    The Note shall be repaid in twenty four (24) consecutive monthly installments of principal, plus interest thereon. The first twenty three (23) installments of principal shall be in the amounts set forth in <u>Schedule 1</u> hereto, plus interest thereon payable on the first day of each month commencing on January 1, 2011 until the last and twenty fourth (24th) installment for the then outstanding balance of the principal of the Note and accrued interest thereon shall be due and payable, together with any other amounts outstanding under the Loan Documents.

    Borrower may prepay the principal amount outstanding on this Note in whole or in part, subject to the provisions of <u>Section 4.7</u> of the Loan Agreement.

    Borrower shall pay Lender a late charge fee equal to five percent (5%) of any monthly installment of principal and/or interest not received by Lender within fifteen (15) days of its due date.

    In the case recourse to the courts by the holder of this Note becomes necessary, including but not limited to, the filing of a proof of claim or other proceedings under the Bankruptcy Code in order to collect the whole or any portion of the principal and interest due on this Note, the undersigned agrees to pay a liquidated sum equal to **ten per cent (10%)** of the principal sum of this Note, to cover expenses of such proceedings, court costs, disbursements and attorney's fees which amount will immediately become due and payable upon the filing and commencement of such proceedings, as a fixed and liquidated amount, and without necessity for judicial assessments, determination or review.

    This Note has been issued pursuant to the provisions of a Revolving Credit and Term Loan Agreement executed on this date, between Borrower and Lender (the "Loan Agreement"),

and it is entitled and subject to the benefits and security provided for therein.  Terms used herein which are defined in the Loan Agreement shall have their defined meanings when used herein.

The Loan Agreement, amongst other, contains provisions pertaining to acceleration of the maturity of this Note upon the happening of stated Events of Defaults.

Borrower hereby waives presentment for payment, demand, protest, notice of protest and notice of dishonor.

Executed at San Juan, Puerto Rico, this 15th day of December, 2010.

RAMALLO BROS. PRINTING, INC.

By: _____
        Alberto Ramallo Yllanes
        President

Affidavit Number: _____

Acknowledged and subscribed before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed person, in his stated capacity and representation, who is of legal age, single, executive and resident of San Juan, Puerto Rico, personally known to me.

_____
NOTARY PUBLIC

<u>**EXHIBIT "B"**</u>

<u>**REVOLVING LOANS NOTE**</u>

AMOUNT:   **$5,160,000.00**                    San Juan, Puerto Rico

DUE:      **ON DEMAND**

**FOR VALUE RECEIVED, RAMALLO BROS. PRINTING, INC.** (the "Borrower") hereby promise(s) to pay to the order of **FIRSTBANK PUERTO RICO** (the "Lender") at its office or branch at Santurce, Puerto Rico, the sum of **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)** or, if less, the aggregate unpaid principal amount of all Revolving Loans that have been made by the Lender to the undersigned hereunder and are outstanding on the date this Note is presented for payment by the Lender to the undersigned.

The unpaid balance of the principal of each Revolving Loan made hereunder shall bear interest from its date at an annual rate equal to the Base Interest Rate prevailing on the date each Revolving Loan is disbursed and during the applicable Interest Period.

Interest shall be computed on the basis of a year of three hundred sixty (360) days and for the number of actual days elapsed, and shall be payable in arrears on the last day of each month hereafter.

All outstanding Revolving Loans shall be paid in full on demand and in accordance with the terms of the Loan Agreement (as defined below).

All Revolving Loans made by the Lender to the undersigned, under this Note and all payments made on account of principal hereof shall be recorded by the Lender and, prior to any transfer hereof, endorsed on the grid that appears attached to this Note.

Borrower shall pay Lender a late charge fee equal to five percent (5%) of any monthly installment of principal and/or interest not received by Lender within fifteen (15) days of its due date.

The undersigned hereby agrees to pay an additional sum equal to ten percent (10%) of the unpaid principal hereof as a liquidated and agreed amount without necessity of further liquidation or approval by a court of law to cover costs and expenses, including attorney's fees and expenses, incurred by the holder of this Note in the event that the holder shall take recourse of judicial proceedings for the collection of any amount due hereunder and such sum shall be due and payable immediately upon the filing of any such proceedings.



The undersigned and endorser of this Note hereby waive protest and severally agree that the holder of this Note may extend the time of payment, or release any collateral held, with or without notice to the undersigned and endorsers of this Note.

This Note has been issued pursuant to, and is entitled to, the guarantee, benefits, and security provided for by that certain Revolving Credit and Term Loan Agreement between the Lender and Borrower, dated the date hereof (the "Loan Agreement"). All terms used herein that are defined in the Agreement and are not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

The undersigned hereby waive presentment, demand and notice of non-payment.

Executed at San Juan, Puerto Rico, this 15th day of December, 2010.

RAMALLO BROS. PRINTING, INC.

By: _____

Alberto Ramallo Yllanes
President

Affidavit Number: _____

Acknowledged and subscribed before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed person, in his stated capacity and representation, who is of legal age, single, executive and resident of San Juan, Puerto Rico, personally known to me.

_____
NOTARY PUBLIC

Exhibit 5

MORTGAGE NOTE

VALUE: $700,000                     DUE DATE: ON DEMAND

FOR VALUE RECEIVED, on demand, the undersigned promises to pay to the order of the bearer (the "Payee") the principal sum of SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00) with interest on the unpaid balance at the rate per annum of Twelve Percent (12%).

Interest hereunder shall be payable on demand, and payments of interest and principal shall be made at such place as the Payee may from time to time designate in writing.

The undersigned hereby waives presentment, protest, demand and notice of non-payment.

This Mortgage Note is secured by a mortgage constituted as appears from Deed Number Two (2) of Constitution of Mortgage executed on the date hereof, before the undersigned Notary, and the holder of this Mortgage Note is entitled to the benefit and security of all of the provisions and conditions set forth in said Deed of Mortgage.

In the City of San Juan, Puerto Rico, this 1st day of May, 2002.

RAMALLO BROS. PRINTING, INC.

By: _____
Name:   Angel Ramallo Díaz
Title:  President

Affidavit No. __7,032__

Subscribed and acknowledged to before me by Angel Ramallo Díaz of legal age, married, business executive and resident of San Juan, Puerto Rico in his capacity as President of RAMALLO BROS. PRINTING, INC., who I personally know in San Juan, Puerto Rico, this 1st day of May 2002.

Notary Public

Exhibit 6

40

-------------DEED NUMBER TWO (2)-----------------

------------CONSTITUTION OF MORTGAGE------------

---In the City of San Juan, Commonwealth of Puerto

Rico, this first (1st) day of May, Two Thousand Two

(2002). ---------------------------------------------

------------LEOPOLDO J. CABASSA SAURI-------------

—Attorney-at-Law and Notary Public in and for the

Commonwealth of Puerto Rico, with residence in

Guaynabo, Puerto Rico, and offices on the Fifth

Floor of Torre BBVA, Two Hundred Fifty-four (254)

Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto

Rico.-----------------------------------------------

-------------------------APPEARS-------------------

---AS SOLE PARTY: RAMALLO BROS. PRINTING, INC.,

Federal Employer's Identification Number 66-

0263884, a corporation duly organized and validly

existing under the laws of the Commonwealth of

Puerto Rico (hereinafter the "Mortgagor"), herein

represented by its President, Angel Ramallo Díaz,

social security number 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, of legal age,

married, business executive and resident of San

Juan, Puerto Rico, who is authorized to appear

herein by virtue of resolution adopted by the Board

of Director of the Mortgagor, as evidenced by a

Certificate of Corporate Resolution of the

Mortgagor dated on the first (1st) day of May, Two

Thousand Two (2002) acknowledged by Notary Public

Leopoldo J. Cabassa-Sauri.--------------------------

---I, the subscribing Notary, do hereby certify

that I am personally acquainted with the individual

appearing herein, and by his statements, I further

347716.1

41

attest as to his age, civil status, profession and residence. He assures me that he has and in my judgment he does have, the necessary legal capacity to execute this Deed, and wherefore, in consequence thereof, he freely--------------------------------

-----------------------STATES ----- --------------

---**FIRST**: <u>The Mortgaged Property</u>. The Mortgagor is the owner of record, with valid, good and marketable fee simple title ("pleno dominio") of the real property described paragraph SIXTEENTH of this Deed. --------------------------------------

---**SECOND**: <u>The Mortgage Note</u>. Simultaneously herewith Mortgagor has subscribed before me a mortgage note (hereinafter called the "Mortgage Note"), which is copied literally in paragraph FIFTEENTH hereof. --------------------------------

---**THIRD**: <u>Creation of Mortgage</u>. In order to guarantee and secure: --------------------------

-----(i) the full and complete payment of the principal of and the interest on the Mortgage Note;

-----(ii) the performance and observance of the terms therein and herein contained;---------------

-----(iii) an additional credit in the amount set forth in paragraph SEVENTEENTH hereof to cover interest in addition to that secured by law (hereinafter called the "interest credit"); ------

-----(iv) an additional credit in the amount set forth in paragraph SEVENTEENTH hereof to cover any amounts that may be paid by or advanced by the holder of the Mortgage Note hereunder, together with interest thereon (hereinafter called the "credit for additional advances"); and ------ ---



347716.1                    -2-

42

-----(v)  an additional credit (hereinafter called the "credit for liquidated damages") in the amount set forth in paragraph SEVENTEENTH hereof as a liquidated and agreed amount payable without necessity for further liquidation or approval by any court, to cover the costs and expenses (including attorneys' fees) of the Mortgagee in the event that the Mortgagee shall have recourse to the courts or to any other governmental agency in order to collect all or any part of the principal thereof or any interest thereon (by foreclosure or other proceedings or action), Mortgagor hereby grants, constitutes and creates a voluntary mortgage (the "Mortgage") and security interest in favor of any present or future holder of the Mortgage Note, by endorsement, delivery or otherwise (the "Mortgagee") on the parcel of land described in Paragraph SIXTEENTH hereof (the "Parcel") and the following additional property (hereinafter collectively called the "Mortgaged Property"): ---------- (a)  the Parcel and all of the buildings, structures, additions, fixtures, improvements, appurtenances and facilities now or hereafter located thereon or hereafter erected or placed on said property and all materials intended for the construction, reconstruction, alteration and repair of such buildings or improvements now or hereafter erected thereon, all of which materials  shall be deemed to be included within the Mortgaged Property immediately upon the delivery thereof to the Mortgaged Property; -----------------------------



347716.1          -3-

43

-------(b)   all of the rights, title and interest
of the Mortgagor, in and to, all and singular, the
tenements, hereditaments, rights of way, easements,
appendages and appurtenances, licenses, passages,
waters, water rights, riparian rights,  and other
rights, liberties and privileges thereof or in any
way or hereafter appertaining, including any other
claim at law or in equity, as well as any after
acquired  title,  franchise  or  license  and  the
reversion  and  reversions  and  remainder  and
remainders  thereof  and  any  other  real  property
belonging  or    appertaining  to  the  Mortgaged
Property, and all of the right, title and interest
of  the  Mortgagor  in  and  to  any  streets,  ways,
alleys,  strips  or  gores  of  and  adjoining  the
Mortgaged Property or any part thereof; ---------
-------(c)  all  renewals  and  replacements  of,
substitutions for and additions to the property
described in subparagraphs (a) and (b) above, and
all other property, real, personal or mixed now
owned  or  hereafter  acquired  by  Mortgagor  and
enjoyed in common with or in any way appertaining
to  such  property  as  well  as  all  real  properties
which  may  be  consolidated  or  grouped  with  the
Mortgaged Property; ----------------------------
-------(d)   all  chattels  that  may  be  removed
without breaking the material or deteriorating the
object and that are presently or hereafter perma-
nently placed on the Mortgaged Property, either for
its  decoration,  comfort  or  development,  or  for
commercial, office or industrial use; -----------



347716.1          -4-

44

-------(e)  All machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Mortgaged Property or any part thereof, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Mortgaged Property and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Mortgaged Property, or appurtenant thereto, or usable in connection with the present or future operation, enjoyment and occupancy of the Mortgaged Property, including any leases of any of the foregoing, any deposits existing at any time in connection with any of the foregoing, and the proceeds of any sale or transfer of the foregoing and all other property which under the Civil Code of Puerto Rico may properly be characterized or classified as real or immovable property either by nature or destination; -------

-------(f)  all of the Mortgagor's rights, title and  interest (but none of its obligations) as landlord  whether named as such therein or by assignment or  otherwise, to receive payments of money under all  leases of all or part of the Mortgaged Property or of space therein, or at any



347716.1                          -5-

45

time hereafter made and any and all amendments, modifications, supplements, renewals and extensions thereof, including without limitation all rents, additional rents, revenues, earnings, profits and income, payments incident to any assignment, sublease or surrender of any lease, claims for forfeited deposits and claims for damages, now due or hereafter to become due with respect to any Lease; ------------------------------------------------- -------(g) All proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property or any part thereof; -------------------------------- -------(h) all awards, compensations and payments in respect of any taking by condemnation or eminent domain of any of the foregoing; and -------------- -------(i) all proceeds, products, offspring, rents, earnings, revenues, issue and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. ---------- ---**FOURTH:** Condemnation. In the event of a taking of all or any part of the Mortgaged Property as a result of or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, or a change of grade adversely affecting the Mortgaged Property, Mortgagee shall be entitled to receive, to be applied as described below, all



347716.1 -6-

46

awards and payments on account of such taking not to exceed in the aggregate the amounts covered by this Mortgage and by any other mortgage securing a note held by the Mortgagee, which in turns encumbers the Parcel. Mortgagor will pay all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) of Mortgagee in connection with any such taking and seeking and obtaining any award or payment in respect thereof. All awards and payments collected by Mortgagee, after the payment of costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in the seeking and obtaining thereof, shall be applied by Mortgagee to the payment of the Mortgage Note or of any notes or obligations for which the Mortgage Note is assigned or pledged as security or in such other manner as may be provided in the pledge agreement or other instrument under which the Mortgage Note is assigned or pledged, or as other-wise agreed by Mortgagor and Mortgagee in writing.

---**FIFTH:** _Insurance_. As provided in Article One Hundred Sixty (160) of the Mortgage and Property Registry Act of Puerto Rico, Act Number One Hundred Ninety-eight (198) of August Ten (10), Nineteen Hundred Seventy-nine (1979), Thirty Laws of Puerto Rico Annotated Two Thousand Five Hundred Fifty-six (30 L.P.R.A. 2556), this Mortgage shall be extensive to, and shall cover, all indemnities to which the Mortgagor may be entitled under any policy of insurance covering the Mortgaged Property or any part thereof, and Mortgagee shall be



347716.1                    -7-

47

entitled to receive directly from the underwriters
all payments which become due under any such
policy(ies) of insurance. Such payments, after
deducting therefrom all costs and expenses
(including, but without limitation, reasonable at-
torneys' fees and expenses) incurred in the col-
lection thereof, shall be applied on account of the
payment of the Mortgage Note or of any notes or
obligations for which the Mortgage Note may be
assigned or pledged as security or in such other
manner as may be provided in the pledge agreement
or other instrument under which the Mortgage Note
is assigned or pledged, or as otherwise agreed by
Mortgagor and Mortgagee in writing.----------------

---**SIXTH**:. <u>Additional Advances</u>. If Mortgagor
should fail to make punctual payment of all
Impositions (as defined in paragraph TWELFTH
hereof), or should fail to maintain insurance
coverage on the Mortgaged Property as required
under the pledge agreement or other instrument
under which the Mortgage Note is assigned or
pledged to the Mortgagee or as required under any
other written agreement between Mortgagor and
Mortgagee, or if Mortgagor should fail to discharge
any mortgage, lien, encumbrance or charge upon the
Mortgaged Property, or any part thereof, which is
prohibited by the terms hereof or of the pledge
agreement or other instrument under which the
Mortgage Note is assigned or pledged or by the
terms of any other written agreement between
Mortgagor and Mortgagee, or should fail to maintain
the Mortgaged Property in good condition, normal

347716.1                    -8-

48

wear and tear excepted, or should fail to perform any other term or covenant hereof or of such pledge agreement or other instrument or written agreement, then Mortgagee, after written notice to Mortgagor (provided, however, that failure by Mortgagee to give such notice to the Mortgagor shall not affect its rights under this Article) and without waiving or releasing any obligation or default, may (but shall be under no obligation to) at any time thereafter advance such funds as may in Mortgagee's reasonable judgment be needed for the purpose of performing such terms or covenants, and Mortgagee may, in such event, take such other and further action in the premises as it may consider necessary or appropriate for such purposes. All sums so advanced or paid by Mortgagee and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred, together with interest thereon at the rate set forth in the Mortgage Note from the date of payment or incurring, shall constitute additional indebtedness secured by this Mortgage and shall be paid by Mortgagor to Mortgagee on demand. ----------------

---**SEVENTH**: Further Assurances; Additional Security. Mortgagor, at its expense, will execute, acknowledge, deliver and record all such instruments and take all such action as Mortgagee from time to time may reasonably request for better assuring to Mortgagee the properties and rights hereby mortgaged and assigned or intended so to be. Without notice to or consent of Mortgagor, and without impairment of the lien of and rights under



347716.1          -9-

49

this Mortgage, Mortgagee may take (but Mortgagor shall not be obligated to furnish) from Mortgagor or from any other person or persons additional security for the Mortgage Note or for the obligations secured by the assignment or pledge of the Mortgage Note; and neither the giving of this Mortgage nor the acceptance of any such additional security shall prevent Mortgagee from resorting first to such additional security, or to the security created by this Mortgage, in either case without affecting Mortgagee's lien and rights under this Mortgage. --------------------------------

---**EIGHTH**: <u>Default</u>. In case the Mortgagor shall fail to pay any principal of or accrued interest on the Mortgage Note on demand by the Mortgagee, or shall fail to pay any principal of or accrued interest when due on any obligation for which the Mortgage Note or this Mortgage shall have been assigned or pledged as security, or there shall be any breach of any other condition or covenant under the pledge agreement or other instrument under which the Mortgage Note is assigned or pledged to the Mortgagee, or an Event of Default (as such term is defined in the pledge agreement or other instrument under which the Mortgage Note is assigned or pledged to the Mortgagee) shall have occurred and be continuing, then at any time thereafter Mortgagee may, at its election: ------ ------(i) proceed to enforce the payment of the Mortgage Note and/or to foreclose the lien of this Mortgage as against all or any part of the Mortgaged Property (by summary proceedings or

347716.1 -10-

50

otherwise) and to have the same sold under the judgment or decree of a court of competent jurisdiction; ------------------------------------ -----(ii) to the extent permitted by law, enter upon and take possession of the Mortgaged Property or any part thereof, by force, summary proceedings, ejectment or otherwise, remove Mortgagor and all other persons and any and all properties therefrom, hold, operate and manage the same and receive all earnings, income, rents, issue and proceeds accruing with respect thereto or any part thereof. In connection with any of the foregoing, Mortgagee shall as a matter of right and without regard to the solvency of the Mortgagor or the adequacy of the security for the indebtedness from Mortgagor to Mortgagee, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Mortgagor hereby consents to the appointment of such a receiver and agrees that it will not oppose any such appointment. Said receiver shall have the broadest powers and faculties usually granted to a receiver by the court and his/her appointment shall be made by the court as a matter of absolute right granted to the Mortgagee. ------------------------------------ -----In the event of any inconsistency between the terms and conditions contained herein and the terms and conditions of any agreement evidencing the obligations secured by, delivered and/or executed in connection with the assignment or pledge of the



347716.1          -11-

51

Mortgage Note, the terms and conditions of any such
agreement shall prevail and be controlling.--------
----------------------------------------------------
---**NINTH**: <u>Foreclosure Valuation</u>. In compliance
with Article One Hundred Seventy-nine (179) of the
Mortgage and Property Registry Act of Puerto Rico,
Act Number One Hundred Ninety-eight (198) of August
Ten (10), Nineteen Hundred Seventy-nine (1979),
Thirty Laws of Puerto Rico Annotated Two Thousand
Five Hundred Seventy-five (30 L.P.R.A. 2575),
Mortgagor hereby declares and agrees that the value
of the Mortgaged Property is as set forth in
paragraph SEVENTEENTH hereof under the title
"Foreclosure Valuation". ------------------------
---**TENTH**: <u>Foreclosure</u>. In the event that the Mort-
gage Note is assigned or pledged or otherwise
encumbered as collateral security for the payment
of any other note or obligation of the Mortgagor or
of any other person, the Mortgagor agrees: ------
-----(a) That Mortgagee may foreclose this
Mortgage and may exercise all other rights,
remedies, powers and privileges provided herein or
now or hereafter existing at law, in equity, by
statute, or otherwise, without first foreclosing
the pledge or other lien so constituted upon the
Mortgage Note, to the same extent and with the same
force and effect as if the Mortgage Note had been
assigned or transferred directly to Mortgagee
rather than assigned or pledged as collateral
security, provided that nothing contained in this
paragraph TENTH shall relieve Mortgagee from the
obligation to comply with the terms of the pledge



347716.1          -12-

52

agreement or other instrument under which the Mortgage Note is assigned or pledged. -----------

------------------------------------------------------

-----(b)   That Mortgagor will not exercise any right which it may have to cancel the recordation of the Mortgage by reason of lapse of time counted from the date of the constitution of the Mortgage either under the provisions of Article One Hundred Forty-five (145) of the Mortgage and Property Registry Act of Puerto Rico, Act Number One Hundred Ninety-eight (198) of August Ten (10), Nineteen Hundred Seventy-nine (1979), Thirty Laws of Puerto Rico Annotated Two Thousand Four Hundred Sixty-nine (30 L.P.R.A. 2469) or otherwise and further agrees, whenever requested by the Mortgagee, to execute and file in the appropriate Registry, at Mortgagor's cost and expense, any and all supplemental instruments which may be necessary or convenient for the preservation of the lien of the mortgage until full payment of the Mortgage Note and the note or obligations secured by the pledge or assignment of the Mortgage Note. Without limiting the generality of the foregoing, Mortgagor agrees that, unless the Mortgagee shall consent in writing to the cancellation of the Mortgage at an earlier date, the Mortgage shall be conclusively presumed to subsist for a period of thirty (30) years from the date of its constitution; and the Mortgagor does hereby waive any right which it may otherwise have under said Article One Hundred Forty-five (145) of the Mortgage and Property Registry Act of

347716.1              -13-

53

Puerto Rico to apply for an earlier cancellation of
the record of the Mortgage.--- -------------------
---ELEVENTH: Expenses. All costs and expenses of
this Deed, of a certified copy or copies thereof,
and of the registration of this instrument in the
proper public registry; all expenses of such
additional documentation as may hereafter be
required, including the registration thereof in a
proper public registry, if such be required; and
all expenses of all documents of cancellation,
including the cost of registration thereof, shall
be for the account of Mortgagor. ---------------
---TWELFTH: Definitions. As used in this
Mortgage, the term "Impositions" shall mean all
real estate and other taxes, all assessments
(including, without limitation, all assessments for
public improvements or benefits, whether or not
commenced or completed prior to the date hereof or
while this Mortgage is in force), water, sewer,
electricity, utility and other rents, rates and
charges, excises, levies, license fees, permit
fees, inspection fees and other authorization fees
and other charges, in each case whether general or
special, ordinary or extraordinary, or foreseen or
unforeseen, of every character (including all
penalties or interest thereon), which at any time
may be assessed, levied, confirmed or imposed on or
in respect of or be a lien upon (a) the Mortgaged
Property or any part thereof or any rents, issues,
income, profits or earnings therefrom or any
estate, right or interest therein, or (b) any
occupancy, use or possession of or sales from the

347716.1                    -14-

54

Mortgaged Property or any part thereof, or (c) this Mortgage, any interest herein or any payments due from the Mortgagor under the terms of this Mortgage or the Mortgage Note; excepting, however, the income taxes now or hereafter imposed by the United States under the Internal Revenue Code of Nineteen Hundred Eighty- six (1986), as amended, and by the Commonwealth of Puerto Rico under the Puerto Rico Internal Revenue Code of Nineteen Hundred Ninety-four (1994), as amended, or under any other Act of Congress or Act of the Legislature of Puerto Rico of the same nature, modifying, amending, or substituting the statutes above mentioned. ------

---**THIRTEENTH:** <u>Miscellaneous</u>. All of the terms of this Mortgage shall apply to and be binding upon the successors and assigns of Mortgagor and all persons claiming under or through Mortgagor or any such successor or assign, and shall inure to the benefit of Mortgagee. Neither this Mortgage nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by Mortgagor and Mortgagee, notice of which is endorsed on the Mortgage Note. ------

---**FOURTEENTH:** <u>Other Terms and Conditions</u>. The following terms and conditions are made a part of this Mortgage and shall apply to and be binding upon the successors and assigns of Mortgagor and all persons claiming under or through Mortgagor or any such successors or assigns, and shall inure to the benefit of Mortgagee. Additionally, if any of the terms and conditions contained in this paragraph shall be inconsistent or contrary to any



347716.1                    -15-

55

other terms and conditions contained in this Deed, the terms and conditions of this paragraph shall prevail. ----------------------------------------

-----(a)   Representations and Warranties.   In addition to all other representations made by the Mortgagor to the Mortgagee, the Mortgagor hereby represents and warrants to the Mortgagee as follows: -----------------------------------------

-------(i)   No Leases.   There are presently in effect no leases of the Mortgaged Property or any part thereof other than those which have been disclosed in writing to the Mortgagee. -----------

-------(ii) Execution, Delivery and Enforceability. Mortgagor is duly authorized to make and enter into this Mortgage and to carry out the transactions contemplated by this Mortgage and the Mortgage Note. This Mortgage and the Mortgage Note, as amended, have been duly executed and delivered by Mortgagor and are  the legal, valid and binding obligations of Mortgagor, enforceable in accordance with their respective terms, subject only to the effect of any applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or transfer, or other similar laws affecting creditors' rights generally and the discretionary nature of specific performance and other equitable remedies. ----------------------------------------

-------(iii)   Compliance with Law.   Except as otherwise disclosed in writing by Mortgagor to Mortgagee, the Mortgaged Property is in compliance in all material respects with all applicable laws and governmental regulations, including but not

347716.1                    -16-

56

limited to those governing zoning, land use, subdivision control, health, safety, fire protection and protection of the environment. ---------(iv) No Conflicts. The execution and delivery of this Mortgage does not, and the performance and observance of the terms hereof will not, contravene in any material respect any provision of existing law or governmental regulations, and will not conflict with or result in any breach of any material terms, conditions or provisions of, or constitute a default under or result in or permit the creation or imposition of any charge or encumbrance upon any of the properties of Mortgagor pursuant to any indenture, mortgage or other agreement or instrument to which Mortgagor is a party or by which its properties are bound. ---------------------------------------------(v) Governmental Approvals. No approval, authorization or other action by, or filing with, any federal, state, or local commission, board or agency, is required under existing law in connection with the execution and delivery by Mortgagor of this Mortgage, except for a filing of a certified copy hereof in the appropriate Section of the Registry of Property of Puerto Rico. ------------(vi) Title. Mortgagor is the owner of the Mortgaged Property in fee simple ("pleno dominio") and to all rights and titles appertaining thereto. -------(vii) Liens and Encumbrances. Except as may be otherwise stated in paragraph SIXTEENTH of this Deed, the Mortgaged Property is free and clear of all liens and encumbrances whatsoever on a

347716.1                    -17-

57

parity with or superior to the lien of this Mortgage. ------------------------------------ --------------------------------------------- -------(viii)  Impositions.  All Impositions required to have been paid on the Mortgaged Property on or prior to the date of this Deed have been paid, except to the extent that the validity thereof is being contested in good faith by proper proceedings and with respect to which adequate reserves have been made and set aside for the payment thereof. ------------------------------- -----(b)  Certain Covenants and Conditions. Mortgagor covenants and agrees as follows: ------ -------(i) Provision for Payment of Governmental Charges and Other Obligations.  To assure the payment of all Impositions, taxes, charges, sewer use fees, water rates, ground rents and assessments of every name and nature, or any other obligation which may have or acquire priority over this Mortgage, and which are assessed or payable with regard to the Mortgaged Property, the Mortgagor, if so requested by the Mortgagee, shall deposit with the Mortgagee, on the first day of each month, a sum determined by the Mortgagee to be sufficient to provide, in the aggregate, a fund adequate to pay any such amounts at least ten (10) days before the same become delinquent; and whenever the Mortgagee determines sums accumulated under the provisions of this section to be insufficient to meet the obligation for which such deposits were made, the Mortgagor shall pay, upon demand by the Mortgagee, any amount required to cover the deficiency

347716.1                    -18-

58

therein. Every such deposit may, at the option of the Mortgagee, be applied directly against the obligation with reference to which it was made, or, to the fullest extent permitted by law, any other obligation of the Mortgagor secured hereby. Such deposits may, to the fullest extent permitted by law, be commingled with other assets of the Mortgagee and, in the discretion of the Mortgagee, invested by the Mortgagee for its own account, without any obligation to pay income from such investment, or interest on such deposits, to the Mortgagor, or to account to Mortgagor for such income in any manner. --------------------------------In the event of any inconsistency between the terms and conditions contained herein and the terms and conditions of any agreement evidencing the obligations secured by, delivered and/or executed in connection with the assignment or pledge of the Mortgage Note, the terms and conditions of any such agreement shall prevail and be controlling.---------------(ii) Maintenance of Mortgaged Property; Alterations. Mortgagor shall keep and maintain the Mortgaged Property in good repair and condition (ordinary wear and tear excepted), shall make all such necessary and proper repairs, replacements, additions and improvements thereto as shall be reasonably necessary for the proper conduct of its business thereon, and shall not permit or commit waste on the Mortgaged Property. Mortgagor shall make or cause to be made, as and when the same shall become reasonably necessary, all structural and non-structural, exterior and interior, ordinary

347716.1            -19-

59

and extraordinary, repairs, renewals and replacements reasonably necessary to that end. Mortgagor shall not permit removal or alteration, except in the ordinary course of business and except as otherwise permitted in writing by Mortgagee, of anything which constitutes a part of the Mortgaged Property without the prior written consent of the Mortgagee. Mortgagor shall permit the Mortgagee to enter the Mortgaged Property, at any reasonable time, to determine whether Mortgagor is in compliance with its obligations under this Mortgage. All construction on the Mortgaged Property shall comply with, and each and every part of the Mortgaged Property shall be maintained and used in accordance with, all applicable federal, state, commonwealth and local laws and governmental regulations, and any lawful private restrictions or other requirements or provisions, relating to the maintenance or use thereof. ---------------------

---Notwithstanding the above, the Mortgagor shall have the right, at any time and from time to time, to remove and dispose of machinery and equipment on, or forming a part of, the Mortgaged Property that may have become obsolete or unfit for use or that is no longer useful in the operation of the building now or hereafter constituting a portion of the Mortgaged Property or in the business conducted thereupon. The Mortgagor agrees promptly to replace with other machinery and equipment, free of superior title, liens or claims, except as otherwise permitted, agreed or consented by Mortgagee in writing, substantially of the same

347716.1                    -20-

60

character and of equal usefulness and quality, any such machinery and equipment so removed or disposed of; except that, if by reason of technological or other developments in the operation and maintenance of property of the general character of the machinery and equipment so removed, no replacement of the property so removed or disposed of is necessary or desirable in the proper operation or maintenance of the Mortgaged Property or the business conducted thereupon, the Mortgagor shall not be required to replace the same. ------------ -----In connection with the preservation, restoration and maintenance of the Mortgaged Property, Mortgagor shall fully comply with the covenants and undertakings contained in any agreement evidencing the obligations secured by, delivered and/or executed in connection with the assignment or pledge of the Mortgage Note, and in the event of any inconsistency between the terms of any such agreement and the terms and conditions contained herein, the terms and conditions of any such agreement shall control.--------------------- -----(c) Environmental Assessments. In addition to the Mortgagee's rights provided hereunder, the Mortgagee may, at its election, obtain one or more environmental assessments of the Mortgaged Property prepared by a geohydrologist, an independent engineer or other qualified consultant or expert approved by the Mortgagee evaluating or confirming (i) whether any hazardous substances or other toxic substances are present in the soil or water at or adjacent to the Mortgaged Property and (ii) whether

347716.1 -21-

61

the use and operation of the Mortgaged Property
comply with all Applicable Environmental Law (as
defined hereinafter) relating to air quality,
environmental control, release of oil, hazardous
materials, hazardous wastes and hazardous
substances, and any and all other applicable
environmental laws. Environmental assessments may
include detailed visual inspections of the
Mortgaged Property including, without limitation,
any and all storage areas, storage tanks, drains,
dry wells and leaching areas, and the taking of
soil samples, surface water samples and ground
water samples, as well as such other investigations
or analysis as are necessary or appropriate for a
complete determination of the compliance of the
Mortgaged Property and the use and operation
thereof with all Applicable Environmental Laws.
The Mortgagor shall be responsible for payment of
the cost and expense of any such environmental
assessment. Mortgagee shall minimize interference
with Mortgagor's ongoing business on the Mortgaged
Property during any such environmental assessments.
------In the event of any inconsistency between the
terms and conditions contained herein and the terms
and conditions of any agreement evidencing the
obligations secured by, delivered and/or executed
in connection with the assignment or pledge of the
Mortgage Note, the terms and conditions of any such
agreement shall prevail and be controlling.--------
------(d) Hazardous Substances. Mortgagor
represents that neither Mortgagor nor, to the best
of its knowledge, any other person has (1) used or

347716.1               -22-

62

installed any Hazardous Materials (hereinafter defined) on, from, or affecting the Mortgaged Property in violation of any Applicable Environmental Laws (as defined below); or (ii) received any notice from any governmental authority with regard to Hazardous Materials on, from or affecting the Mortgaged Property. Mortgagor covenants that the Mortgaged Property shall be kept free of Hazardous Materials and shall not be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process Hazardous Materials in violation of any Applicable Environmental Laws (as defined below), and Mortgagor shall not cause or permit, as a result of any intentional or unintentional act or omission on the part of Mortgagor or any tenant or subtenant, the installation of Hazardous Materials in or on the Mortgaged Property or a release of Hazardous Materials onto the Mortgaged Property or suffer the presence of Hazardous Materials on the Mortgaged Property in violation of any Applicable Environmental Laws (as defined below). Mortgagor shall comply with and take all necessary steps to ensure compliance in all material respects by all tenants and subtenants with all applicable federal, state and local laws, ordinances, rules and regulations, with respect to Hazardous Materials, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to any federal, state, or local environmental law, ordinance, rule, or regulation including, without limitation, the Comprehensive Environmental Response, Compensation,

347716.1          -23-

63

and Liability Act of 1980, as amended (42 U.S.C. Section 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901 et seq.) (all of the foregoing being collectively referred to as "Applicable Environmental Laws") and in the regulations adopted and publications promulgated pursuant thereto at any time. In the event that Mortgagor receives any notice from any governmental authority with regard to Hazardous Materials on, from or affecting the Mortgaged Property, or any notice of violation of Applicable Environmental Laws, Mortgagor shall promptly notify Mortgagee.. Mortgagor shall conduct and complete all investigations, studies, sampling, and testing, and all remedial, removal, and other actions necessary to clean up and remove all Hazardous Materials on, from or affecting the Mortgaged Property as required by the Applicable Environmental Laws and to the reasonable satisfaction of Mortgagee. For purposes of this paragraph, "Hazardous Materials" shall include, without limitation, any flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related materials, asbestos or any material containing asbestos, or any other substance or material regulated under any Applicable Environmental Laws. Mortgagor shall indemnify, defend and hold Mortgagee harmless from and against any losses, reasonable expenses, liabilities and



347716.1                    -24-

64

claims arising from any breach or default by Mortgagor of its representations or obligations under this paragraph, including, without limitation, enforcing the obligations of the Mortgagor under this paragraph and including, without limitation, reasonable attorneys' fees. The obligations, liabilities, and indemnification agreement of Mortgagor under this paragraph shall survive the foreclosure, expiration or sooner termination of this Mortgage or the delivery of a deed in lieu of foreclosure. The obligations, liabilities and indemnification agreement of Mortgagor under this paragraph are specifically excepted from any limitation of liability provision contained in this or any other loan document with Mortgagee. --------------------------------------- -----In the event of any inconsistency between the terms and conditions contained herein and the terms and conditions of any agreement evidencing the obligations secured by, delivered and/or executed in connection with the assignment or pledge of the Mortgage Note, the terms and conditions of any such agreement shall prevail and be controlling.-------- -----(e) Notice of Condemnation. Mortgagor, immediately upon obtaining knowledge of the institution of any proceeding for the condemnation or requisition of the Mortgaged Property or any portion thereof, shall notify the Mortgagee of the pendency of such proceeding. The Mortgagee may participate in such proceeding, and the Mortgagor from time to time shall deliver to the Mortgagee

65

all instruments requested by the Mortgagee to permit such participation. ----------------------- ------(f) Leases; Assignments; Subordination. Mortgagor hereby assigns to Mortgagee all rents and profits under any and all leases of the Mortgaged Property. At any time on notice from the Mortgagee, Mortgagor shall submit to the Mortgagee for examination all such leases and upon demand by the Mortgagee, shall execute and deliver a separate instrument collaterally assigning any or all such leases, or the rents and profits thereof, in form reasonably satisfactory to the Mortgagee. Nothing in this paragraph shall be deemed to constitute an agreement to subordinate this Mortgage to any leases with respect to the Mortgaged Property. ------ ----(g) Prior Mortgages. Nothing contained in this Deed is intended, nor shall it be deemed to constitute, consent by the Mortgagee to a subordination of the lien of this Mortgage to any other mortgage or lien. -------------------------- ----(h) Expenses. Mortgagor shall pay when due all fees and charges (including reasonable attorneys' fees) incurred by the Mortgagee incident to the transactions evidenced by the obligations (including, without limitation, the Mortgage Note) secured by this Mortgage, the assurance of the security represented by this Mortgage, and incident to the enforcement of said obligations and this Mortgage, and such fees and charges shall be secured by the lien of this Mortgage. ----------- -----(i) Priority of Lien; After-Acquired Mortgaged Property. This Mortgage is and will be

347716.1                    -26-

66

maintained as a valid mortgage lien on the Mortgaged Property subject only to the liens and encumbrances that have been otherwise permitted in writing by the Mortgagee. All property of every kind acquired by the Mortgagor after the date hereof which, by the terms hereof, is required or intended to be subjected to the lien of this Mortgage shall, immediately upon the acquisition thereof by the Mortgagor, and without any further mortgage, conveyance, assignment or transfer, become subject to the lien of this Mortgage. The Mortgagor will do, execute, acknowledge and deliver all and every such further acts, conveyances, mortgages, and assurances as the Mortgagee shall reasonably require for accomplishing the purposes of this Mortgage. ------------------------------

-----(j) Recovery Proceedings. If any action or proceeding shall be instituted to recover possession of the Mortgaged Property or for the foreclosure of any other mortgage or for any other purpose affecting the Mortgaged Property or this Mortgage, the Mortgagor will immediately, upon service thereof on or by the Mortgagor, deliver to the Mortgagee a true copy of each petition, summons, complaint, notice of motion, order to show cause, and all other process, pleadings and papers, however designated, served in any such action or proceeding. ------------------------------

----(k) Waiver and Modification; Fees and Expenses in Event of Redemption or Foreclosure. Whether or not for additional interest or other consideration paid or payable to the Mortgagee, no forbearance on

347716.1                 -27-

67

the part of the Mortgagee or extension of the time for the payment of the whole or any part of the obligations secured hereby, whether oral or in writing, or any other indulgence given by the Mortgagee to Mortgagor or to any other party claiming any interest in or to the Mortgaged Property, shall operate to release or in any manner affect the original liability of Mortgagor, or the priority of this Mortgage or to limit, prejudice or impair any right of the Mortgagee, including, without limitation, the right to realize upon the security, or any part thereof, for the obligations secured hereby or any of them, notice of any such extension, forbearance or indulgence being hereby waived by Mortgagor and all those claiming by, through or under Mortgagor. No consent or waiver, express or implied, by the Mortgagee to or of any default by Mortgagor shall be construed as a consent or waiver to or of any further default in the same or any other term, condition, covenant or provision of this Mortgage or of the obligations secured hereby. In case pursuant to the laws of the Commonwealth of Puerto Rico redemption is had by Mortgagor after foreclosure proceedings have begun, the Mortgagee shall be entitled to collect all reasonable costs, charges and expenses incurred up to the time of redemption. --------------------

----(1) Fixtures and Equipment. Mortgagor hereby grants to the Mortgagee to secure the payment and performance of the obligations under the Mortgage Note and also to secure the performance of all agreements and covenants herein contained, a

347716.1                -28-

68

security interest in all fixtures, equipment,
machinery and any other property included in the
Mortgaged Property, now owned or hereafter acquired
by Mortgagor, which might otherwise be deemed
"personal property" (and all accessions thereto and
the proceeds thereof). The Mortgagor covenants and
agrees that, upon the subsequent acquisition of
fixtures, equipment and machinery it will provide
to the Mortgagee such further assurances as may be
required by the Mortgagee to establish the
Mortgagee's security interest in such fixtures,
equipment and machinery. Mortgagor shall execute,
deliver and cause to be recorded and filed from
time to time with all necessary public offices, at
Mortgagor's sole cost and expense, such financing
statements and other documents or instruments as
will maintain the Mortgagee's priority of security
in all fixtures, equipment and machinery. -------
------(m) Right of Mortgagee to Cure Default. If a
default shall occur and be continuing hereunder or
under the Mortgage Note beyond any applicable grace
period, the Mortgagee shall have the right, but
without any obligation so to do, to cure such
default for the account of Mortgagor. Without
limiting the generality of the foregoing, Mortgagor
hereby authorizes the Mortgagee to pay, at its
option, all taxes, sewer use fees, water rates and
assessments and other Impositions, with interest,
costs and charges accrued thereon, which may at any
time be a lien upon the Mortgaged Property, or any
part thereof; to pay the premiums for any insurance
required hereunder; to incur and pay reasonable



347716.1          -29-

69

expenses in protecting its rights hereunder and the security hereby granted; to pay any balance due and delinquent under any security agreement on any fixtures and equipment included as a part of the Mortgaged Property; and the payment of all amounts so incurred shall be secured hereby as fully and effectually as any other obligation of Mortgagor secured hereby. ----------------------------------- -----(n) Certain Terms of Foreclosure Sale. To the extent permitted by law, at any foreclosure sale, any combination, or all, of the Mortgaged Property or security given to secure the indebtedness and obligations secured hereby, may be offered for sale for one total price, and the proceeds of such sale accounted for in one account without distinction between the items of security or without assigning to them any proportion of such proceeds, or be offered at more than one foreclosure sale in parts or parcels, Mortgagor hereby waiving the application of any doctrine of marshaling; and, in case the Mortgagee, in the exercise of the power of sale herein given, elects to sell in parts or parcels, said sales may be held from time to time, and the power shall not be fully executed until all of the Mortgaged Property or security not previously sold shall have been sold. ----------- -----(o) Notices. All notices, requests and other communications made or required to be given pursuant to this Mortgage shall be in writing and shall be delivered in hand, mailed by United States registered or certified first-class mail, postage prepaid, or sent by telegraph, telex or telecopy

70

confirmed by letter, at such address as Mortgagor and Mortgagee may have furnished in writing to each other, respectively.------------------------------
-----(p) Successors and Assigns; Joint and Several Liability; Partial Invalidity. All the covenants and agreements of Mortgagor herein contained shall be binding upon Mortgagor and, if applicable, the heirs, executors, administrators, successors and assigns of Mortgagor; and, where more than one person constitutes Mortgagor, the liability of such persons under this Mortgage for the obligations set forth herein shall be joint and several ("solidaria"). In case any one or more of the provisions of this Mortgage may be found to be invalid, or unenforceable for any reason or in any respect, such invalidity or unenforceability shall not limit or impair enforcement of any other provision thereof. ------------------------------
---All benefits and agreements of Mortgagee herein contained shall be binding upon Mortgagee, its successors, assigns and future holders of the Mortgage Note. ------------------------------
-----(q) Modification. No change, amendment, modification, cancellation or discharge of this Mortgage, or any part hereof, shall be valid unless in writing and signed by the parties hereto or their respective successors and assigns, and notice of which shall be endorsed on the Mortgage Note.
-----(r) Insurance. Mortgagor shall, at all times, provide, maintain and keep in force policies of insurance with respect to the Mortgaged Property in such amounts, containing such coverage, terms and

347716.1                    -31-

71

conditions and with such companies as required under the pledge agreement or other instruments under which the Mortgage Note is assigned or pledged to the Mortgagee or as required under any other written agreement between Mortgagor and Mortgagee. ----------------------------------------
-----(s) Impositions. Mortgagor shall promptly pay as they become due all Impositions on the Mortgaged Property, except to the extent that the validity thereof is being contested in good faith by proper proceedings and with respect to which adequate reserves have been made and set aside for the payment thereof. ----------------------------
-----In the event of any inconsistency between the terms and conditions contained herein and the terms and conditions of any agreement evidencing the obligations secured by, delivered and/or executed in connection with the assignment or pledge of the Mortgage Note, the terms and conditions of any such agreement shall prevail and be controlling.--------
-----(t) Governing Law. This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. --------
-----(u) Captions. Section headings are inserted for convenience of reference only and shall be disregarded for purposes of the interpretation of the terms of this Mortgage. --------------------
---FIFTEENTH: The Mortgage Note. The Mortgage Note referred to in paragraph SECOND of this Deed is literally transcribed herein as follows: -----
-----------------"MORTGAGE NOTE--------------------
-----VALUE: $700,000.00 --------------------------
-----DUE DATE: ON DEMAND -------------------------

347716.1                    -32-

72

---FOR VALUE RECEIVED, on demand, the undersigned promises to pay to the order of the bearer (the "Payee") the principal sum of SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00) with interest on the unpaid balance at the rate per annum of Twelve Percent (12%). ----------------------------------

---Interest hereunder shall be payable on demand, and payments of interest and principal shall be made at such place as the Payee may from time to time designate in writing. ----------------------

---The undersigned hereby waives presentment, protest, demand and notice of non-payment. ------

---This Mortgage Note is secured by a mortgage constituted as appears from Deed Number Two (2) of Constitution of Mortgage executed on the date hereof, before the undersigned Notary, and the holder of this Mortgage Note is entitled to the benefit and security of all of the provisions and conditions set forth in said Deed of Mortgage.-----

---In the City of San Juan, Puerto Rico, this first (1st) day of May, 2002.----------------------------



------------------**RAMALLO BROS. PRINTING, INC.** ----
---------------- /s/Angel Ramallo Díaz-------------
------------,---Name: Angel Ramallo Díaz-------------
--------------Title: President -------------------

Affidavit No. 7,032 ----------------------------------

Subscribed and acknowledged to before me by Angel Ramallo Díaz of legal age, married, business executive and resident of San Juan, Puerto Rico in his capacity as President of **RAMALLO BROS. PRINTING, INC.**, who I personally know in San Juan, Puerto Rico, this 1st day of May, 2002.----------

------------------/s/Leopoldo J. Cabassa Saurí-----
------------------------Notary Public--------------
------------THERE APPEARS THE NOTARIAL SEAL------

---**SIXTEENTH:** Description and Recording Information of the Mortgaged Property. The Parcel referred to in the THIRD PARAGRAPH of this Deed its recording information and the liens and encumbrances affecting the same are described and set forth in Exhibit A attached hereto. ----------------------

---**SEVENTEENTH:** Various Sums.----- -------------

-----(i) The amount of the mortgage credit constituted and created to secure payment of the

347716.1                    -33-

73

Mortgage Note is SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00) ------------------------------------ -----(ii) The "interest credit" is an amount equal to five (5) annuities of interest on the principal amount of the Mortgage Note pursuant to the provisions of Article One Hundred Sixty-six (166) of the Mortgage and Registry of Property Act of Puerto Rico. ------------------------------------ -----(iii) The "credit for additional advances" is SEVENTY THOUSAND DOLLARS ($70,000.00).-------------- -----(iv) The "credit for liquidated damages" is SEVENTY THOUSAND DOLLARS ($70,000.00).-------------- -----(v) The "Foreclosure Valuation" is SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00)------------ ---**EIGHTEENTH**: Conflict; Construction of Documents. In the event of any conflict between the provisions of this Deed and any agreement between the Mortgagor and the Mortgagee or any other document under which the Mortgage Note may be assigned, pledged or otherwise encumbered as collateral security for the payment of any obligation of the Mortgagor or of any other person, the provision of such agreement or document shall control.----------- -------------ACCEPTANCE AND WARNINGS ------------- ---The appearing party to this Deed accepts the same as drafted because it has been drawn up in accordance with his stipulations, terms and con- ditions. I, the Notary, do hereby certify that the appearing party can read and understands the English language and that I, the Notary, made to the appearing party the necessary legal warnings concerning the execution of this Deed and he was

347716.1              -34-

74

fully advised by me thereon. Specifically, I advised the appearing party of the following: --- -----(a) That any liens or encumbrances affecting title to the Mortgaged Property that may be filed for recordation prior to the filing of this Deed may be legally binding and could take precedence over this Mortgage.----------------------------- -----(b) That this Deed was prepared in accordance with a title abstract dated the twenty ninth (29th) day of April, Two Thousand Two (2002), prepared by Hato Rey Title Insurance Agency, Inc., an entity engaged in such business, and not by the undersigned Notary, and Mortgagee is relying on such abstract.------------------------------------ -----(c) .That a certified copy of this Deed must be filed and recorded in the appropriate Section of the Registry of the Property of Puerto Rico. ---- -----(d) That there may exist and be pending unrecorded statutory liens and real property taxes (including the statutory legal mortgage in favor of the Commonwealth of Puerto Rico). ---------------- --------------------EXECUTION -------------------- ----The appearing party waived the right which I advised him he had to have witnesses to the execution of this Deed but, upon my advice, made use of his right to read the same, and finding it drafted to his entire satisfaction, having been advised by me, the Notary, of the pertinent legal warnings and reservations, proceed to sign before me, and to affix his initials on each folio of the same. To all of which, as well as to everything

347716.1                    -35-

75



contained or related in this Deed, I, the Notary,

CERTIFY, ATTEST AND GIVE FAITH.-------------------

347716.1

76

## EXHIBIT A

### DESCRIPTION OF THE PARCEL

DESCRIPTION:

---URBANA: Parcel of land lot number three (3) located at Cidra Industrial Subdivision, Cidra, Puerto Rico.  It bounds by the North, with land owned by Puerto Rico Urban Renewal and Housing Corporation; by the South, with street of the same industrial subdivision; by the East, with lot number four of the same industrial subdivision.  It has a surface area of two thousand nine hundred point four hundred fifty eight square meters (2,900.458 s.m.), equivalent to seven thousand four hundred five ten thousandths of a "cuerda" (7,405.10 cdas.).  Its is affected by a right of way for storm sewer lines which affect a strip of land three (3) meters with along its northern and western boundaries."-------------------

Recording Information:

---Recorded at Page Sixty (60), of Volume two hundred twenty seven (227) of Cidra, property number nine thousand twenty eight (9,028), Registry of the Property of Puerto Rico, Second Section of Caguas.-------------------------------

Liens and Encumbrances:

---By its origin is free and clear of liens and encumbrances.-----------------

---By itself is subject to the following liens and encumbrances: ----------------

-----(i) Attachment in favor of Estado Libre Asociado de Puerto Rico in the sum of twenty seven thousand three hundred twenty one dollars and thirty five cents ($27,321.35), recorded at page sixty one (61) of volume two hundred twenty seven (227) of Cidra----------------------------------------------------------

-----(ii) Mortgage in the principal sum of Three Hundred Thousand Dollars ($300,000.00) securing a mortgage note for said amount payable on demand to the order of bearer, constituted as per the terms of Deed number twenty (20), executed in San Juan, Puerto Rico on September thirty (30), nineteen hundred ninety one (1991) before Notary Public Jorge Souss Villalobos, recorded at page sixty two (62) of volume two hundred twenty seven (227) of Cidra.-----------------------

347716.1

**Exhibit 7**

## MORTGAGE NOTE PLEDGE AND SECURITY AGREEMENT

This Mortgage Note Pledge and Security Agreement (the "Agreement") dated as of the 15th day of December, 2010, by and between:

**FIRSTBANK PUERTO RICO** (hereinafter the "**Lender**"), a banking corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its Vice President, **MR. LUIS ORENGO**, who is of legal age, married, executive and resident of Trujillo Alto, Puerto Rico, and

**RAMALLO BROS. PRINTING, INC.** (hereinafter the "**Pledgor**"), a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its President, Alberto Ramallo Yllanes, of legal age, single, executive and resident of San Juan, Puerto Rico.

### WITNESSETH:

**WHEREAS**, Lender and Ramallo Bros. Printing, Inc. (the "Borrower") entered into a Revolving Credit and Term Loans Agreement dated the date hereof, providing for (i) a term loan in the sum of **FIVE MILLION SIX HUNDRED FIFTY-SEVEN THOUSAND EIGHT HUNDRED FIFTY-TWO DOLLARS ($5,657,852.00)**, (ii) a term loan in the sum of **ONE MILLION NINE HUNDRED THOUSAND DOLLARS ($1,900,000.00)**, and (iii) loans in a revolving line of credit of up to **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)** (as modified and supplemented and in effect from time to time, the "Loan Agreement"), and the documents, instruments, and agreements ancillary thereto.

**WHEREAS**, Lender and Caribbean Printing Group, Inc. ("CP") entered into a Credit Agreement dated the date hereof, providing for (i) loans in a revolving line of credit of up to **TWO MILLION EIGHT HUNDRED TWENTY THOUSAND DOLLARS ($2,820,000.00)**, at any one time outstanding necessary for working capital of the Borrower and (ii) loans in a non-revolving line of credit of up to **ONE MILLION DOLLARS ($1,000,000.00)** (as modified and supplemented and in effect from time to time, the "CP Credit Agreement"), and the documents, instruments, and agreements ancillary thereto.

**WHEREAS**, as a condition of, and in order to induce Lender to extend credit under the Loan Agreement and the CP Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Pledgor has agreed to execute and deliver to Lender a pledge agreement and security interest upon certain mortgage note, as more particularly set forth hereinafter.

-2-

NOW, **THEREFORE**, in consideration of the premises, the parties hereto agree as follows:

1. <u>Definitions.</u>

All terms defined in this Agreement in the singular form shall have the same meanings when used in the plural and vice versa. The words "hereof," "herein," and "herein under" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto. Unless the context indicates otherwise, the definitions in the PR UCC (as hereinafter defined) as in effect in the Commonwealth of Puerto Rico on the Effective Date apply to words and phrases in this Agreement; if definitions in the PR UCC (as hereinafter defined) conflict, definitions in Chapter 9 of the PR UCC (as hereinafter defined) apply. Defined terms not otherwise defined herein shall have the meaning contained in the Loan Agreement. In addition, as used herein:

"Effective Date" shall mean the date hereof.

"Lender" shall have the meaning ascribed thereto in the preamble of this Agreement.

"Loan Documents" means, collectively, the "Loan Documents" as such term is defined in the Loan Agreement and the "Loan Documents" as such term is defined in the CP Credit Agreement.

"Notes" means, collectively, the "Notes," as such term is defined in the Loan Agreement and the "Notes," as such term is defined in the CP Credit Agreement.

"Mortgage" shall mean the deeds of constitution of mortgage securing the Mortgage Note constituted over the Property.

"Mortgage Note" shall have the meaning ascribed thereto in Section 2.1(i) of this Agreement.

"PR UCC" shall mean the Commercial Transactions Act of the Commonwealth of Puerto Rico created by Act No. 208 of August 17, 1995, as amended by Act No. 176 of August 31, 1997, Act No. 241 of September 19, 1996, Act No. 1 of January 17, 1997, Act No. 26 of June 30, 1997 and Act No. 214 of December 31, 1997 and as maybe further amended and in effect from time to time in the Commonwealth of Puerto Rico, and any successor statute.

"Pledgor" shall have the meaning ascribed thereto in the preamble of this Agreement.

-3-

"Proceeds" shall mean all proceeds, as such term is defined in Section 9-306(1) of the PR UCC as in effect on the Effective Date and, in any event, shall include, but not be limited to, (i) any and all proceeds of any insurance, judgment, indemnity, warranty or guaranty payable to or on behalf of the Pledgor from time to time with respect to any of the Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to the Pledgor from time to time in connection with any requisition, confiscation, condemnation, seizure, taking or forfeiture of the Collateral by any governmental authority; and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Property" shall mean the Property(ies) as set forth in **Exhibit B**.

"Secured Obligations" shall mean, collectively, any and all debts, obligations, and liabilities of Pledgor to Lender arising out of this Agreement and all obligations of Borrower to the Lender, arising out of or related to the Loan Agreement, the CP Credit Agreement, the Notes and the other Loan Documents (whether principal, interest, fees, or otherwise, whether now exiting or hereafter arising, whether voluntary or involuntary, whether or not jointly owed with others, whether direct or indirect, absolute or contingent, contractual or tortuous, liquidated or unliquidated, arising by operation of law, or otherwise, whether or not from time to time decreased or extinguished and later increased, created or incurred, and whether or not extended, modified, rearranged, restructured, refinanced, or replaced, including without limitation, modifications to interest rates or other payment terms of such debts, obligations, or liabilities).

2.    Pledge and Grant of Security Interest.

2.1    Creation of Security Interest.    As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, the Pledgor hereby pledges and delivers, pledges, assigns and grants to the Lender as hereinafter provided, a continuing security interest in the following properties and/or instruments, whether now owned by the Pledgor or hereafter acquired and whether now existing or hereafter coming into existence (all being collectively referred to herein as the "Collateral"):

i.    The bearer mortgage note(s) identified in **Exhibit A** hereof (the "Mortgage Note"), which are secured by the Mortgage.

ii.    All extensions, modifications, improvements, betterments, renewals, accessions, substitutes and replacements of, and all additions and appurtenances to, any and all of the property of the Pledgor described in subsection (i) of this Section 2.1.

iii.    All Proceeds of any and all of the foregoing, including, without limitation, all cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for the Mortgage Note and all proceeds derived from the enforcement thereof of the Mortgage or other security therefor.

-4-

2.2   Possession of Note. The Lender (by its acceptance of the benefits of this Agreement) and the Pledgor consent and agree to the possession of the Mortgage Note by the Lender.

3.   Security for the Secured Obligations.

The pledge and security interest created hereby upon the Collateral constitute continuing first priority collateral security for the Secured Obligations.

4.   Representations and Warranties.

The Pledgor hereby represents and warrants as follows:

4.1   Authority. The Pledgor has all necessary power and authority to make and carry out this Agreement, to pledge to the Lender all of its right, title and interest in and to the Mortgage Note and to create a security interest in the Collateral. The Pledgor is duly authorized to execute and deliver this Agreement.

4.2   No Default or Lien. The exercise by the Lender of any of its rights and remedies hereunder in accordance with the terms of this Agreement will not contravene any law or any contractual restriction binding on or affecting the Pledgor or any of its properties and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties except the pledge and security interest created hereby or created in connection with the Loan Agreement.

4.3   Operations of Pledgor. The Pledgor does not have or operate in any jurisdiction under, or in the preceding ten (10) years has not had or has not operated in any jurisdiction under, any trade names, fictitious names or other names (including, without limitation, any names of divisions or operations), except its legal name.

4.4   Enforceability. This Agreement is effective to create a valid and continuing Lien on and, upon the filing of the appropriate financing statements and the delivery of the Mortgage Note to Lender, a perfected Lien in favor of Lender on the Collateral with respect to which a Lien may be perfected by filing or delivery pursuant to the PR-UCC. Such lien is prior to all other Liens, and is enforceable as such as against any and all creditors of and purchasers from Pledgor (other the purchasers of Inventory in the ordinary course of business). All action by Pledgor necessary or desirable to protect and perfect such Lien on each item of the Collateral has been duly taken.

4.5   Mortgaged Rights. The Pledgor is the owner of record, with valid, good and insurable fee simple ("pleno dominio") title to each portion of the real rights ("derechos reales") encumbered by the Mortgage (the "Mortgaged Rights"), free and clear of all liens, charges, encumbrances and rights of third parties, other than the lien of the Mortgage or the other

-5-

encumbrances referred to in the Mortgage or permitted under the Loan Agreement and those appearing as exceptions in the Title Insurance Policy.

4.6    Ownership of Collateral.  The Pledgor is and will be at all times during the term of this Agreement the sole beneficial and legal owner of the Collateral free and clear of any lien, security interest, pledge, option or other charge, claim or encumbrance, except for the pledge and security interest created by this Agreement, and the lien, security interest, pledge and encumbrance created to secure the obligations of the Borrower under the Loan Agreement, the CP Credit Agreement, the Note and the other Loan Documents and the obligations of Pledgor thereunder.

4.7    No Filing or Approval Necessary.  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or other regulatory body is required for (i) the pledge and the creation of a security interest by the Pledgor to the Lender of all of the Pledgor's rights, title and interest in and to the Collateral and the perfection of the pledge and security interest of the Mortgage Note pursuant to this Agreement, or (ii) the exercise by the Lender of any of its rights and remedies hereunder, except for such filings as may be required under the PR UCC.

4.8    Mortgage Duly Executed.  The Mortgage was duly executed and has been filed for recordation in the appropriate section(s) of the Registry of the Property of the Commonwealth of Puerto Rico, and upon recordation will constitute a duly perfected valid first mortgage lien effective as of the date of filing for recordation on the Mortgaged Rights therein described with the priority therein set forth.

4.9    Mortgage Filing Fees.  All mortgage recording taxes, notary fees, documentary fees, stamp taxes, and other taxes, fees and expenses required to be paid in connection with the execution and recording of the Mortgage, have been paid in full.

4.10    Perfection of Security Interest over Mortgage Note.  Upon delivery of the Mortgage Note to the Lender and the continued possession of the Mortgage Note by the Lender, this Agreement creates a valid perfected first priority pledge and security interest in favor of the Lender in the Mortgage Note as security for the Secured Obligations subject to no superior lien, security interest, adverse claim, charge or encumbrance.

4.11    Access and Utility Services.  The Property is served by all utilities required or necessary for current use or the Pledgor has otherwise built the necessary infrastructure to provide all utility services required for the proper operation thereof. All streets necessary to serve the Property are completed and serviceable and to righteous knowledge have been dedicated and accepted as such by the appropriate governmental authorities.  The Pledgor has access to the Property from public roads or other right of way easements sufficient to allow the Pledgor and its tenants and invitees to conduct its and their businesses at the Property in accordance with sound commercial practices.

-6-

5.      Covenants.

So long as any of the Secured Obligations shall remain outstanding and unpaid, unless the Lender shall otherwise consent in writing (to be given or withheld in its sole discretion):

5.1      Further Assurances.  The Pledgor will at its expense, at any time from time to time, promptly execute and deliver all further instruments, financing statements and documents and take all further action which may be necessary or that the Lender may reasonably request in order (i) to establish, perfect and protect the pledge and security interest created hereby, and maintain a valid, enforceable, first priority security interest in the Collateral as provided herein and the other rights and security contemplated herein, all in accordance with the PR UCC, (ii) to enable the Lender to exercise and enforce its rights and remedies hereunder in respect of the Collateral, or (iii) to otherwise effect the purposes of this Agreement.

5.2      Compliance with Laws.  The Pledgor will comply with all Federal, Commonwealth of Puerto Rico and local laws, and regulations affecting the Mortgaged Rights, the Collateral and the Mortgage, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.3      No Disposition or Other Liens.  Except for the pledge and security interest created hereby, the Pledgor will not (i) assign, exchange or otherwise dispose of the Collateral or any interest therein or attempt, offer or contract to do so, or (ii) create or suffer to exist any mortgage, lien, security interest, attachment or other charge or encumbrance upon or with respect to Collateral.

5.4      Preservation of Collateral.  The Pledgor will not take any action that would in any manner impair the value or enforceability of the Lender's pledge and security interest in the Collateral and will take such actions as are necessary to preserve the value and enforceability of the Lender's pledge and security interest created by this Agreement.

5.5      Payment of Taxes, etc.  The Pledgor shall pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including, without limitation, claims for labor, materials and supplies) against the Property, except to the extent that the validity thereof is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been made and set aside on its books for the payment thereof.

5.6      Insurance.  The Pledgor shall, at its expense, maintain the Property insured by such insurance companies, in such amounts, covering such loss, damage and risks and in the form and manner required under the Mortgage.

-7-

5.7   Payment of Utility Services.  The Pledgor shall pay, or cause to be paid, when due all charges for all utility services in connection with the Property and shall comply with all contracts relating to such services.

5.8   Delivery of After-Acquired Collateral.  The Pledgor shall account fully for and promptly deliver to Lender, in the form received, all documents, chattel paper, instruments, and agreements constituting Collateral hereunder and all proceeds of the Collateral received, all endorsed to Lender or in blank, as requested by Lender, and until so delivered, all such documents, instruments, agreements and proceeds shall be held by Pledgor in trust for Lender, separate from all other property of Pledgor and identified as the property of Lender.

5.9   Maintenance of Records.  The Pledgor shall keep separate, accurate, and complete records of the Collateral and provide Lender with such records and such other reports and information relating to the Collateral as Lender may request from time to time.

5.10   Payment of Lender's Costs and Expenses.  The Pledgor shall reimburse Lender upon demand for any costs and expenses, including, without limitation, reasonable attorney's fees and disbursements, Lender may incur while exercising any right, power, or remedy provided by this Agreement or by law, all of which costs and expenses are included in the Secured Obligations.

5.11   Notice of Changes.  The Pledgor shall give Lender thirty (30) days prior written notice of any change in Pledgor's residence or chief place of business or legal name or trade name(s) or style(s) set forth in the penultimate paragraph of this Agreement.

6.   Events of Default; Remedies.

6.1   A default under this Agreement shall be deemed to exist upon the occurrence of any of the following (each an "Event of Default"):

(a)   An "Event of Default" (as such term is defined in the Loan Agreement) shall occur; or

(b)   An "Event of Default" (as such term is defined in the CP Credit Agreement) shall occur; or

(c)   Debtor shall fail to perform or observe any other material term or condition of this Agreement and such failure shall remain unremedied for a period of fifteen (15) days after written notice from the Secured Party to the Debtor.  It shall not be construed that the fifteen (15) days period referenced in this subsection (c) shall have the effect of increasing any cure periods allowed under the Loan Agreement, the CP Credit Agreement, the Notes or the Loan Documents.

6.2   Remedies.  If any Event of Default shall have occurred and be continuing:

-8-

(a)  Foreclose on Collateral.  The Lender shall, to the fullest extent permitted by applicable law, have the right to foreclose on the lien of the pledge and security interest herein granted upon the Collateral.

(b)  Foreclose on Mortgage.  The Lender may bring legal action or proceedings for the collection of the Secured Obligations, and at its option, simultaneously or thereafter foreclose the Mortgage, without first foreclosing the pledge and security interest herein created.

(c)  All Other Rights.  The Lender's may exercise, to the fullest extent permitted by applicable law, in addition to their rights and remedies provided for herein or otherwise available to it at law or in equity, all of the rights and remedies of a secured party under the PR UCC and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted.

(d)  Proceeds.  Any amounts realized by the Lender from the sale of the Collateral and/or the foreclosure of the Mortgage shall be applied by the Lender, in whole or in part, against all or any part of the Secured Obligations in such order as the Lender shall elect.

(e)  Deficiency.  In the event that the proceeds of any such sale, disposition or realization are insufficient to pay all amounts of the Secured Obligations to which the Lender's are legally entitled, the Pledgor shall be liable for the deficiency, if any.

7.  Indemnity and Expenses.

7.1  Indemnity.  The Pledgor agrees to indemnify and hold the Lender, its officers, directors, agents and Affiliates (each such Person being called an "Indemnitee") harmless from and against any losses, liabilities, claims and damages including reasonable attorneys' fees and disbursements, and other reasonable expenses incurred or arising by reason of the taking or the failure to take action by the Lender, in good faith, with respect of any transaction effected under this Agreement or in connection with the pledge provided for herein, except that such indemnity shall not be available to the extent that such losses liabilities, claims, damages and related expenses are determined by a court of competent jurisdiction by final and nonappelable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

7.2  Expenses.  The Pledgor agrees to pay to the Lender all reasonable out-of-pocket costs and expenses and all reasonable fees, expenses and disbursements of the Lender, incurred in connection with the execution and delivery of this Agreement and the enforcement by the Lender of the provisions of this Agreement and of any transactions effected in connection herewith, including without limitation, all internal revenue stamps, filing and recording fees payable in connection with the foreclosure of the Mortgage and the termination or cancellation of any other liens upon the Mortgaged Rights covered thereby.

-9-

7.3     Survival.  The obligations of the Pledgor under this Section 7 shall survive the termination of this Agreement.

8.        Interest Absolute.

Except as expressly provided herein, all rights and interests of the Lender and the pledge and security interest constituted hereunder, and all agreements and obligations of the Pledgor hereunder, shall be absolute and unconditional, irrespective of:

8.1     any lack of validity or enforceability of the Loan Agreement, the CP Credit Agreement, the Note, the Mortgage Note, the Mortgage, and/or the other Loan Documents;

8.2     any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document;

8.3     any exchange, release or non-perfection of any lien on or security interest in, any Collateral or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations; or

8.4     to the fullest extent permitted by law, any other circumstances that might otherwise constitute a defense available, or discharge of, the Pledgor in respect of the Secured Obligations or this Agreement.



-10-

Without limiting the generality of the foregoing, the Pledgor hereby consents to, and hereby agrees, that the rights of the Lender hereunder, and the liability of the Pledgor hereunder, shall not be affected by any and all releases of any Collateral from the lien and security interest created by this Agreement, the Mortgage, the Loan Agreement, the CP Credit Agreement, the Note, the other Loan Documents or any other agreement or instrument. This Agreement and the lien and security interest created hereby shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Secured Obligations is rescinded or must otherwise be returned by the Lender upon the insolvency, bankruptcy or reorganization of the Pledgor, or otherwise, all as though such payment had not been made.

9.   Notice.

All notices, requests and other communications hereunder shall de addressed to the addresses set forth in the Loan Agreement and the CP Credit Agreement with respect to the Lender and on the execution page of this Agreement with respect to the Pledgor.

10.   Limitation of the Lender's Duties in Respect of the Mortgage Note and other Provisions Concerning the Collateral.

10.1   Lender's Duty.   Other than holding the possession of the Mortgage Note in accordance with safe and sound banking practices, the Lender shall not have any other duty under Section 9-207 of the PR UCC to the Pledgor, and/or any other Person as to the Mortgage Note in its possession and control or any income thereon, or as to the preservation of rights against third parties or any other rights pertaining thereto. The Lender assumes no responsibility for the correctness, validity or genuineness of the Mortgage Note and/or the Mortgage.

10.2   Attorney-in-Fact.   The Pledgor hereby irrevocably appoints the Lender as the Pledgor's attorney-in-fact and proxy, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time in the Lender's discretion, to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, (i) to obtain and adjust insurance required to be paid to the Lender with respect to the Property or the rents thereunder, (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipt for moneys due and to becomes due under or in respect of any Collateral or the Mortgaged Rights, (iii) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, and (iv) to file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable to enforce the rights of the Lender with respect to any Collateral or the Mortgaged Rights.

-11-

10.3  <u>Performance by Lender</u>.  If the Pledgor fails to perform any agreement contained herein, the Lender may itself perform, or cause performance of, such agreement or obligation, and the expenses of the Lender incurred in connection therewith shall be payable by the Pledgor pursuant to <u>Section 7</u> hereof.

11.   <u>Miscellaneous</u>.

11.1   <u>Amendments</u>.  No amendment of any provisions of this Agreement shall be effective unless it is in writing and signed by the Pledgor and the Lender and no waiver of any provision of this Agreement, and no consent to any departure by the Pledgor therefrom, shall be effective unless it is in writing and signed by the Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2   <u>No Waiver</u>.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Lender provided herein and/or in the Loan Agreement, the CP Credit Agreement and the other loan documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Lender under the Loan Agreement and the CP Credit Agreement and any other loan document against any party thereto are not conditional or contingent on any attempt by the Lender to exercise any of its rights under the Loan Agreement the CP Credit Agreement and any other Loan Document against such party or against any other person.

11.3   <u>Lender not Obligated</u>.  All rights granted to the Lender hereunder shall be exercised solely at the discretion of the Lender and nothing in this Agreement shall be construed as obligating the Lender to exercise any said rights.

11.4   <u>Severability</u>.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

11.5   <u>Successors and Assigns</u>.  This Agreement shall be binding on the Pledgor, the Pledgor and their respective successors and assigns and shall inure, together with all rights and remedies of the Lender hereunder, to the Lender and its successors, transferees and assigns. Without limiting the generality of the immediately preceding sentence, any Person who shall succeed the Lender under the Loan Agreement, the CP Credit Agreement, the Note and/or the other Loan Documents shall become vested with all of the benefits in respect thereof granted to the Lender herein or therein, and the Lender may assign or otherwise transfer its rights under the Loan Agreement, the CP Credit Agreement, the Note and/or the other Loan Documents to any other Person, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Lender herein or therein.  None of the rights or obligations of the

-12-

Pledgor hereunder may be assigned or otherwise transferred without the prior written consent of the Lender (to be given or withheld in its sole discretion).

11.6    Satisfaction.  When all Secured Obligations shall have been paid in full and the commitment of the Lender under the Loan Agreement and the CP Credit Agreement shall have expired or been terminated, the lien and security interest created hereby and this Agreement shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Pledgor. Upon such termination, (i) the Lender shall return and deliver the Mortgage Note to the Pledgor without recourse, representation or warranty, and (ii) the Lender will, upon the Pledgor's request and at the Pledgor's expense, execute and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence such termination and the reversion of such rights and the cancellation of the security interest created over the rest of the Collateral.

11.7    Headings.  Section headings used in this Agreement are for convenience or reference only and do not constitute part of this Agreement for any other purpose.

11.8    Inconsistency with Loan Agreement.  The terms, clauses and provisions of this Agreement are in addition and not in limitation or substitution of the terms, clauses and provisions set forth in the Loan Agreement and the CP Credit Agreement. In the event of any inconsistency between this Agreement and the Loan Agreement and the CP Credit Agreement, the terms hereof shall be controlling as necessary to create, preserve and/or maintain a valid, enforceable first priority lien and security interest under applicable law upon the Collateral, but otherwise, provisions of the Loan Agreement shall be controlling.

11.9    Applicable Law.  This Agreement is to be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico without respect to any otherwise applicable principles of conflict of law, both as to interpretation and performance.

11.10   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

**[SIGNATURE PAGE FOLLOWS]**

-13-

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto through their authorized representatives and is effective as of the day and year first written above.

FIRSTBANK PUERTO RICO                           RAMALLO BROS. PRINTING, INC.

By: _____                     By: _____
Luis Orengo                                          Alberto Ramallo Yllanes
Senior Vice President                                President

Affidavit Number: 4200

Acknowledged and subscribed to before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed persons, of the personal circumstances and in the capacities and representations stated above, both personally known to me.

_____
NOTARY PUBLIC

-14-

**EXHIBIT A**

Mortgage Note

1.    Demand Mortgage Note to the order of Bearer in the principal amount of $700,000.00 issued on May 1, 2002, before Notary Public Leopoldo J. Cabassa Saurí, affidavit number 7,032.

CONFIDENTIAL: MISSION CAPITAL ADVISORS, LLC
Opened by Tessa Truex, Hudson Advisors
on 1/18/13 @ 11:19 AM from 12.23.41.194

-15-

**EXHIBIT B**

Property

---URBANA: Parcel of land lot number three (3) located at Cidra Industrial Subdivision, Cidra, Puerto Rico. It bounds by the North, with land owned by Puerto Rico Urban Renewal and Housing Corporation; by the South, with street of the same industrial subdivision; by the East, with lot number four (4) of the same industrial subdivision. It has a surface area of two thousand nine hundred point four hundred fifty-eight square meters (2,900.458 s.m.), equivalent to seven thousand four hundred five ten thousandth of a "cuerda" (7,405.10 cdas.). It is affected by a right-of-way for storm sewer lines which affect a strip of land three (3) meters with along its northern and western boundaries."

---Recorded at page 60 of volume 227 of Cidra, property number 9,028, Registry of the Property of Puerto Rico, Second Section of Caguas.

**Exhibit 8**

## SECURITY AGREEMENT

This **Security Agreement** entered into in the City of San Juan, Commonwealth of Puerto Rico, this 15th day of December, 2010, between:

**FIRSTBANK PUERTO RICO**, a banking corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its Senior Vice President, **MR. LUIS ORENGO**, who is of legal age, married, executive and resident of Trujillo Alto, Puerto Rico (the **"Secured Party"**); and

**RAMALLO BROS. PRINTING, INC.** (hereinafter the **"Debtor"**), a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its President, Alberto Ramallo Yllanes, of legal age, single, executive and resident of San Juan, Puerto Rico.

### RECITALS

**WHEREAS**, Lender and Debtor entered into a Revolving Credit and Term Loans Agreement dated the date hereof, providing for (i) a term loan in the sum of **FIVE MILLION SIX HUNDRED FIFTY-SEVEN THOUSAND EIGHT HUNDRED FIFTY-TWO DOLLARS ($5,657,852.00)**, (ii) a term loan in the sum of **ONE MILLION NINE HUNDRED THOUSAND DOLLARS ($1,900,000.00)**, and (iii) loans in a revolving line of credit of up to **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)** (as modified and supplemented and in effect from time to time, the "Loan Agreement"), and the documents, instruments, and agreements ancillary thereto.

**WHEREAS**, Lender and Caribbean Printing Group, Inc. ("CP") entered into a Credit Agreement dated the date hereof, providing for (i) loans in a revolving line of credit of up to **TWO MILLION EIGHT HUNDRED TWENTY THOUSAND DOLLARS ($2,820,000.00)**, at any one time outstanding necessary for working capital of the Borrower and (ii) loans in a non-revolving line of credit of up to **ONE MILLION DOLLARS ($1,000,000.00)** (as modified and supplemented and in effect from time to time, the "CP Credit Agreement"), and the documents, instruments, and agreements ancillary thereto.

**WHEREAS**, to induce Lender to extend such credit under the Loan Agreement and the CP Loan Agreement, Debtor has agreed to pledge and to grant to Secured Party a security interest in and lien upon certain property of Debtor described more particularly herein.

**NOW, THEREFORE**, in consideration of the above Recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtor hereby agrees as follows:

1. **Certain Terms**.

The following terms, when used herein, including the recitals hereto, shall, unless the context otherwise requires, have the following meanings:



-2-

"Account Debtor" shall have the meaning assigned to such term in **Section 8(i)** hereof.

"Agreement" means this Security Agreement, together with all Exhibits and Schedules hereto, as amended, supplemented, replaced, or otherwise or modified from time to time.

"Applicable Law" means and includes the applicable statutes and rules of the Commonwealth of Puerto Rico or of any other applicable jurisdiction and all applicable regulations promulgated thereunder and interpretations thereof by a governmental authority charged with the administration or the interpretation thereof, and all applicable statutes and orders, requests, directives, instructions and notices of any governmental authority of the Commonwealth of Puerto Rico or of any other applicable jurisdiction.

"Closing Date" means the date of this Agreement.

"Instrument" means any contract, agreement, indenture, mortgage, certificate or other document or writing (whether by formal agreement, letter or otherwise) including, without limitation, any initial transaction statement, under which any obligation is evidenced, assumed or undertaken, or any right to any lien is granted or perfected.

"Loan Documents" means, collectively, the "Loan Documents" as such term is defined in the Loan Agreement and the "Loan Documents" as such term is defined in the CP Credit Agreement.

"Notes" means, collectively, the "Notes" as such term is defined in the Loan Agreement and the "Notes" as such term is defined in the CP Credit Agreement.

"PR UCC" means the Commercial Transactions Act as in effect in the Commonwealth of Puerto Rico or any corresponding provisions of Applicable Law, as amended from time to time.

"Proceeds" shall mean whatever is received upon the sale, exchange, collection or other disposition of the Collateral and all "proceeds" thereof, as such term is defined in the PR UCC.

"Security Collateral" has the meaning set forth in **Section 6** hereto, and all Proceeds therefrom.

2.   **Definitions**. All terms used in this Agreement that are defined in the Loan Agreement and the CP Credit Agreement and that are not otherwise defined herein shall have the meanings herein as set forth in the Loan Agreement and the CP Credit Agreement. All other undefined terms contained in this Agreement, unless the context indicates otherwise, have the meanings provided for by the provisions of the Commercial Transaction Act as in effect in the Commonwealth of Puerto Rico (PR-UCC).

-3-

3.  **PR UCC Definitions**.

Unless otherwise defined pursuant to **Sections 1.1** and **1.2** hereof or the context otherwise requires, terms for which meanings are provided in Chapter 9 of the PR UCC are used in this Agreement with such meanings.

4.  **General Provisions Relating to Definitions**.

Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the term defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The term "including" means including, without limiting, the generality of any description preceding such term. Each reference herein to any Person shall include a reference to such Person's successors and assigns.

5.  **Grant of Security Interest**.

Debtor hereby pledges and grants to Secured Party a security interest in the property described hereinafter (collectively and severally, the Security Collateral) to secure payment and performance of the obligations described in **Section 7** (collectively and severally, the "Obligations").

6.  **Security Collateral**.

The Security Collateral shall consist of the following personal property, which description is illustrative and shall not limit the scope of the particular term as such is defined in the PR-UCC:

(a)  Accounts.  All of Debtor's present and future rights to payments for Inventory sold or leased or for services rendered, whether or not represented by instruments or chattel paper, and whether or not earned by performance; all of Debtor's now owned or hereafter acquired accounts, contract rights, chattel paper, instruments, documents and proceeds, including, without limitation, all insurance proceeds; proceeds of any letter of credit on which Debtor is beneficiary; and all forms of obligations whatsoever owing to Debtor, together with all instruments and documents of title representing any of the foregoing, all rights in any Inventory, and all rights, security and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit.

(b)  Inventory.  All of Debtor's now owned and hereafter acquired inventory, including, without limitation, all goods, merchandise and other personal property furnished under any contract of service or intended for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description that are or might be used, consumed or sold in Debtor's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods, merchandise and other personal property, all returned or repossessed goods now, or at any time or times hereafter,

-4-

in the possession or under the control of Debtor or the Secured Party, and all documents of title or documents representing the same.

     (c)   <u>Equipment</u>. All equipment of Debtor, now owned or hereafter acquired, including, without limitation, all machinery, tools, dies, blueprints, catalogues, computer hardware and software, furniture, furnishings, and fixtures.

     (d)   <u>Documents and Instruments</u>. All documents and instruments of Debtor, now owned or hereafter acquired.

     (e)   <u>General Intangibles, etc.</u> All now existing or hereafter acquired general intangibles of every nature, all permits (to the extent that they may be assigned), regulatory approvals (to the extent that the same may be assigned), copyrights, patents, trademarks, service marks, trade names, mask works, good will, licenses (to the extent that they may be assigned), and all other intellectual property owned by Debtor or used in Debtor's business.

     (f)   <u>Deposit Accounts</u>. All deposit accounts, now existing or hereafter arising, maintained in Debtor's name with the Secured Party and any and all funds at any time held therein.

     (g)   <u>Books and Records</u>. All now existing and hereafter acquired books and records relating to the foregoing Security Collateral and all equipment containing such books and records (including, without limitation, computer date and storage media).

     (h)   <u>Contracts</u>. Any and all agreements entered into by Debtor with Persons in connection with the management, development and operation of Borrower's business, as such may be amended, modified or substituted.

     (i)   <u>Proceeds</u>. All Proceeds of the foregoing Security Collateral. For purposes of this Agreement, the term "Proceeds" includes whatever is receivable or received when the Security Collateral or proceeds thereof is sold, collected, exchanged, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto.

7.   **Obligations**.

   The Obligations secured by this Agreement shall consist of any and all debts, obligations, and liabilities of Debtor to the Secured Party, arising out of or related to this Agreement, the Loan Agreement, the CP Credit Agreement, the Notes and the other Loan Documents (whether principal, interest, fees, or otherwise, whether now exiting or hereafter arising, whether voluntary or involuntary, whether or not jointly owed with others, whether direct or indirect, absolute or contingent, contractual or tortuous, liquidated or unliquidated, arising by operation of law, or otherwise, whether or not from time to time decreased or extinguished and later increased, created or incurred, and whether or not extended, modified, rearranged, restructured, refinanced, or replaced, including without limitation, modifications to interest rates or other payment terms of such debts, obligations, or liabilities).

-5-

8.      <u>Representations and Warranties</u>.

In addition to any representations and warranties of Debtor set forth in the Loan Agreement, which are incorporated herein by this reference, Debtor hereby represents and warrants that:

        a.      <u>Authority</u>.   It has authority, and has completed all proceedings and obtained all approvals and consents necessary, to execute, deliver, and perform this Agreement and the transactions contemplated hereby.

        b.      <u>No Default or Lien</u>.   Such execution, delivery, and performance will not contravene, or constitute a default under or result in a lien upon any property of Debtor pursuant to any applicable law or regulation or any contract, agreement, judgment, order, decree, or other instrument binding upon or affecting Debtor.

        c.      <u>Enforceability</u>.   This Agreement constitutes a legal, valid, and binding obligation of Debtor, enforceable in accordance with its terms (except as enforceability may be affected by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditor's rights), and this Agreement grants to Secured Party a valid, first-priority perfected and enforceable lien on the Security Collateral.

        d.      <u>Ownership of Security Collateral</u>.   Debtor is the sole owner of and has good and marketable title to the Security Collateral (or, in the case of after-acquired Security Collateral, at the time the Debtor acquires rights in the Security Collateral, will be the sole owner thereof).

        e.      <u>Priority</u>.   Except for security interests in favor of Secured Party, no Person has (or, in the case of after-acquired Security Collateral, at the time Debtor acquires rights therein, will have) any right, title, claim, or interest (by way of security interest or other lien or charge) in, against or to the Security Collateral.

        f.      <u>Accuracy of Information</u>.   All information heretofore, herein or hereafter supplied to Secured Party by or on behalf of Debtor with respect to the Security Collateral is true and correct.

        g.      <u>Delivery of Documents, etc.</u>   Debtor has delivered to Secured Party all instruments, documents, chattel paper, and other items of the Security Collateral in which a security interest is or may be perfected by possession, the certificate of title with respect to each motor vehicle, if any, included in the Security Collateral.

        h.      <u>Enforceability Against Account Debtors</u>.   Each account, contract right, item of chattel paper, instrument or any other right to the payment of money constituting Security Collateral is genuine and enforceable in accordance with its terms against the party obligated to pay the same (an "Account Debtor"), which terms have not been modified or waived in any respect or to any extent.

-6-

       i.        <u>Amount Due From Account Debtors</u>.  Each account, contract right, item of chattel paper, instruments or any other right to the payment of money constituting Security Collateral is genuine and enforceable in accordance with its terms against the Account Debtor, which terms have not been modified or waived in any respect or to any extent.

       j.        <u>No Account Debtor Defense</u>.  No Account Debtor has any defense, set off, claim, or counterclaim against Debtor that can be asserted against Secured Party, whether in any proceeding to enforce Secured Party's rights in the Security Collateral, or otherwise.

       k.        <u>Valid Lien</u>.  This Agreement is effective to create a valid and continuing Lien on and, upon the filing of the appropriate financing statements, a perfected Lien in favor of Secured Party, on the Security Collateral with respect to which a Lien may be perfected by filing pursuant to the PR-UCC.  Such Lien is prior to all other Liens, and is enforceable as such as against any and all creditors of and purchasers from Debtor (other than purchasers of Inventory in the ordinary course of business).  All action by Debtor necessary or desirable to protect and perfect such Lien on each item of the Security Collateral has been duly taken.

       l.        <u>Accounts</u>.  With respect to the accounts, (i) they represent bona fide sales of inventory or rendering of services to Account Debtors in the ordinary course of Debtor's business and are not evidenced by a judgment, Instrument or chattel paper; (ii) there are no set-offs, claims or disputes existing or asserted with respect thereto and Debtor has not made any agreement with any Account Debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom, except a discount or allowance allowed by Debtor in the ordinary course of its business for prompt payment and disclosed to Secured Party; (iii) to Debtor's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on Debtor's books and records and any invoices, statements and aging reports delivered to Secured Party with respect thereto; (iv) Debtor has not received any notice of proceedings or actions which are threatened or pending against any Account Debtor which might result in any adverse change in such Account Debtor's financial condition; and (v) Debtor has no knowledge that any Account Debtor is unable generally to pay its debts as they become due.  Further with respect to the accounts (x) the amounts shown on all invoices, statements and aging reports which may be delivered to the Secured Party with respect thereto are actually and absolutely owing to Debtor as indicated thereon and are not in any way contingent; and (y) to Debtor's knowledge, all Account Debtors have the capacity to contract.

       m.        <u>Inventory</u>.  With respect to the Inventory scheduled or listed on the most recent inventory report delivered to Secured Party pursuant to the terms of this Agreement or the Loan Agreement, (i) such inventory is located at one of Debtor's locations set forth in **Section 22**, (ii) no Inventory is now, or shall at any time or times hereafter be stored at any other location without Secured Party's prior consent, (iii) Debtor has good, indefeasible and merchantable title to the Inventory and the Inventory is not subject to any Lien or security interest or document whatsoever except for the Lien granted to Secured Party, (iv) the Inventory is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreements

-7-

with any third parties which would require any consent of any third party upon sale or disposition of the Inventory or the payment of any monies to any third party as a precondition of such sale or other disposition, and (v) the completion of manufacture, sale or other disposition of the Inventory by Secured Party following an Event of Default shall not require the consent of any Person and shall not constitute a breach or default under any contract or agreement to which Debtor is a party or to which such property is subject.

9.    **Covenants and Agreements of Debtor**.

In addition to all covenants and agreements of Debtor set forth in the Loan Agreement, which are incorporated herein by this reference, Debtor hereby agrees:

a.    Preservation of Security Collateral.  To do all acts that may be necessary to maintain, preserve, and protect the Security Collateral and to keep the Security Collateral in good condition and repair and not to cause or permit any waste or unusual or unreasonable depreciation of the Security Collateral.

b.    Use of Security Collateral.  Not to use or permit any of the Security Collateral to be used unlawfully or in violation of any provision of this Agreement, any other agreement with Secured Party related hereto or any applicable statute, regulation, or ordinance or any policy of insurance covering the Security Collateral.

c.    Payment of Taxes, etc.  To pay promptly when due all taxes, assessments, charges, encumbrances and liens now or hereafter imposed upon or affecting any of the Security Collateral.

d.    Defense of Litigation.  To appear in and defend any action or proceeding that may affect its title to or Secured Party's interest in the Security Collateral.

e.    Possession of Security Collateral.  Not to surrender or lose possession of (other than to Secured Party), sell, encumber, lease, rent, or otherwise dispose of or transfer any of the Security Collateral or right or interest therein except as hereinafter provided, unless an Event of Default shall occur, Debtor may, in the ordinary course of business, sell or lease any of the Security Collateral consisting of Inventory.

f.    Compliance with Law.  To comply in all material aspects with all laws, regulations, and ordinances relating to the possession, operation, maintenance, and control of the Security Collateral.

g.    Standard of Care by Secured Party.  That such care as Secured Party gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Security Collateral when in Secured Party's possession.

h.    Delivery of After-Acquired Security Collateral.  To account fully for and promptly deliver to Secured Party, in the form received, all documents, chattel paper, instruments, and agreements constituting Security Collateral hereunder and all proceeds of the

-8-

Security Collateral received, all endorsed to Secured Party or in blank, as requested by Secured Party, and until so delivered, all such documents, instruments, agreements, and proceeds shall be held by Debtor in trust for Secured Party, separate from all other property of Debtor and identified as the property of Secured Party.

i.  <u>Maintenance of Records</u>.  To keep separate, accurate, and complete records of the Security Collateral and to provide Secured Party with such records and such other reports and information relating to the Security Collateral as Secured Party may request from time to time.

j.  <u>Further Assurances</u>.  To procure, execute, and deliver from time to time any endorsements, notifications, registrations, assignments, financing statements, certificates of title, mortgages and other writings deemed necessary or appropriate by Secured Party to perfect, maintain, and protect its security interest in the Security Collateral hereunder and the priority thereof; and to take such other actions as Secured Party may reasonably request to protect the value of the Security Collateral and of Secured Party's security interest in the Security Collateral, including, without limitation, provision of assurances from third parties regarding Secured Party's access to, right to foreclose on or sell, the Security Collateral and right to realize the practical benefits of such foreclosure or sale.

k.  <u>Payment of Secured Party's Costs and Expenses</u>.  To reimburse Secured Party upon demand for any costs and expenses, including, without limitation, reasonable attorney's fees and disbursements, Secured Party may incur while exercising any right, power, or remedy provided by this Agreement or by law, all of which costs and expenses are included in the Obligations.

l.  <u>Notice of Changes</u>.  To give Secured Party thirty (30) days prior written notice of any change in Debtor's residence or chief place of business or legal name or trade name(s) or style(s) set forth in the penultimate paragraph of this Agreement.

m.  <u>Location of Records</u>.  To keep the records concerning the Security Collateral at the locations(s) set forth in **Section 22** and not to remove such records from such location(s) without the prior written consent of the Secured Party.

n,  <u>Purchase Money Agreement</u>.  If Secured Party gives value to enable Debtor to acquire rights in or the use of any Security Collateral, to use such value for such purpose.

o.  <u>Inspection by Secured Party</u>.  At any reasonable time, upon demand by Secured Party, to exhibit to or allow inspection by Secured Party (or persons designated by Secured Party) of the Security Collateral.

p.  <u>Location of Security Collateral</u>.  To keep the Security Collateral at the location(s) set forth in **Section 22** and not to remove the Security Collateral from such location(s) without the prior written consent of Secured Party.

-9-

q.     Insurance.  To insure the Security Collateral, with Secured Party named as loss payee, in form and amounts, with companies, and against risks and liabilities satisfactory to Secured Party, and Debtor hereby assigns the policies to Secured Party, agrees to deliver them to Secured Party at its request, and agrees that Secured Party may make any claim thereunder, cancel the insurance on default by Debtor, collect and receive payment and indorse any instrument in payment of loss or return premium or other refund or return, and apply such amounts received, at Secured Party's election, to replacement of Security Collateral or to the Obligations as set forth in the Loan Agreement.  Such policies shall contain an endorsement providing that the insurance shall not be cancelable, except upon thirty (30) days prior written notice to the Secured Party, and from time to time at the request of the Secured Party, Debtor shall deliver to the Secured Party a detailed schedule indicating all such insurance policies then in force.

r.     Limitation on Liens on Security Collateral.  Debtor will not create, permit or suffer to exist, and will defend the Security Collateral against, and take such other action as is necessary to remove, any Lien on the Security Collateral and will defend the right, title and interest of Secured Party in and to any of Debtor's rights under the Security Collateral against the claims and demands of all Persons whomsoever.

s.     Further Identification of Security Collateral.  Debtor will, if so requested by Secured Party, furnish to Secured Party, as often as Secured Party requests, statements and schedules further identifying and describing the Security Collateral and such other reports in connection with the Security Collateral as Secured Party may reasonably request, all in such detail as Secured Party may specify.

10.     **Additional Covenants with Respect to Accounts and Inventory**.

So long as any of the Obligations shall remain outstanding, unless the Secured Party shall otherwise consent in writing:



a.     Debtor will, at its expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable or that the Secured Party may request in order (i) to perfect and protect the security interest purported to be created hereby; (ii) to enable the Secured Party furnishing to enforce its rights and remedies hereunder in respect of the inventory and the accounts; or (iii) to otherwise effect the purposes of this Agreement, including, without limitation:  (A) if any account shall be evidenced by a promissory note or other instrument, delivering and pledging to the Secured Party hereunder such note or instrument duly indorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Secured Party, (B) executing and filing such statements or amendments thereto, as may be necessary or desirable or that the Secured Party may request in order to perfect and preserve, or extend the effective date of, the security interest purported to be created hereby, and (C) furnishing to the Secured Party within twenty (20) days after the end of each month, the monthly aging reports on Debtor's account receivable and Inventory listing in reasonable detail and prepared in accordance with the GAAP consistently applied.

-10-

b.      All inventory shall be kept by Debtor at its place(s) of business specified therefor hereafter, and Debtor shall not (without the Secured Party's prior written approval) remove the Inventory therefrom, except for the purposes of sale in the regular course of its business. Except for sales of Inventory made in the regular course of its business, Debtor shall not sell, encumber or dispose of, or permit the sale, encumbrance or disposal of, any Inventory without the Secured Party's prior written consent.

c.      Without the prior written consent of the Secured Party in each case, Debtor will not re-date any invoice or sale, make sales on extended dating beyond that customary in its industry, or change the terms of sale customarily offered to its customers. Debtor will not make a sale to any customer on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or any other repurchase or return basis if the accounts with respect to all such transactions exceed $25,000.00 at any time outstanding (except for such customers which accounts traditionally exceed such amount but have maintained and continues to maintain a stable and reputable credit and financial profiles, all with industry standards). Debtor shall notify the Secured Party promptly of all returns and recoveries that are equal to or in excess of $50,000.00. Debtor shall also notify the Secured Party promptly of all disputes and claims in excess of $50,000.00 and settle or adjust them at no expense to the Secured Party, but no discount, credit or allowance shall be granted to any customer or account debtor and no returns of Inventory shall be accepted by Debtor without the Secured Party's consent, other than discounts, credits, allowances and returns of less than $25,000.00 made, given or accepted in the ordinary course of Debtor's business. Upon the occurrence of an Event of Default, or an event which, with the giving of notice or the lapse of time or both would constitute an Event of Default, or in the event that the Secured Party, in its sole discretion, deems that it has cause therefor, the Secured Party may settle or adjust disputes and claims directly with customers or account debtors for amounts and upon terms which the Secured Party considers advisable.

d.      Promptly after each fiscal quarter, and in any event within the first forty-five (45) days after every fiscal quarter, Debtor shall provide the Secured Party with schedules describing all accounts created or acquired by it (including the name and address of each account Debtor) during the immediately preceding month and shall execute and deliver confirmatory written instruments corresponding to such accounts to the Secured Party in the form of **Exhibit A** (or such other form required by the Secured Party); provided, that any failure by Debtor to execute and deliver such schedules or instruments shall not affect or limit the Secured Party's security interest or other rights in and to the accounts. Together with each schedule, Debtor shall furnish, upon request therefor, copies of related customers' invoices (or the equivalent) and copies of original shipping or delivery receipts for all Inventory sold (or the equivalent) and such other documents as the Secured Party may require.

e.      Debtor shall provide to the Secured Party, within the first forty-five (45) days of each fiscal quarter, a schedule of its Inventory showing the value thereof, computed on an average cost basis, in form and substance satisfactory to the Secured Party. Debtor shall, within the first forty-five (45) days after the end of each fiscal quarter, execute and deliver confirmatory written instruments in the form of **Exhibit A** (or such other form required by the Secured Party) pledging and granting a security interest to the Secured Party over the Inventory described in such listings or otherwise owned by Debtor, provided, however, that any failure by

-11-

Debtor to execute and deliver such confirmatory instruments, or to list any inventory therein, shall not affect or limit the Secured Party's security interest in the inventory. All instruments and certificates prepared by Debtor that show the value of Inventory shall be accompanied, upon request therefor by the Secured Party, by copies of related purchase orders and invoices. Debtor shall conduct an annual (or more often when requested by the Secured Party as set forth below) physical count of the Inventory and a copy of each such count shall be promptly supplied to the Secured Party accompanied by a report of the value (valued at the lower of cost or market value and on a FIFO basis) of such inventory.

        f.     Debtor will provide the Secured Party with agings of accounts and payable reports for all accounts, as soon as available and in any event, within the first forty-five (45) days after the end of each fiscal quarter, and such other documents and information with respect to the Inventory and accounts as the Secured Party may from time to time request, pursuant to an instrument in the form of **Exhibit A** (or such other form required by the Secured Party).

        g.     Debtor will, except as otherwise provided herein, retain possession of the inventory and accounts subject to the security interest created hereby, and will at its own expense make all collections of amounts falling due thereon, and shall promptly forward, or cause to be forwarded, to the Secured Party all amounts collected thereon as hereinafter provided in this Agreement.

        h.     The Secured Party may, in its sole discretion, (i) exchange, enforce, waive or release any security or portion of the inventory and accounts, (ii) apply such security or any proceeds of the inventory and accounts and direct the order of sale thereof as the Secured Party may, from time to time, determine, and (iii) settle, compromise, collect or otherwise liquidate any such inventory and accounts for the Obligations of Debtor following the occurrence of an Event of Default without affecting or impairing the Secured Party's right to take any other further action with respect to any security or the inventory and accounts for the Obligations of Debtor or any part thereof.

11.     **Additional Covenants with Respect to Contracts**.

So long as any of the Obligations shall remain outstanding, unless the Secured Party shall otherwise consent in writing:

        a.     The Debtor shall deliver to the Secured Party complete and correct copy of the Contracts upon execution (including all schedules and exhibits thereto).

        b.     The Debtor shall maintain the Contracts free and clear of any lien or other charge or encumbrance except for the security interest created by this Agreement.

        c.     The Debtor, at its expense, at any time and from time to time, shall promptly execute and deliver all further agreements, instruments and documents and take all further action that may be necessary or desirable or that the Secured Party may request in order (i) to perfect and protect the liens over the contracts purported to be created hereby; (ii) to enable the Secured Party to exercise and enforce its rights and remedies hereunder in respect of the



-12-

Contracts or (iii) to otherwise effect the purposes of this Agreement, including, without limitation, executing and delivering such other documents and taking all further action as may be necessary or desirable or that the Secured Party may request in order to perfect and preserve the lien purported to be created hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to the Contracts.

        d.     The Debtor shall duly perform and observe all of its obligations under the Contracts and shall enforce all of its rights thereunder.

        e.     Upon the occurrence and during the continuance of any material breach or default under the Contracts by any party thereto, (a) the Debtor shall, promptly after obtaining knowledge thereof, give the Secured Party written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto, (b) the Debtor shall not, without the prior written consent of the Secured Party, declare or waive any such material breach or default or affirmatively consent to the cure thereof or exercise any of its remedies in respect of the Contracts, and (c) the Debtor, upon written instructions from the Secured Party and at the Debtor expense, shall take such action as the Secured Party may reasonably deem necessary or advisable in respect thereof.

        f.     The Debtor shall not, without the prior written notice of the Secured Party, cancel, terminate, amend, modify, or waive in any material respect any provision of a Contract.

12.    **Appointment as Attorney-in-Fact.**

     Debtor hereby agrees that from time to time, without presentment, notice or demand, and without affecting or impairing in any way the rights of Secured Party with respect to the Security Collateral, the obligations of the Debtor hereunder or the Obligations, Secured Party may, but shall not be obligated to and shall incur no liability to Debtor or any third party for failure to take any action which Debtor is obligated by this Agreement to do and to exercise such rights and powers as Debtor might exercise with respect to the Security Collateral, and Debtor hereby irrevocably appoints Secured Party as its attorney-in-fact to exercise such rights and powers, including without limitation, to (a) collect by legal proceedings or otherwise and indorse, receive and receipt for all dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on or on account of the Security Collateral; (b) deposit, surrender, accept, hold or apply other property in exchange for the Security Collateral; (c) insure, process, and preserve the Security Collateral; (d) transfer the Security Collateral to its own or its nominee's name; (e) make any compromise or settlement, and take any action it deems advisable, with respect to the Security Collateral; and (f) notify any Account Debtor on any Security Collateral to make payment directly to Secured Party. None of Secured Party, the Lenders or their affiliates, officers, directors, employees, agents or representatives shall be responsible to Debtor for any act or failure to act under any Power of Attorney or otherwise, except in respect of damages attributable solely to their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction, nor for any punitive, exemplary, indirect or consequential damages.

-13-

13. **Default**.

A default under this Agreement shall be deemed to exist upon the occurrence of any of the following (each an "Event of Default"):

(a)    An "Event of Default" (as such term is defined in the Loan Agreement) shall occur; or

(b)    An "Event of Default" (as such term is defined in the CP Credit Agreement) shall occur; or

(c)    Debtor shall fail to perform or observe any other material term or condition of this Agreement and such failure shall remain unremedied for a period of fifteen (15) days after written notice from the Secured Party to the Debtor. It shall not be construed that the fifteen (15) days period referenced in this subsection (c) shall have the effect of increasing any cure periods allowed under the Loan Agreement, the CP Credit Agreement, the Notes or the Loan Documents.

14. **Remedies**.

Upon the occurrence and continuance of any such Event of Default beyond its applicable grace period, Secured Party may, at its option, and without notice to or demand on Debtor and in addition to all rights and remedies available to Secured Party under the Loan Documents, at law, in equity, or otherwise, do any one or more of the following:

a.    General Enforcement.  Foreclose or otherwise enforce Secured Party's security interest in any manner permitted by law, or provided for in this Agreement.

b.    Sale, etc.  Sell, lease, or otherwise dispose of any Security Collateral at one or more public or private sales (to the extent permitted by law) at Secured Party's place of business or any other place or places including, without limitation, any broker's board or securities exchange, whether or not such Security Collateral is present at the place of sale, for cash or credit of future delivery on such terms and in such manner as Secured Party may determine.

c.    Cost of Remedies.  Recover from Debtor all costs and expenses, including, without limitation, reasonable attorney fees, incurred or paid by Secured Party in exercising any right, power, or remedy provided by this Agreement.

d.    Assembly of Security Collateral.  Require Debtor to assemble the Security Collateral and make it available to Secured Party to be designated by Secured Party.

e.    Take Possession of Security Collateral.  Enter onto property where any Security Collateral is located and take possession thereof with or without judicial process, to the extent permitted by law.

-14-

f. _Preparation of Security Collateral for Sale_. Prior to the disposition of the Security Collateral, store, process, repair or recondition it or otherwise prepare it for disposition in any manner.

g. _Manner of Sale of Security Collateral_. Debtor shall be given five (5) Business Days prior notice of the time and place of any public sale or of the time after which any private sale or other intended disposition of Security Collateral is to be made, which notice Debtor hereby agrees shall be deemed reasonable notice thereof.

h. _Delivery to and Rights of Purchaser_. Upon any sale or other disposition pursuant to this Agreement, Secured Party shall have the right to deliver, assign and transfer to the purchaser thereof the Security Collateral or portion thereof so sold or disposed. Each purchaser at any such sale or other disposition (including Secured Party) shall hold the Security Collateral free from any claim or right of whatever kind, including any equity or right of redemption of Debtor and Debtor specifically waives (to the extent permitted by law) all rights of redemption, stay or appraisal which it has or may have under any rule of law or statute now existing or hereafter adopted.

i. _Notice to Account Debtors_. Without prior notice to Debtor, notify Account Debtors, parties to the Contracts and obligors in respect of Instruments and chattel paper, that the Accounts and the rights, title and interest of Debtor in and under such Contracts, Instruments and chattel paper have been assigned to the Secured Party, and that payments shall be made directly to the Secured Party. Upon the request of the Secured Party Debtor shall so notify Account Debtors, parties to Contracts and obligors in respect of Instruments and chattel paper.

j. _Audit of Security Collateral_. Upon Secured Party's request, Debtor, at its own expense, shall cause the independent certified public accountants then engaged by Debtor to prepare and deliver to Secured Party at any time and from time to time promptly upon Secured Party's request the following reports with respect to: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts as Secured Party may request. Debtor, at its own expense, shall deliver to Secured Party the results of each physical verification, if any, which Debtor may in its discretion have made, or cause any other Person to have made on its behalf, of all or any portion of its Inventory.

15. **Cumulative Rights**.

The rights, powers, and remedies of Secured Party under this Agreement shall be in addition to all rights, powers, and remedies given to Secured Party by virtue of any statute or rule of law, the Loan Documents or any other agreement, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing Secured Party's security interest in the Security Collateral.



-15-

16.    **Waiver**.

Any waiver, forbearance or failure to delay by Secured Party in exercising any right, power, or remedy shall not preclude the further exercise thereof, and every right, power or remedy of Secured Party shall continue in full force and effect until such right, power or remedy is specifically waived in a writing executed by Secured Party. Debtor waives any right to require Secured Party to proceed against any person or to exhaust any Security Collateral or to pursue any remedy in Secured Party's power.

17.    **Setoff**.

Debtor agrees that Secured Party and/or Lenders may exercise its rights to setoff with respect to the Obligations in the same manner as if the Obligations were unsecured and subject to the notice requirements set forth in the Loan Agreement.

18.    **Binding Upon Successors**.

All rights of Secured Party under this Agreement shall inure to the benefit of its successors and assigns, and all obligations of Debtor shall bind its heirs, executors, administrators, successors, and assigns.

19.    **Entire Agreement**.

If any of the provisions of this Agreement shall be held invalid or unenforceable, this Agreement shall be construed as if not containing those provisions and the rights and obligations of the parties hereto shall be construed and enforced accordingly.



20.    **Consent to Jurisdiction; Choice of Law**.

THE DEBTOR BY ITS EXECUTION HEREOF (A) HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE COMMONWEALTH OF PUERTO RICO FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, AND (B) HEREBY WAIVES TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH PROCEEDING, ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF THE ABOVE-NAMED COURTS, THAT ITS PROPERTY IS EXEMPT OR IMMUNE FROM ATTACHMENT OR EXECUTION, THAT ANY SUCH PROCEEDING BROUGHT IN ONE OF THE ABOVE-NAMED COURTS IS IMPROPER, OR THAT THIS AGREEMENT OR ANY INSTRUMENT EVIDENCING THE OBLIGATIONS, OR THE SUBJECT MATTER HEREOF OR THEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT.

-16-

THIS AGREEMENT SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO.

21.    **Amendment**.

This Agreement may not be amended or modified except by a writing signed by each of the parties hereto.

22.    **Residence; Security Collateral Location Records**.

Debtor represents that its principal statutory office is located at:

> Ramallo Bros. Printing, Inc.
> 300 Ramallo Boulevard #1
> San Juan, Puerto Rico 00936-8225

and that Debtor's records concerning the Security Collateral are located at its chief place of business, however, due to the nature of its business, some of the Security Collateral may be located at different locations within the jurisdiction of the Commonwealth.

23.    **Addresses for Notices**.

All demands, notices, and other communications to Debtor or Secured Party provided for hereunder shall be in writing and as provided in the Loan Agreement and the CP Credit Agreement.

24.    **Reinstatement**.

This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Debtor for liquidation or reorganization, should Debtor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of Debtor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

25.    **Security Interest Absolute**.

All rights and security interests of the Secured Party granted hereunder, and all obligations of the Debtor hereunder, shall be absolute and unconditional, irrespective of, and shall not be impaired or affected by:

-17-

       a.     any lack of validity or enforceability of any Loan Document relating to any thereof or to any of the Obligations;

       b.     any change in the legal existence, structure or ownership of the Debtor, or any bankruptcy or insolvency proceeding affecting the Debtor or any property of the Debtor or any resulting release or discharge of any obligation contained in the Note, the Loan Agreement or the CP Credit Agreement;

       c.     the failure of the Secured Party:

           i.     to assert any claim or demand or to enforce any right or remedy against the Debtor or under the provisions of this Agreement, the other Loan Documents, or any other Instrument relating to any thereof or under any Applicable Law, or

           ii.     to exercise any right or remedy against any Collateral;

       d.     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment to, rescission, waiver or other modification of, or any consent to any departure from, the Loan Documents, or any other Instrument relating to any thereof;

       e.     any increase, reduction, limitation, impairment or termination of the Obligations, for any reason, including any claim of waiver, release, surrender, alteration or compromise, and any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, ungenuineness, irregularity, compromise, or unenforceability of, or any other event or occurrence affecting, any of the Obligations;

       f.     any amendment to, rescission, waiver or other modification of, or any consent to departure from, any of the terms of the Loan Documents, or any other Instrument relating to any thereof; or

       g.     any other circumstances which might otherwise constitute a suretyship or other defense available to, or a legal or equitable discharge of the Debtor.

       26.    **Inconsistency with the other Loan Documents**.  The terms, clauses and provisions of this Agreement are in addition and not in limitation or substitution of the terms, clauses and provisions set forth in the Loan Agreement and the CP Credit Agreement.  In the event of any inconsistency between this Agreement, the Loan Agreement and the CP Credit Agreement, the terms hereof shall be controlling as necessary to create, preserve and/or maintain a valid, enforceable first priority lien and security interest under applicable law upon the Collateral, but otherwise, provisions of the Loan Agreement and the CP Credit Agreement shall be controlling.

-18-

IN WITNESS WHEREOF Secured Party and Debtor execute this Agreement, in the city of San Juan, Puerto Rico, this 15th day of December, 2010.

FIRSTBANK PUERTO RICO                    RAMALLO BROS. PRINTING, INC.

By: _____            By: _____
Luis Orengo                                  Alberto Ramallo Yllanes
Senior Vice President                              President

Affidavit Number: __4199__

Acknowledged and subscribed to before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed persons, of the personal circumstances and in the capacities and representations stated above, both personally known to me.

NOTARY PUBLIC

CONFIDENTIAL, MISSION CAPITAL ADVISORS, LLC
Opened by Tessa Truex, Hudson Advisors
on 1/18/13 @ 11:19 AM from 1.123.41.205

-19-

**EXHIBIT A**

FirstBank Puerto Rico
P.O. Box 9146
Santurce, Puerto Rico  00908

Attention:  Commercial Credit Department

Gentlemen:

Pursuant to the terms and conditions of the Security Agreement dated December 15, 2010, between FirstBank Puerto Rico and the undersigned (the "Agreement"), we attach hereto (i) a quarterly aging schedule of accounts and due dates and arrears of drafts, notes and other evidence of indebtedness corresponding to such accounts, as of the last day of the immediately preceding quarter, (ii) a list of the inventory owned by the undersigned with descriptions and locations thereof, as of the last day of the immediately preceding quarter, (iii) a detailed statement as to the value (at average cost basis) of the inventory (as defined in the Agreement) owned by the undersigned as of the last day of immediately preceding quarter, and (iv) a list of the names and addresses of such accounts debtors.  It is hereby acknowledged and agreed that such inventory and accounts are covered by the lien of the Agreement, and the undersigned hereby pledges and grant upon FirstBank Puerto Rico a security interest upon such inventory and accounts pursuant thereto,

I hereby certify that the information attached hereto is true and correct and that such accounts and inventory described in the attachments hereto are not subject to any prior lien other than the lien created by the Agreement.

Very truly yours,

**RAMALLO BROS. PRINTING, INC.**

By: _____

Alberto Ramallo Yllanes
President

Affidavit Number: _____

Sworn to and subscribed before me in San Juan, Puerto Rico, this 15th day of December, 2010, by Mr. Alberto Ramallo Yllanes, of the above representation, who is of legal age, single and resident of San Juan, Puerto Rico, personally known to me.

_____

NOTARY PUBLIC

**Exhibit 9**

## PLEDGE AND ASSIGNMENT OF DEPOSITORY ACCOUNTS

**FOR VALUE RECEIVED, RAMALLO BROS. PRINTING, INC.,** a corporation organized and existing under the laws of the Commonwealth of Puerto Rico and authorized to do business in the Commonwealth of Puerto Rico (the "Borrower"), being the depositor to certain depository accounts (the "Accounts") in Firstbank Puerto Rico with the following identifying information: (i) **Ramallo Restricted Reserve Account**, Account Number: 01-5025866; (ii) **Ramallo LOC Marginal Account**, Account Number: 01-9204953; (iii) **Ramallo Operating Account**, Account Number: 60-5000672; and (iv) **Ramallo Marginal Account**, Account Number: 60-5000727 hereby constitutes and grants a security interest over and pledges, assigns, sets over and transfers, to **FIRSTBANK PUERTO RICO**, a commercial bank organized and existing under the laws of the Commonwealth of Puerto Rico (the "Assignee") all of the rights, title and interest of the Borrower (existing or hereinafter acquired or arising) in and to the Accounts, for the purpose of securing the obligations of the Borrower in the Revolving Credit and Term Loans Agreement dated December 15, 2010, between Assignor and Borrower (the "Credit Agreement"; all capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Credit Agreement) and of each and every other debt, liability or obligation of every type or description which the Borrower may now or at any time hereafter owe to the Assignee under the Credit Agreement and other Loan Documents executed in connection therewith (as such agreements may hereafter be modified or amended from time to time), whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is direct or indirect, due or to become due, absolute or contingent, or joint and/or several (collectively, the "Obligations").

In addition, the Borrower hereby pledges, assigns, sets over and transfers to the Assignee and constitutes and grants a security interest for the benefit of the Assignee in all passbooks, certificates and instruments of whatever nature which evidence the ownership and control of the Accounts hereby assigned. The Borrower will, at its sole expense, at any time and from time to time upon request by the Assignee, promptly execute and deliver all further instruments and documents and take all further action that may be reasonably necessary in order to perfect this Agreement and to protect the rights of the Assignee hereunder.

The parties hereto acknowledge that for purposes of securing payment of the Obligations, there shall be no liens or encumbrances over the Accounts with a prior or equal rank to the rights of Assignee herein.

Management, control and dominion rights over the Accounts shall be dictated by the terms and conditions set forth in Section 6.16 of the Credit Agreement with respect to the Ramallo Operating Account, Section 6.18 with respect to the Ramallo Restricted Reserve Account, Section 6.19 with respect to the Ramallo LOC Margin Account, and Section 6.20 with respect to the Ramallo Marginal Account.

Furthermore, the Borrower hereby irrevocably authorizes and empowers the Assignee, at any time and without notice to the Borrower, after the occurrence of any Event of Default by the Borrower under the Credit Agreement or any other Loan Document (as the case may be),

-2-

whether or not at such time the Obligations or any part thereof are due and payable, in its own name or in the name of the Borrower, to: (i) demand, apply for withdrawal and receive any and all sums now or in the future in the Accounts; (ii) exercise any and all rights and privileges, and receive all benefits accorded to the Accounts; and (iii) execute any and all instruments required therefor. Upon the occurrence and during the continuance of an Event of Default under the Credit Agreement or any other Loan Documents, the Borrower shall have no right to make any withdrawals from the Accounts, except for the Ramallo Operating Account.

The Borrower hereby further agrees to take whatever action may be requested by the Assignee, including, without limitation, the filing of any notices of liens or financing statements which may be required, any amendments, renewals, and continuations thereof and perform such further acts as the Assignee may require in order to perfect and continue the perfection of the pledge and assignment granted herein. The Borrower hereby agrees that a copy of this Agreement shall be sufficient as a financing statement and that the same may be filed as such in the corresponding offices of the Department of State of the Commonwealth of Puerto Rico.

In the event any term or provision of this Agreement or the application thereof to any person or circumstance shall, for any reason or to any extent be invalid or unenforceable, the remaining terms and provisions of this Agreement, or the application of any such provision to persons or circumstances other than those as to whom or which it has been determined to be invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

This Agreement creates a continuing lien and security interest on the Accounts and shall remain in full force and effect until the later of (i) the expiration of any commitment to lend on the part of Assignee under any of the Credit Agreement and (ii) the indefeasible payment in full of the Obligations, and promptly thereafter Assignee, at Assignor's cost and expense, shall execute all the necessary documents to effect the release of the Accounts from such lien and security interest.

[Signature Page Follows]

-3-

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed in the municipality of San Juan, Puerto Rico, as of this 15th day of December, 2010.

**FIRSTBANK PUERTO RICO**                    **RAMALLO BROS. PRINTING, INC.**

By: _____                    By: _____
    Luis Orengo                                     Alberto Ramallo Yllanes
    Senior Vice President                           President

Affidavit Number: **4198**

Acknowledged and subscribed to before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed persons, who are of legal age, married and single, respectively, businessmen and residents of Trujillo Alto and San Juan, Puerto Rico, respectively, both personally known to me.

_____
NOTARY PUBLIC

FIRSTBANK PUERTO RICO
PO BOX 9146
SAN JUAN, PR 009080146
Núm Registro (File #): 2010007007

Reservado para el oficial de archivo / Reserved for the filing officer

Sello de fecha y hora: / Date and time stamp:

'10 DEC 22 AM 8: 3

Número de registro: / Registration number:

A. DEVOLVER CON A / RETURN COPY TO: (Nombre y Dirección postal / Name and mailing address)

Ledo. José J. Ledesma
Ledesma, Vargas & Villarrubia, PSC
P.O. Box 194089
San Juan, PR 00919
Tel: (787) 296-9500

1. NOMBRE DEL "NIMER DEUDOR / FIRST DEBTOR'S NAME  Complete sólo un nombre (1a o 1b) (use only one name (1a o 1b)

| a. Apellidos del deudor / Individual's last name | | Segundo apellido / Second surname | Primer Nombre / First Name | | Segundo Nombre / Middle name | | Sufijo / Suffix |

| b. Nombre de la entidad / Entity name  Ramallo Bros. Printing, Inc. | | | | | | | |
| 1. Dirección postal / Mailing address    300 Ramallo Boulevard #1 | Ciudad / City   San Juan | Estado / State  PR | País / Country  USA | Código postal / Zip Code  00936-8225 |

2. NOMBRE DE DEUDOR ADICIONAL / ADDITIONAL DEBTOR'S NAME  Complete  sólo un nombre (2a o 2b) (use only one name (2a o 2b)

3. NOMBRE DEL ACREEDOR GARANTIZADO / SECURED PARTY'S NAME  Complete  sólo un nombre (3a o 3b) (use only one name (3a o 3b)

| b. Nombre de la entidad / Entity name    FirstBank Puerto Rico | | | | | | | |
| 1. Dirección postal / Mailing address    P.O. Box 9146 | Ciudad / City   San Juan | Estado / State  PR | País / Country  USA | Código postal / Zip Code  00908-0146 |

4. ESTA DECLARACIÓN DE FINANCIAMIENTO CUBRE LAS SIGUIENTES CLASES O ARTÍCULOS DE PROPIEDAD:
THIS FINANCING STATEMENT COVERS THE FOLLOWING TYPES OR ITEMS OF PROPERTY:

See attached Exhibit A.

5. MARQUE SI APLICA / CHECK IF APPLICABLE (Describa la propiedad en el addendum / Describe the real estate in the addendum)

6. FIRMA(S) / SIGNATURE(S)

7. NOTARÍA (Opcional) / Notary (Optional)

AFFIDAVIT NÚMERO / NUMBER:
Jurado y suscrito, ante mi por / Sworn and subscribed before me by:

En / At:

Fecha / Date:

Notario Público / Notary Public

Forma UCC-1PR. (Rev. Julio 2010)

CONFIDENTIAL
MISSION CAPITAL ADVISORS, LLC
Opened by Tessa Trzaska - Hudson - Windows
on 1/18/13 @ 11:19 AM - 12.233.114

## EXHIBIT A TO FINANCING STATEMENT

**DEBTOR:** Ramallo Bros. Printing, Inc.
**SECURED PARTY:** FirstBank Puerto Rico
**DATED:** December 15, 2010

      The Security Collateral described hereinbelow covers all of Debtor's rights, title and interest secured by the Master Security Agreement executed on this date between Debtor and Secured Party (the "Security Agreement"). Terms not otherwise defined herein shall have the meaning ascribed to them in the Security Agreement.

      (a)    Accounts. All of Debtor's present and future rights to payments for Inventory sold or leased or for services rendered, whether or not represented by instruments or chattel paper, and whether or not earned by performance; all of Debtor's now owned or hereafter acquired accounts, contract rights, chattel paper, instruments, documents and proceeds, including, without limitation, all insurance proceeds; proceeds of any letter of credit on which Debtor is beneficiary; and all forms of obligations whatsoever owing to Debtor, together with all instruments and documents of title representing any of the foregoing, all rights in any Inventory, and all rights, security and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit.

      (b)    Inventory. All of Debtor's now owned and hereafter acquired inventory, including, without limitation, all goods, merchandise and other personal property furnished under any contract of service or intended for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description that are or might be used, consumed or sold in Debtor's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods, merchandise and other personal property, all returned or repossessed goods now, or at any time or times hereafter, in the possession or under the control of Debtor or the Secured Party, and all documents of title or documents representing the same.

      (c)    Equipment. All equipment of Debtor, now owned or hereafter acquired, including, without limitation, all machinery, tools, dies, blueprints, catalogues, computer hardware and software, furniture, furnishings, and fixtures.

      (d)    Documents and Instruments. All documents and instruments of Debtor, now owned or hereafter acquired.

      (e)    General Intangibles, etc. All now existing or hereafter acquired general intangibles of every nature, all permits (to the extent that they may be assigned), regulatory approvals (to the extent that the same may be assigned), copyrights, patents, trademarks, service marks, trade names, mask works, good will, licenses (to the extent that they may be assigned), and all other intellectual property owned by Debtor or used in Debtor's business.

      (f)    Deposit Accounts. All deposit accounts, now existing or hereafter arising, maintained in Debtor's name with the Secured Party and any and all funds at any time held therein, including, but not limited to, the following accounts maintained with Secured Party:

            Operational Account #60-5000672
            LOC Marginal Account #01-9204953
            Restricted Reserve Account #01-5025866
            Marginal Account #60-5000727

      (g)    Books and Records. All now existing and hereafter acquired books and records relating to the foregoing Security Collateral and all equipment containing such books and records (including, without limitation, computer date and storage media).

-2-

(h)    Contracts.  Any and all agreements entered into by Debtor with Persons in connection with the management, development and operation of Borrower's business, as such may be amended, modified or substituted.

All proceeds of the foregoing Security Collateral.  For purposes of this Security Agreement, the term "proceeds" includes whatever is receivable or received when the Security Collateral or proceeds thereof is sold, collected, exchanged, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto.

**Ramallo Bros. Printing, Inc.**

By: _____
Name:  Alberto Ramallo Yllanes
Title:   President

Exhibit 10

## ASSIGNMENT OF LEASE AGREEMENT

THIS ASSIGNMENT OF LEASE AGREEMENT (the "Agreement"), entered into in the City of San Juan, Commonwealth of Puerto Rico, this 15th day of December, 2010, by and between:

**FIRSTBANK PUERTO RICO**, a banking corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its Senior Vice President, **MR. LUIS ORENGO**, who is of legal age, married, executive and resident of Trujillo Alto, Puerto Rico (the "**Assignee**"); and

**RAMALLO BROS. PRINTING, INC.** (hereinafter the "**Assignor**"), a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, herein represented by its President, Alberto Ramallo Yllanes, of legal age, single, executive and resident of San Juan, Puerto Rico.

## RECITALS

**WHEREAS**, Lender and Debtor entered into a Revolving Credit and Term Loans Agreement dated the date hereof, providing for (i) a term loan in the sum of **FIVE MILLION SIX HUNDRED FIFTY-SEVEN THOUSAND EIGHT HUNDRED FIFTY-TWO DOLLARS ($5,657,852.00)**, (ii) a term loan in the sum of **ONE MILLION NINE HUNDRED THOUSAND DOLLARS ($1,900,000.00)**, and (iii) loans in a revolving line of credit of up to **FIVE MILLION ONE HUNDRED SIXTY THOUSAND DOLLARS ($5,160,000.00)** (as modified and supplemented and in effect from time to time, the "Loan Agreement"), and the documents, instruments, and agreements ancillary thereto.

**WHEREAS**, Lender and Caribbean Printing Group, Inc. ("CP") entered into a Credit Agreement dated the date hereof, providing for (i) loans in a revolving line of credit of up to **TWO MILLION EIGHT HUNDRED TWENTY THOUSAND DOLLARS ($2,820,000.00)**, at any one time outstanding necessary for working capital of the Borrower and (ii) loans in a non-revolving line of credit of up to **ONE MILLION DOLLARS ($1,000,000.00)** (as modified and supplemented and in effect from time to time, the "CP Credit Agreement"), and the documents, instruments, and agreements ancillary thereto.

**WHEREAS**, to induce Lender to extend such credit under the Loan Agreement and the CP Loan Agreement, Assignee requires that the payment of the obligations of Assignor to Assignee be collaterally secured by the assignment to the Assignee of all of Assignor's right, title and interest in and to that certain Lease Agreement (hereafter "the Lease"), between Assignee, as Tenant, and the Municipio de San Juan, as Landlord (the "Municipality") dated December 15, 2010, a copy of which is attached hereto as **Exhibit B**.

- 2-

NOW THEREFORE, in consideration of the premises, and of the mutual and separate agreements, covenants, and warranties of the parties hereto, and for other good and valuable considerations, Assignor hereby:

1.    Assigns, conveys, transfers and sets over unto Assignee all of its right, title and interest in and to the Lease, and under any and all additions, supplements, renewals or other amendments thereof, to secure the payment of the Obligations.

2.    The Assignee shall not be obligated to perform or discharge any obligation under the Lease, or under or by reason of this Assignment, and the Assignor hereby agrees to indemnify the Assignee against and hold it harmless from any and all claims and demands whatsoever as well as from any and all liability, loss or damage which it may or might incur under the Lease or under or by reason of this Assignment.

3.    Assignor represents and warrants that: (i) it has complete right and title to the Lease; (ii) Assignor has not previously assigned or encumbered the same; (iii) Assignor has a good right to assign the same to Assignee as per the terms and conditions of a Landlord's Consent to Assignment of Lease as Security, executed by the Municipality on even date herewith; (iii) this Assignment shall be acknowledged and accepted by the Municipality as per the terms and conditions of a Landlord's Consent to Assignment of Lease as Security, executed by the Municipality on even date herewith; (iv) the Lease is valid and is in full force and effect; and (v) Assignor and/or the Municipality thereunder are not in default under the same.

4.    This Assignment has been duly authorized, executed and delivered by Assignor and is the valid, legal and binding obligation of Assignor.

5.    No term, covenants or provisions of the Lease prohibits or imposes a limitation upon the Lien and the rights of Assignee created hereby.

6.    This Assignment creates a valid Lien in favor of Assignee as security for the Obligations.

7.    The Assignor hereby further covenants and agrees as follows:

(a)    That the terms of the Lease will not be altered, modified or changed, nor will the Lease be surrendered or canceled, nor will Assignor sell, assign, mortgage, or otherwise constitute or permit any lien to attach to its leasehold rights under the Lease without the prior written consent of the Assignee, which consent shall not be unreasonably withheld or denied.

(b)    To perform promptly and completely its obligations under the Lease, it being expressly understood and agreed that each and every covenant and agreement of Assignor contained in the Lease shall survive this Assignment and shall remain the sole liability of the Assignor herein;

- 3 -

(c)     Guarantee to Assignee with reasonable commercial efforts the full and prompt performance by the Municipality of all of the Municipality's obligations under the Lease;

(d)     Not to agree or consent to any assignment of or subletting of the leased premises under the Lease, whether or not in accordance with its terms, without the prior written consent of Assignee which consent shall not be unreasonably withheld or denied;

(e)     Not to transfer, convey or permit a transfer or conveyance of the leased premises object of the Lease so as to cause a termination or changing of the obligations of Assignor under the Lease;

(f)     That upon payment of the Obligations, this assignment shall be rendered null and void and the said Lease shall be reassigned to Assignor.

8.     Assignor hereby agrees to execute, at the request of Assignee, any and all documentation and or public instruments deemed necessary to perfect the security afforded by this Assignment.

9.     This instrument shall be binding upon the Assignor and upon Assignor's heirs, executors, administrators, successors and assigns as the case may be, and shall inure to the benefit of Assignee, its successors, and assigns.

10.    To deliver to Assignee on the date of execution hereof the Landlord's consent to assignment in form and substance as set forth in **Exhibit A** hereto.

11.    A default under this Agreement shall be deemed to exist upon the occurrence of any of the following (each an "Event of Default"):

(a)     An "Event of Default" (as such term is defined in the Loan Agreement) shall occur; or

(b)     An "Event of Default" (as such term is defined in the CP Credit Agreement) shall occur; or

(c)     Debtor shall fail to perform or observe any other material term or condition of this Agreement and such failure shall remain unremedied for a period of fifteen (15) days after written notice from the Secured Party to the Debtor.  It shall not be construed that the fifteen (15) days period referenced in this subsection (c) shall have the effect of increasing any cure periods allowed under the Loan Agreement, the CP Credit Agreement, the Notes or the Loan Documents.

12.    If any Event of Default shall have occurred and be continuing:

- 4 -

(a)    The Assignee may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to them at law or in equity, all the rights and remedies of a secured party on default under the laws of the Commonwealth of Puerto Rico.

(b)    Assignee may enter the demised premises and hold such premises for the remainder of the term of the Lease, subject, nevertheless, to the rents, covenants, conditions and warranties of such Lease.

13.    **Certain Terms**.

The following terms, when used herein, including the recitals hereto, shall, unless the context otherwise requires, have the following meanings:

"Applicable Law" means and includes the applicable statutes and rules of the Commonwealth of Puerto Rico or of any other applicable jurisdiction and all applicable regulations promulgated thereunder and interpretations thereof by a governmental authority charged with the administration or the interpretation thereof, and all applicable statutes and orders, requests, directives, instructions and notices of any governmental authority of the Commonwealth of Puerto Rico or of any other applicable jurisdiction.

"Loan Documents" means, collectively, the "Loan Documents" as such term is defined in the Loan Agreement and the "Loan Documents" as such term is defined in the CP Credit Agreement.

"Notes" means, collectively, the "Notes" as such term is defined in the Loan Agreement and the "Notes" as such term is defined in the CP Credit Agreement.

"Obligations" means any and all debts, obligations, and liabilities of Assignor to the Assignee, arising out of or related to this Agreement, the Loan Agreement, the CP Credit Agreement, the Notes and the other Loan Documents (whether principal, interest, fees, or otherwise, whether now exiting or hereafter arising, whether voluntary or involuntary, whether or not jointly owed with others, whether direct or indirect, absolute or contingent, contractual or tortuous, liquidated or unliquidated, arising by operation of law, or otherwise, whether or not from time to time decreased or extinguished and later increased, created or incurred, and whether or not extended, modified, rearranged, restructured, refinanced, or replaced, including without limitation, modifications to interest rates or other payment terms of such debts, obligations, or liabilities).

14.    **Definitions**. All terms used in this Agreement that are defined in the Loan Agreement and the CP Credit Agreement and that are not otherwise defined herein shall have the meanings herein as set forth in the Loan Agreement and the CP Credit Agreement.

- 5 -

15.    **Entire Agreement**.  If any of the provisions of this Agreement shall be held invalid or unenforceable, this Agreement shall be construed as if not containing those provisions and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

16.    **Consent to Jurisdiction; Choice of Law**.

THE ASSIGNOR BY ITS EXECUTION HEREOF (A) HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE COMMONWEALTH OF PUERTO RICO FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, AND (B) HEREBY WAIVES TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH PROCEEDING, ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF THE ABOVE-NAMED COURTS, THAT ITS PROPERTY IS EXEMPT OR IMMUNE FROM ATTACHMENT OR EXECUTION, THAT ANY SUCH PROCEEDING BROUGHT IN ONE OF THE ABOVE-NAMED COURTS IS IMPROPER, OR THAT THIS AGREEMENT OR ANY INSTRUMENT EVIDENCING THE OBLIGATIONS, OR THE SUBJECT MATTER HEREOF OR THEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT.

THIS AGREEMENT SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO.

17.    **Amendment**.  This Agreement may not be amended or modified, except by a writing signed by each of the parties hereto.

18.    **Addresses for Notices**.  All demands, notices, and other communications to Assignor or Assignee provided for hereunder shall be in writing and as provided in the Loan Agreement and the CP Credit Agreement.

18.    **Recordation.**  Assignee hereby agrees not to record this Agreement without Assignor's consent.

**[SIGNATURE PAGE FOLLOWS]**

- 6 -

**IN WITNESS WHEREOF**, the Assignor and Assignee have duly executed this instrument in the city and on the day and year first above written.

**FIRSTBANK PUERTO RICO**                    **RAMALLO BROS. PRINTING, INC.**

By: _____            By: _____
        Luis Orengo                                    Alberto Ramallo Yllanes
        Senior Vice President                          President

Affidavit Number: __4201__

Acknowledged and subscribed to before me in San Juan, Puerto Rico, this 15th day of December, 2010, by the above-signed persons, of the personal circumstances and in the capacities and representations stated above, both personally known to me.

NOTARY PUBLIC

CONFIDENTIAL, MISSION CAPITAL ADVISORS, LLC
Opened by Tessa Truex, Hudson Advisors
on 1/18/13 @ 11:19 AM from 12.233.4.94